Exhibit

**A**

Index of Documents Filed with Removal

| Exhibit Number | Description | Date Filed in State Court |
|---|---|---|
| A-1 | Harris County District Court Docket Sheet | N/A |
| A-2 | Original Petition (with Exhibit A) | 4/29/2019 |
| A-3 | Request for Citation | 4/29/2019 |
| A-4 | Affidavit of Service | 5/1/2019 |
| A-5 | Answer of Starr Indemnity and Liability Company | 5/14/2019 |

Harris County Docket Sheet



**Exhibit**

**A-1**

# 2019-29904

**COURT:**   152nd

**FILED DATE:**   4/29/2019

**CASE TYPE:**   Insurance

---

### AHG PROPERTIES LLC

Attorney: SAXE, TRACY A

### vs.

### STARR INDEMNITY AND LIABILITY COMPANY

Attorney: CURRAN, ALICIA G.

---

| Docket Sheet Entries | |
|---|---|
| **Date** | **Comment** |

**HCDistrictclerk.com**       AHG PROPERTIES LLC vs. STARR INDEMNITY AND          5/14/2019
LIABILITY COMPANY
Cause: 201929904       CDI: 7       Court: 152

## DOCUMENTS

| Number | Document | Post Jdgm | Date | Pgs |
|---|---|---|---|---|
| 85243062 | Defendant Starr Indemnity And Liability Company's Answer And Affirmative Defenses to Plaintiff's Original Petition | | 05/14/2019 | 84 |
| 85048111 | Affidavit of Service | | 05/01/2019 | 3 |
| 85013321 | Plaintiffs' Original Petition | | 04/29/2019 | 28 |
| -> 85013323 | Civil Process Request | | 04/29/2019 | 1 |
| -> 85013322 | Exhibit A | | 04/29/2019 | 71 |

4/29/2019 4:20:50 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 33153551
By: CHAMBERS, WANDA R
Filed: 4/29/2019 4:20:50 PM

# Marilyn Burgess

## HARRIS COUNTY DISTRICT CLERK

201 Caroline | P.O. Box 4651 | Houston, Texas 77210-4651 | 832-927-5800 | www.hcdistrictclerk

**Exhibit**

**A-2**

### Request for Issuance of Service

**CASE NUMBER:** _____  **CURRENT COURT:** _____

**Name(s) of Documents to be served:** Plaintiffs' Original Petition _____

**FILE DATE:** 4/29/19_____ Month/Day/Year

**SERVICE TO BE ISSUED ON (Please List Exactly As The Name Appears In The Pleading To Be Served):**

**Issue Service to:** Starr Indemnity and Liability Company _____

Address of Service: 8401 N. Central Expressway, 5th Floor _____

City, State & Zip: Dallas, TX 75225 _____

Agent (if applicable) CT Corporation Systems, 1999 Bryan Street, Suite 900, Dallas, TX 75201

**TYPE OF SERVICE/PROCESS TO BE ISSUED:** (Check the proper Box)

| | | |
|---|---|---|
| ☒ Citation ☐ Citation by Posting | ☐ Citation by Publication | ☐ Citations Rule 106 Service |
| ☐ Citation Scire Facias | Newspaper_____ | |
| ☐ Temporary Restraining Order | ☐ Precept | ☐ Notice |
| ☐ Protective Order | | |
| ☐ Secretary of State Citation ($12.00) | ☐ Capias (not an E-Issuance) | ☐ Attachment |
| ☐ Certiorari | ☐ Highway Commission ($12.00) | |
| ☐ Commissioner of Insurance ($12.00) | ☐ Hague Convention ($16.00) | ☐ Garnishment |
| ☐ Habeas Corpus | ☐ Injunction | ☐ Sequestration |
| ☐ Subpoena | | |
| ☐ Other (Please Describe) _____ | | |

**(See additional Forms for Post Judgment Service)**

**SERVICE BY** *(check one)*:
☐ **ATTORNEY PICK-UP (phone)** _____  ☒ **E-Issuance by District Clerk**
☐ **MAIL to attorney at:** _____  **(No Service Copy Fees Charged)**
☐ **CONSTABLE**  *Note*: The email registered with EfileTexas.gov must be
☐ **CERTIFIED MAIL by District Clerk**  used to retrieve the E-Issuance Service Documents.
  Visit www.hcdistrictclerk.com for more instructions.

☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____  Phone: _____

☐ **OTHER**, *explain* _____

**Issuance of Service Requested By:** Attorney/Party Name: Tracy Alan Saxe  Bar # or ID 24094388

Mailing Address: Saxe Doernberger & Vita, P.C., 35 Nutmeg Drive, Ste. 140, Trumbull, CT 06611

Phone Number: (203) 287-2100 _____

Certified Document Number: 85013323 - Page 1 of 1



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 8, 2019

Certified Document Number:      85013323 Total Pages:  1

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

4/29/2019 4:20 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 33153551
By: Wanda Chambers
Filed: 4/29/2019 4:20 PM

CAUSE NO._____

| | | |
|---|---|---|
| AHG PROPERTIES, LLC and EASTWOOD TERRACE AND OAKHILL PLAZA, LLC, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| STARR INDEMNITY AND LIABILITY COMPANY, | § § § | |
| Defendant. | § § | _____ JUDICIAL DISTRICT |

**Exhibit**

**A-3**

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs AHG Properties, LLC and Eastwood Terrace and Oakhill Plaza, LLC (collectively, the "AHG Companies") file this Original Petition against Defendant Starr Indemnity and Liability Company ("Starr") and allege upon information and belief as follows:

## DISCOVERY CONTROL PLAN

1. Pursuant to Texas Rule of Civil Procedure 190.4, Plaintiffs request that this case be designated as a Level 3 case and a discovery control plan tailored to the circumstances of this specific suit be instituted.

## PARTIES

2. AHG Properties, LLC is a limited liability company formed in the State of Texas with its principal place of business in Harris County, Texas.

3. Eastwood Terrace and Oakhill Plaza, LLC is a limited liability company formed in the State of Texas with its principal place of business in Nacogdoches, Texas.

4. Starr is an insurance company incorporated in the State of Texas with its principal place of business in New York, New York.

Certified Document Number: 85013321 - Page 1 of 28

1

## JURISDICTION AND VENUE

5.  The amount in controversy exceeds this Court's minimum jurisdictional requirement exclusive of interest and costs, as Plaintiffs seek monetary relief over $1,000,000.00.

6.  This court has personal jurisdiction over Starr because Starr is a Texas insurance company, which is licensed to conduct business in the State of Texas and conducts such business in the State of Texas.

7.  Harris County is a proper venue because a substantial part of the events or omissions giving rise to the claims against Starr occurred in Harris County.  *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).

## FACTUAL BACKGROUND

### The Properties

8.  AHG Properties, LLC is a private residential real estate development company based in Houston, Texas that, among other things, owns and develops affordable housing projects throughout the United States.

9.  AHG Properties, LLC owns and operates several affordable housing projects in Texas, including Eastwood Terrace and Oakhill Plaza Apartments ("Eastwood Terrace"), a 192 unit affordable housing project located in Nacogdoches, Texas; Emerald Bay Apartments ("Emerald Bay"), a 248 unit affordable housing project in Houston, Texas; and Gulf Coast Arms Apartments ("Gulf Coast Arms"), a 162 unit affordable housing project in Houston, Texas.

10. In 2017, Eastwood Terrace, Emerald Bay, and Gulf Coast Arms were managed by the same property management company, ZG Real Estate Management Group, Inc. ("ZG Management"). ZG Management is also owned by AHG Properties.

Certified Document Number: 85013321 - Page 2 of 28

2

11. Eastwood Terrace and Gulf Coast Arms both participate in the U.S. Department of Housing and Urban Development's ("HUD") Section 8 Project Based Rental Assistance program. Pursuant to this program, low-income, elderly, and disabled individuals are able to apply for monetary assistance from HUD (i.e., a voucher/subsidy) to help pay for housing. A potential tenant, in conjunction with the owner (or owner's agent), completes an "Owner Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures" form (i.e., a HUD-50059 form), which collects information to determine an individual's eligibility, the recommended unit size the tenant is qualified for, and the amount the individual must pay towards rent and utilities.

12. Based upon the HUD-50059 form, it is determined what portion of the rent is paid by HUD directly to the property owner (i.e., the amount of the voucher/subsidy) and the portion of the rent that the tenant owes to the property owner. Therefore, the property owner receives the full rental value of the unit – a portion paid by HUD and a portion paid by the tenant.

13. The property owner subsequently submits a "Housing Owner's Certification and Application for Housing Assistance Payments" form (i.e., a HUD-52670 form) each month to HUD, which sets forth the amount HUD owes the property owner based upon all of the vouchered tenants residing at that property for that month.

**The Starr Policy**

14. Starr issued a "Resolute Portfolio" policy, policy number 1000057336161, to AHG Properties, LLC, which included two coverage sections: a "Directors & Officers Liability Coverage Section" and a "Crime and Fidelity Coverage Section" (hereinafter referred to as the "Starr Policy").

15. A true and accurate copy of the Starr Policy is attached as Exhibit A.

16. The Starr Policy has a policy period of November 3, 2016 to November 30, 2017.

3

17. AHG Properties, LLC subsequently renewed the policy with Starr from November 30, 2017 to November 30, 2018.

18. The Starr Policy includes a $1,000,000 limit of liability for the "Directors and Officers Liability Coverage Section."

19. The Starr Policy includes a $1,000,000 per occurrence limit of liability for the "Crime and Fidelity Coverage Section" (specifically for Insuring Agreement A, Employee Theft).

20. The AHG Companies are insureds on the Starr Policy.

21. ZG Management is an insured on the Starr Policy.

22. At all relevant times, the Starr Policy was in full force and effect.

### HUD's Management and Occupancy Review of Eastwood Terrace

23. On or around February 15, 2017, the Southwest Housing Compliance Corporation ("SHCC"), HUD's local performance-based contract administrator for Section 8 housing properties in Texas, conducted a two-day Management and Occupancy Review (often referred to as a "MOR") of the Eastwood Terrace property to assess the property's management and oversight. The SHCC's review included, in part, a physical inspection of the property and a review of Eastwood Terrace's tenant files.

24. During SHCC's on-site review of the Eastwood Terrace property, irregularities in tenant files were discovered, which suggested potential fraud by on-site ZG Management employees, who were in charge of maintaining those tenant files.

25. Those irregularities include, but are not limited to, incomplete and/or inaccurate information in tenants' HUD-50059 forms, incomplete move-in and move-out certifications, required documentation missing from tenants' files, and signatures on tenant paperwork that did

Certified Document Number: 85013321 - Page 4 of 28

not appear to match prior signatures (suggesting tenant signatures on paperwork were forged by ZG Management employees).

26. On February 16, 2017, based upon the SHCC's on-site review of the Eastwood Terrace property, the Office of Inspector General ("OIG") for HUD began a criminal investigation into the potential criminal activity at Eastwood Terrace.

27. Upon learning of the issues at Eastwood Terrace, the AHG Companies immediately began their own investigation into the issues at Eastwood Terrace and the actions of certain employees of ZG Management.  Legal counsel specializing in complex HUD matters and criminal defense counsel were hired to assist with the AHG Companies' defense and investigation.

28. The investigation uncovered numerous instances of theft by ZG Management employees of rent payments (in the form of money orders) from tenants at Eastwood Terrace, Emerald Bay, and Gulf Coast Arms.  Tenants would often pay their monthly rent with money orders and ZG Management employees would unlawfully take those money orders and not deposit them into the accounts of the AHG Companies, as they were supposed to do.

29. The investigation also indicated mismanagement and potential fraud with respect to the maintenance of tenant files at the Eastwood Terrace property by ZG Management employees, and at times in collusion with Eastwood Terrace tenants.  This resulted in certain tenants being assessed a lower portion of the rent then the tenant should have been paying, and HUD being assessed a higher portion of the rent than it should have been paying.

30. On March 17, 2017, SHCC issued a Management and Occupancy Review Summary Report (i.e., a HUD-9834 form) (hereinafter the "SHCC Report"), which set forth thirty-eight (38) findings based upon SHCC's on-site review of Eastwood Terrace.  According to the SHCC, the findings indicated serious, systemic issues at the Eastwood Terrace property that required prompt

Certified Document Number: 85013321 - Page 5 of 28

correction.  Each finding detailed the required corrective action and identified a period of time in which the AHG Companies must complete the corrective action – typically within 30 to 60 days.

31. The SHCC Report also required the AHG Companies conduct an audit of all files for all Eastwood Terrace tenant households that received Section 8 vouchers/subsidies from September 1, 2015 to the "present" (March 2017).

32. Pursuant to the SHCC Report, if the AHG Companies received HUD vouchers/subsidies for tenants that were not properly "vouchered" (i.e., if the tenants should have paid a larger amount of the rent, based upon the tenants' income, unit size, or otherwise), then the AHG Companies were obligated to pay HUD an amount equal to the amount of the unsupported vouchers/subsidies.

33. The SHCC Report also required the AHG Companies to correct a number of deficiencies in the physical appearance of the property, including the interior, exterior and common areas, to make the property compliant with HUD guidelines.

34. The SHCC Report is a written demand for monetary and non-monetary relief to the AHG Companies.

35. The AHG Companies provided notice of their insurance claims arising out of the SHCC Report to Starr on April 25, 2017, which included, in part, a request for Starr to pay legal and accounting fees associated with AHG Companies' investigation of the SHCC Report's findings.

36. Four business days later on May 1, 2017, after conducting no investigation, Starr denied the AHG Companies' claim for legal and accounting fees.

37. Starr also requested that the AHG Companies complete a sworn proof of loss with respect to the remainder of the AHG Companies' claims and provided the AHG Companies with a sample proof of loss form to complete, which only included the option to select (i.e., check-off a box) coverage under the "Crime and Fidelity Coverage Section."

Certified Document Number: 85013321 - Page 6 of 28

38. On August 3, 2017, the AHG Companies provided Starr with a proof of loss detailing the theft of money orders from tenants at Eastwood Terrace, Emerald Bay, and Gulf Coast Arms by ZG Management employees, and indicating that because of the fraudulent activities by ZG Management employees, the AHG Companies estimated that they would be required to pay HUD for certain unsupported subsidies/vouchers (estimated to be between $300,000 to $500,000 at that time).

39. On August 8, 2017, Starr issued a letter requesting additional information regarding the money order theft claim and taking no position with respect to insurance coverage for the amounts owed to HUD.

40. Due to the overwhelming scale of the full audit of all tenant files (more than 400 tenant files) and the inability to hire additional consultants to assist with the audit investigation due to Starr's wrongful denial of coverage for the AHG Companies' defense costs, the AHG Companies were unable to complete the full audit within sixty days (60) and the SHCC Report was not closed out until April of 2018, over a year after SHCC's initial on-site review.

41. On November 6, 2017, approximately eight months after the SHCC Report was issued, the AHG Companies received notice from the HUD Office of Inspector General's Audit Office, which indicated that an OIG audit team would be auditing a sample of tenant files (approximately 15 files) at Eastwood Terrace.

42. The next day on November 7, 2017 Starr issued a letter denying the portion of the claim related to payments to HUD under the "Crime and Fidelity Coverage Section" of the Starr Policy. The letter indicated that "the only potentially applicable Coverage Section is the Crime and Fidelity Coverage Section."

Certified Document Number: 85013321 - Page 7 of 28

43. Starr failed to analyze the HUD payments claim under the "Directors & Officers Liability Coverage Section" and wrongfully concluded that it was not even potentially applicable to the loss.

44. On November 9, 2017, Starr provided the AHG Companies with an agreement, which provided that the AHG Companies would be paid $75,000.00 as a partial payment of the money order theft claim.  In exchange for the partial payment, the AHG Companies would be required to release all rights with respect to the separate, unrelated HUD payments claim.

45. On November 14, 2017, an OIG audit team was on-site at Eastwood Terrace and began its sample tenant audit consisting of 15 tenant files.

46. At the same time, the AHG Companies were still trying to conduct their own audit/investigation (per the SHCC Report) of the tenant files alongside the OIG audit team.

47. If the AHG Companies had been able to complete their audit in a timely manner, the OIG audit team would have had no reason to conduct its own sample audit.

48. After completing the initial sample review and because of the poor results of that review, the OIG audit team returned approximately two months later and conducted a review of an additional 66 tenant files at Eastwood Terrace.

49. On January 15, 2018, the AHG Companies provided a copy of the SHCC Report to Starr and, again, the AHG Companies requested coverage for their ongoing defense and investigation costs in defending and investigating the findings in the SHCC Report.

50. On January 29, 2018, Starr issued another letter denying coverage for the defense and investigation costs incurred in connection with the SHCC Report.

Certified Document Number: 85013321 - Page 8 of 28

51. On June 26, 2018, a letter was sent on behalf of the AHG Companies to Starr providing additional documentation and correcting Starr's wrongful assertions in its January 29, 2018 denial letter.

52. On July 12, 2018 and July 26, 2018 Starr issued letters standing by its prior wrongful denials of coverage.

53. The OIG audit team issued a public report dated August 2, 2018 (the "OIG Report"). The OIG Report concluded that based upon the OIG audit team's review of the Eastwood Terrace tenant files, the following was found: "[the owner] (1) billed HUD for at least 81 tenants without the required documentation for recertifications and did not ensure that it could support the eligibility of its tenants, as certified on its reimbursement requests to HUD, (2) housed tenants in units larger than their family size should have allowed, and (3) failed to ensure that required annual inspections were conducted."

54. The OIG Report also concluded that the AHG Companies owe HUD an additional $1,865,344.00, representing the value of the vouchers/subsidies that were not supported by proper documentation (i.e., the amount of rent underpaid by the Eastwood Terrace tenants).

55. To date, the AHG Companies have paid HUD $297,622.00.

56. On December 21, 2018, the AHG Companies sent another comprehensive coverage letter to Starr requesting coverage for their defense costs, the HUD payments (both the portion of the HUD payments already paid to HUD – i.e., $297,622.00 and the portion still owed to HUD – i.e., $1,865,344.00), and the theft of money orders. In the letter, the AHG Companies specifically provided notice to Starr that Starr's continued failure to promptly pay under the terms of the Starr Policy was causing the AHG Companies significant distress and professional loss, including lost business opportunities, and additional costs and expenses for current business investments.

Certified Document Number: 85013321 - Page 9 of 28

57. On March 6, 2019, knowing the impact on the AHG Companies, Starr, with no due diligence or analysis, issued another letter denying coverage for the entirety of the AHG Companies' claim for defense costs, HUD payments, and, now, for the first time, the theft of the money orders.

### Insurance Coverage for the AHG Companies' Loss under the Starr Policy

58. The Starr Policy provides coverage for the following losses: (1) defense and investigation costs incurred in defending and investigating the SHCC Report and the OIG Report (the "Defense Costs"); (2) the amounts the AHG Companies already paid and are obligated to pay HUD representing unsupported tenant vouchers/subsidies that should have been paid by Eastwood Terrace tenants (the "HUD Payments"); (3) theft of money orders (i.e., rental payments) by ZG Management employees at Eastwood Terrace, Gulf Coast Arms, and Emerald Bay; (4) direct loss of revenue at Eastwood Terrace resulting from theft and forgery by ZG Management employees; and (5) direct loss of other property resulting from theft and forgery by ZG Management employees at Eastwood Terrace (collectively, the "Money Order Theft Loss").

### Defense Costs under the Starr Policy

59. The Starr Policy's "Directors & Officers Coverage Section" provides coverage for the defense and investigation costs incurred by the AHG Companies in defending and investigating the SHCC Report and the OIG Report.

60. Insuring Agreement C. of the "Directors & Officers Coverage Section" provides that Starr shall pay for "Loss" on behalf of the AHG Companies arising from a "Claim" that is made and reported during the policy period for a "Wrongful Act" in accordance with the terms of the Starr Policy.

Certified Document Number: 85013321 - Page 10 of 28

61. The SHCC Report and the OIG Report constitute a "Claim" under the Starr Policy as they are written demands for monetary and non-monetary relief made against the AHG Companies.

62. "Loss" is defined in the Starr Policy to expressly include reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a "Claim."

63. The SHCC Report and the OIG Report allege wrongful acts and omissions by the AHG Companies in failing to comply with requirements set by HUD.

64. The "Claim" was made and reported in accordance with the requirements of the Starr Policy.

### Payments to HUD under the Starr Policy

65. The Starr Policy's "Directors & Officers Coverage Section" and the "Crime and Fidelity Coverage Section" both provide coverage for the amounts the AHG Companies have already paid to HUD and the remaining amounts the AHG Companies are obligated to pay HUD for unsupported tenant vouchers/subsidies.

66. HUD's demand for monetary relief, as set forth in the SHCC Report and the OIG Report, constitutes a "Claim" for a "Wrongful Act" and seeks covered damages under Insuring Agreement C. of the "Directors & Officers Coverage Section."

67. The "Claim" was made and reported in accordance with the requirements of the Starr Policy.

68. The HUD Payments are also covered under Insuring Agreement A ("Employee Theft") of the "Crime and Fidelity Coverage Section." Insuring Agreement A provides that Starr shall pay the AHG Companies for direct loss of "Money, Securities or Other Property" sustained by the AHG Companies resulting from theft or forgery committed by an employee of ZG Management, whether identified or not, acting alone or in collusion with other persons.

Certified Document Number: 85013321 - Page 11 of 28

69. ZG Management employees committed theft and forgery, at times in collusion with Eastwood Terrace tenants, which resulted in a direct loss of money in the amount of approximately $2,162,966.00 (i.e., the amounts already paid to HUD and the remaining amounts the AHG Companies owe to HUD).

70. ZG Management employees, at times in collusion with Eastwood Terrace tenants, stole from the AHG Companies (i.e., unlawfully took money to the detriment of the AHG Companies) when they forged signatures on tenant applications, tenant eligibility certifications, move-in paperwork, and lease agreements, which contained inaccurate and falsified information and resulted in tenants paying less than their required portion of the rent for their units at the Eastwood Terrace property.

71. As a result of the forgeries, the AHG Companies submitted inaccurate monthly "Housing Owner's Certification and Application for Housing Assistance Payments" forms (i.e., HUD - 52670 forms) setting forth the portion of the rent the tenants owed and the portion HUD owed to the AHG Companies.  These inaccurate HUD-52670 forms resulted in the Eastwood Terrace tenants paying less than their required portion of the rent, and HUD paying more than its required portion.

72. The AHG Companies are obligated to pay HUD for those additional amounts that should have been paid by the tenants (and have already paid HUD a portion of those amounts), resulting in a direct loss of money from "Theft" and "Forgery" under the Starr Policy.

**Employee Theft of Money Orders under the Starr Policy**

73. The Starr Policy's "Crime and Fidelity Coverage Section" also provides coverage for (1) direct loss of money resulting from theft of tenant rental payments (in the form of money orders) by ZG Management employees from tenants at Eastwood Terrace, Gulf Coast Arms, and Emerald

Bay; (2) the direct loss of revenue resulting from theft and forgery by ZG Management employees at Eastwood Terrace; and (3) the direct loss of other property resulting from theft and forgery by ZG Management employees.

74. Insuring Agreement A provides that Starr shall pay the AHG Companies for direct loss of "Money, Securities or Other Property" sustained by the AHG Companies resulting from theft or forgery committed by an employee of ZG Management, whether identified or not, acting alone or in collusion with other persons.

75. Insuring Agreement A provides coverage for the AHG Companies' loss of money resulting from ZG Management employees who stole rental payments (in the form of money orders) that should have been deposited in the AHG Companies' accounts.

76. The AHG Companies also suffered a direct loss of revenue as a result of theft and forgery committed by ZG Management employees.

77. The AHG Companies also suffered a direct loss of other property as a result of theft and forgery committed by ZG Management employees.

## Starr's Bad Faith

### Starr Failed To Adequately Investigate the AHG Companies' Claim for Defense Costs

78. The AHG Companies' insurance broker provided notice of a claim to Starr on April 25, 2017 on behalf of the AHG Companies by providing an e-mail with a "rough outline" of the loss. The e-mail included a request for coverage for legal fees and accounting fees that the AHG Companies were currently incurring.

79. Four business days later, on May 1, 2017, Starr denied the AHG Companies' request for defense and investigation costs in connection with the SHCC Report and requested the AHG Companies fill out a proof of loss.

Certified Document Number: 85013321 - Page 13 of 28

80. At no point prior to the May 1, 2017 denial did Starr contact the AHG Companies or any of their employees to discuss the nature of the loss or claim, or inquire as to why they were incurring defense and investigation costs.

81. Starr requested the AHG Companies fill out a sworn proof of loss and provided a specific template form to fill out.  The proof of loss form only gave the AHG Companies the option to select (i.e., check off) coverage under the "Crime and Fidelity Coverage Section" and had no reference to, or option for selecting, coverage under the "Directors & Officers Coverage Section."

82. In the AHG Companies' original notice it did not indicate that they were only providing notice under a specific coverage section of the Starr Policy, but rather they sought coverage for the AHG Companies under the entirety of the Starr Policy (i.e., including both the "Directors & Officers Liability Coverage Section" and the "Crime and Fidelity Coverage Section").

83. However, Starr purposefully directed the AHG Companies' claim towards the "Crime and Fidelity Coverage Section" and intentionally misled the AHG Companies into believing their defense costs were not covered under any other coverage section in the Starr Policy to avoid having to pay costly legal and accounting fees.

**Starr Failed to Investigate and Adjust the HUD Payments Claim under the Directors & Officers Coverage Section**

84. AHG Companies submitted a sworn proof of loss to Starr on behalf of the AHG Companies on or around August 3, 2017.

85. The August 2017 proof of loss identified the following events: (1) the Office of Inspector General for HUD was conducting an investigation into the Eastwood Terrace property; (2) HUD had demanded payment of rental subsidies due to the employee theft, and (3) the AHG Companies were in the process of assessing the total amount it would need to pay to HUD – at the time estimated to be between $300,000.00 to $500,000.00.

14

86. On August 8, 2017, Starr issued a preliminary coverage letter requesting additional information regarding the loss of money orders and acknowledging the AHG Companies' request for coverage for the HUD Payments.

87. Notably, Starr failed to analyze coverage available to the AHG Companies for the HUD Payments under the Policy's "Directors & Officers Coverage Section."  Instead, Starr included the following language in its coverage analysis: "The Policy contains Coverage Sections for Directors & Officers Liability, and Crime and Fidelity.  Based on the information provided in the POL, the only potentially applicable Coverage Section is the Crime and Fidelity Coverage Section.  Please let us know if you disagree."  Starr expressly put the onus on its own insured to adjust and assess coverage under the Starr Policy.  Starr also misled the AHG Companies to believe that the HUD Payments would not be covered under the "Directors & Officers Coverage Section" and that the "only potentially applicable" coverage section was the "Crime and Fidelity Coverage Section."

88. Starr conducted no investigation, except for reading the information contained in the proof of loss, to wrongfully conclude that the Starr Policy did not provide coverage under the "Directors & Officers Liability Coverage Section" for the HUD Payments.  In reality, the Starr Policy's "Directors & Officers Coverage Section" does provide coverage for the HUD Payments.

**Starr Sought to Manipulate the AHG Companies into Signing a Partial Claim Release Agreement, which Required Release of the AHG Companies' Higher Value Claim**

**The November 2017 Partial Claim Release**

89.  On November 9, 2017, Starr offered the AHG Companies $75,000.00 in exchange for the AHG Companies signing a document titled "Partial Claim Release."  At the time, the estimated value of the stolen money orders was approximately $150,000.00.  The Partial Claim Release provided that Starr would pay a "partial payment" of the money order theft and that the AHG

Certified Document Number: 85013321 - Page 15 of 28

Companies "reserve[d] the right to seek further coverage for the Money Order Loss[1] in [the] event it obtains and submits to Starr additional evidence...."   The Partial Claim Release also acknowledged that "Starr ha[d] determined that the Policy potentially would coverage [sic] for the Money Order Loss...."   However, Section Two of the Partial Claim Release required the AHG Companies to release Starr from all liability resulting from the "HUD Payment Loss"[2]  and the "Espinoza Loss."[3]

90. Starr failed to effectuate a prompt, fair, and equitable settlement of AHG Companies' money order theft claim when it premised partial payment of that loss, upon the release of the AHG Companies' other (more valuable) claim under the Starr Policy (i.e., the HUD Payments claim).

91. Because AHG Properties did not want to release their claim for the HUD Payments, they refused to sign the "Partial Claim Release" and received no partial payment from Starr for the stolen money orders.

92. In November 2017, Starr knew or had reason to know that the AHG Companies were experiencing significant distress and professional loss due to the SHCC and OIG investigations into the Eastwood Terrace property, and the expenses that arose out of the investigations and employee theft.   During this time period, AHG Properties, LLC was forced to discontinue its management company, ZG Management, and hire a new management company at an additional expense.   Furthermore, several of the AHG Companies' other business deals were in jeopardy because of the AHG Companies' lack of liquidity and ongoing issues with HUD.

---

[1] The Partial Claim Release defined "Money Order Loss" as "the apparent misappropriation by former AHG employees of money orders that had been tendered to those employees by tenants of certain AHG properties."
[2] The Partial Claim Release defined "HUD Payment Loss" as "AHG's reimbursement to the United States Department of Housing and Urban Development ("HUD") for rent overpayments HUD made to AHG...."
[3] The Partial Claim Release defined "Espinoza Loss" as "the suspected theft of materials and equipment/tools from AHG Properties by Espinoza Contracting...."

Certified Document Number: 85013321 - Page 16 of 28

93. Starr took advantage of the AHG Companies at a time when it knew they were desperate and in need.

## The December 2018 Release

94. On December 10, 2018, a representative for the AHG Companies contacted Starr because he had been told by a Starr underwriter that Starr had "closed out" the AHG Companies' claim. He emphasized the significant losses AHG Companies had incurred and the business opportunities AHG Companies had lost because the claim with Starr had not been resolved.  The representative also inquired about the November 2017 Partial Claim Release and whether Starr would issue the $75,000 payment, as it had previously agreed, without a release.  Starr indicated, in response, that its file was still open and forwarded a new document titled "Release and Assignment" for the AHG Companies' signature.

95. The December 2018 Release and Assignment agreement, however, was not a partial payment of the money order loss as previously agreed, instead it was a settlement in full satisfaction of the money order loss.  The new agreement did not permit the AHG Companies to provide further evidence of the stolen money orders in the event additional information was discovered, and the newly drafted Release and Assignment required that the AHG Companies waive all rights of recovery for the money order loss.

96. A representative of the AHG Companies asked Starr to issue the $75,000 payment without a release as a payment for the undisputed amount of the money order loss (as Starr had previously agreed to do in November of 2017).

97. Contrary to its prior position, Starr now tried to claim that the $75,000 payment was a compromise settlement for the entire money order loss and that a release was required.  Starr also

admitted that it would not require the AHG Companies to release their other claims under the policy (i.e., the HUD Payments claim and the Espinoza Loss).

**The January 2019 Partial Claim Release**

98. After AHG Properties disputed the terms of the December 2018 Release and Assignment agreement and pointed out Starr's inconsistent positions regarding coverage for the theft of money orders, Starr yet again proposed a new Partial Claim Release agreement on January 10, 2019. The agreement was still unacceptable, and the AHG Companies proposed red-line edits to the agreement on January 15, 2019 and requested that Starr confirm the AHG Companies' edits were acceptable, as a representative would then sign the agreement and finally receive a partial payment of the money order loss. A representative of the AHG Companies followed up with Starr on January 25, 2019 and was advised that Starr was still reviewing the proposed edits to the agreement.

99. The AHG Companies have received no further correspondence or communication from Starr regarding the proposed edits to the new Partial Claim Release agreement.

100.     Starr has failed to pay any amounts owed to the AHG Companies for their claims under the Starr Policy.

**COUNT ONE: BREACH OF CONTRACT**
**AHG COMPANIES AGAINST STARR**

101.   The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein.

102.   The Starr Policy is a valid and enforceable written contract effective November 3, 2016 and renewed on November 30, 2017.

103.  The AHG Companies provided timely notice of the claims to Starr and complied with all necessary conditions and other terms of the Starr Policy or is otherwise excused from the performance of those conditions and terms.

104.  Pursuant to the terms of the Starr Policy, Starr is required to provide coverage to AHG Companies for their Defense Costs, the HUD Payments, and the Money Order Theft Loss.

105.  Starr has failed and/or refused to provide coverage to the AHG Companies their Defense Costs, the HUD Payments, and the Money Order Theft Loss.

106.  Starr's failure and/or refusal to provide coverage to the AHG Companies for their Defense Costs, the HUD Payments, and the Money Order Theft Loss is a breach of the express terms of the Starr Policy.

107.  As a result of Starr's breach, the AHG Companies have suffered, and continue to suffer, damages.

## COUNT TWO: ATTORNEYS' FEES
### AHG COMPANIES AGAINST STARR

108.  The allegations in paragraphs 1 through 107 are hereby repeated and realleged as if set forth fully herein.

109.  In accordance with Tex. Civ. Prac. & Rem. Code § 38.002, the AHG Companies present this breach of contract claim to Starr and demand Starr pay the full value of the AHG Companies' claim under the Starr Policy within thirty days of this demand.

110.  The AHG Companies have retained counsel and are entitled to recover their reasonable attorneys' fees and expenses pursuant to Tex. Civ. Prac. & Rem. § 38.001.

111.  Starr is advised that if it fails to tender the amount demanded within thirty days, the AHG Companies will seek an award of attorneys' fees in accordance with Chapter 38 of the Texas Civil Practice and Remedies Code.

Certified Document Number: 85013321 - Page 19 of 28

## COUNT THREE: DECLARATORY JUDGMENT AGAINST STARR
### AHG COMPANIES AGAINST STARR

112.   The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein.

113.   Pursuant to Tex. Civ. Prac. & Rem. § 37.003, the AHG Companies request that this Court declare the AHG Companies' right to insurance coverage for their Defense Costs, HUD Payments, and Money Order Theft Loss under the Starr Policy.  Specifically, the AHG Companies request a declaration that:

a.   The Starr Policy provides coverage to AHG Companies for their Defense Costs;

b.   The Starr Policy provides coverage to the AHG Companies for the portion of the HUD Payments that the AHG Companies have already paid to HUD;

c.   The Starr Policy provide coverage to the AHG Companies for any additional portion of the HUD Payments that the AHG Companies have to pay to HUD; and

d.   The Starr Policy provides coverage to the AHG Companies for the Money Order Theft Loss.

114.   Pursuant to Tex. Civ. Prac. & Rem. § 37.009, the AHG Companies respectfully request this Court issue an award of costs and attorneys' fees.

## COUNT FOUR: VIOLATION OF CHAPTER 541 OF THE TEXAS INSURANCE CODE
### AHG COMPANIES AGAINST STARR

115.   The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein.

116.   Pursuant to Tex. Ins. Code § 541.151, the AHG Companies have sustained actual damages caused by Starr engaging in acts and/or practices that constitute unfair or deceptive acts

Certified Document Number: 85013321 - Page 20 of 28

or practices in the business of insurance, as set forth in Subchapter B of Chapter 541 of the Texas Insurance Code.  Specifically, Starr's violations include, but are not limited to:

    a.  A violation of Tex. Ins. Code § 541.060(a)(2)(A), which provides that "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of…a claim with respect to which the insurer's liability has become reasonably clear…" is an unfair or deceptive act or practice.  Here, the AHG Companies sent two comprehensive coverage letters to Starr setting forth the law and facts that establish that the AHG Companies are entitled to coverage under the Starr Policy and Starr took no action to offer a fair and prompt payment of the AHG Companies' claims. Instead, Starr, having knowledge that the Starr Policy provided coverage to the AHG Companies, continued to deny their claims.

    b.  A violation of Tex. Ins. Code § 541.060(a)(2)(B), which provides that "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of…a claim under one portion of the policy with respect to which the insurer's liability has become reasonably clear to influence the claimant to settle another claim under another portion of the coverage…" is an unfair or deceptive act or practice.  Here, Starr failed to effectuate a prompt, fair, and equitable settlement of the money order loss when Starr required in its November 2017 "Partial Release" that the AHG Companies release their HUD Payments claim (an unrelated, but higher value claim) in order to receive partial payment for the money order loss.  Notably, Starr did not require that the AHG Companies release their rights to seek additional coverage for the money order loss – it only required the AHG Companies to release their HUD Payments claim.  Texas law prohibits Starr from requiring that the AHG

Certified Document Number: 85013321 - Page 21 of 28

21

Companies release a separate, unrelated claim, in order to receive payment for a different claim under the Starr Policy.

c.   A violation of Tex. Ins. Code § 541.060(a)(1), which provides that "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue" is an unfair or deceptive act or practice.   Here, Starr misrepresented to the AHG Companies that the "Directors & Officers Coverage Section" of the Starr Policy would not provide coverage for their claims.   Starr's August 8, 2017 coverage position letter stated that "[b]ased on the information provided in the POL, the **only potentially applicable** Coverage Section is the Crime and Fidelity Coverage Section…" (emphasis added).   However, Starr knew (or should have known) that the Defense Costs and HUD Payments were clearly covered under the "Directors & Officers Coverage Section" of the Starr Policy.

d.   A violation of Tex. Ins. Code § 541.060(a)(6), which provides that "undertaking to enforce a full and final release of a claim from a policyholder when only a partial payment has been made, unless the payment is a compromise settlement of a doubtful or disputed claim…" is an unfair or deceptive act or practice.   Here, Starr agreed to provide the AHG Companies with a partial payment towards the money order loss, however, never provided such payment and through a series of proposed agreements Starr attempted to deceive the AHG Companies into releasing their rights.   First, in the November 2017 proposed partial release agreement, Starr agreed to provide the AHG Companies with a partial payment of the money order loss if they released the higher value HUD Payments claim.   Second, in December 2018, after a representative of AHG Companies had requested Starr pay $75,000.00

22

in partial satisfaction of the money order loss (as it previously had agreed to in November 2017), Starr provided the AHG Companies with a new agreement. The new agreement was a full release of the money order loss (not a partial payment). Starr has failed to provide partial payment of the money order loss and wrongfully insists the AHG Companies execute a full release in violation of Tex. Ins. Code § 541.060(a)(6).

e.  A violation of Tex. Ins. Code § 541.060(a)(7), which provides that "refusing to pay a claim without conducting a reasonable investigation with respect to a claim" is an unfair or deceptive act or practice. Here, Starr denied the AHG Companies' request for coverage for legal fees and accounting costs four days after the AHG Companies had provided notice of the claim to Starr. Starr conducted no investigation into the loss – Starr did not contact the insured or its employees to discuss the nature of the loss and instead wrongfully denied the claim under the "Crime and Fidelity Coverage Section," when the Starr Policy clearly provided coverage for such defense and investigation costs under the "Directors & Officers Liability Coverage Section."

117. Pursuant to Tex. Ins. Code § 541.152(a), the AHG Companies seek actual damages caused by Starr's violation, plus court costs and reasonable and necessary attorneys' fees; and any other relief that this Court determines is proper.

118. The AHG Companies' "actual damages" include, but are not limited to, all direct, consequential and special damages, including but not limited to, the benefits under the Starr Policy that the AHG Companies are entitled to, the increased costs incurred by the AHG Companies due to Starr's bad acts (including lost past and future profits, additional interest, expenses and costs),

Certified Document Number: 85013321 - Page 23 of 28

lost business opportunities (including lost future profits), loss of credit reputation (including loss of loan proceeds and resulting damage), and loss of business reputation.

119.  Pursuant to Tex. Ins. Code § 541.152(c), because Starr knowingly committed the acts set forth above, the AHG Companies seek an award for three times the amount of their actual damages.

**COUNT FIVE: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT AGAINST STARR**
**AHG COMPANIES AGAINST STARR**

120.  The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein, as well as the allegations set forth in paragraphs 115 through 119.

121.  The AHG Companies constitute "consumers" under Tex. Bus. & Com. Code § 17.45.

122.  Pursuant to Tex. Bus. & Com. Code § 17.50(a)(4), Starr's violations of Chapter 541 of the Texas Insurance Code, as set forth in more detail in paragraphs 116 and 119, were the producing cause of the AHG Companies' economic damages.

123.  Pursuant to Tex. Bus. & Com. Code § 17.50(b)(1), the AHG Companies seek economic damages as determined by the trier of fact, along with an award of three time the amount of economic damages for Starr's knowing violations of Chapter 541 of the Texas Insurance Code.

124.  The AHG Companies' economic damages include, but are not limited to, all direct, consequential and special damages, including but not limited to, the benefits under the Starr Policy that the AHG Companies are entitled to, the increased costs incurred by the AHG Companies due to Starr's bad acts (including lost past and future profits, additional interest, expenses and costs), lost business opportunities (including lost future profits), loss of credit reputation (including loss of loan proceeds and resulting damage), and loss of business reputation.

125.  Pursuant to Tex. Bus. & Com. Code § 17.50(d), the AHG Companies seek court costs and reasonable and necessary attorneys' fees.

Certified Document Number: 85013321 - Page 24 of 28

## COUNT SIX: COMMON LAW BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### AHG COMPANIES AGAINST STARR

126.  The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein, and paragraphs 116 through 119.

127.  Pursuant to Texas law, Starr has a duty to act in good faith and to deal fairly with the AHG Companies in the processing of their insurance claims.

128.  Starr breached this duty when it denied the AHG Companies' claims for Defense Costs, the HUD Payments, and the Money Order Theft Loss, and it knew or should have known that it was reasonably clear the claims were covered under the Starr Policy.

129.  AHG Companies damages include, but are not limited to, all direct, consequential and special damages, including but not limited to, the benefits under the Starr Policy that the AHG Companies are entitled to, the increased costs incurred by the AHG Companies due to Starr's bad acts (including lost past and future profits, additional interest, expenses and costs), lost business opportunities (including lost future profits), loss of credit reputation (including loss of loan proceeds and resulting damage), and loss of business reputation.

## COUNT SEVEN: VIOLATION OF THE TEXAS PROMPT PAYMENT OF CLAIMS ACT AGAINST STARR
### AHG COMPANIES AGAINST STARR

130.  The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein.

131.  The Texas Prompt Payment of Claims Act requires insurers to pay claims within 60 days of receiving all items, statements, and forms reasonably requested and required under Tex. Ins. Code § 542.055.

Certified Document Number: 85013321 - Page 25 of 28

132. Starr has failed to pay the AHG Companies' Defense Costs covered under the Starr Policy in violation of Tex. Ins. Code § 541.058.

133. Pursuant to Tex. Ins. Code § 542.060, the AHG Companies seek the amount of the claim, plus interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable and necessary attorneys' fees.

**COUNT EIGHT: EXEMPLARY DAMAGES AGAINST STARR**
**AHG COMPANIES AGAINST STARR**

134. The allegations in paragraphs 1 through 100 are hereby repeated and realleged as if set forth fully herein.

135. Starr knew, through correspondence with AHG, that its failure to promptly pay the AHG Companies for their claims under the Starr Policy would result in financial ruin to the AHG Companies, and still failed to tender such payment.

136. Pursuant to Tex. Civ. Prac. & Rem. § 41.003, the AHG Companies seek exemplary damages resulting from Starr's gross negligence, fraud, and/or malice.

**CONDITIONS PRECEDENT**

137. The AHG Companies have satisfied all conditions precedent under the Starr Policy, including, but not limited to, the payment of premium, notice, and payment of any required retention. All conditions precedent to the AHG Companies' claims for relief have been satisfied.

138. The AHG Companies have complied with the notice requirements of Tex. Ins. Code § 541.154 and Tex. Bus. & Com. Code § 17.505.

**JURY DEMAND**

139. The AHG Companies demand a jury trial and tender the appropriate fee with this Petition.

Certified Document Number: 85013321 - Page 26 of 28

## REQUEST OF DISCLOSURE TO STARR

140. The AHG Companies request that Starr disclose, within 50 days of the service of this Petition, the information or material described in Texas Rule of Civil Procedure 194.2.

## PRAYER

141. The AHG Companies respectfully request that this Court enter judgment in favor of the AHG Companies and against Starr as follows:

    a.  Damages resulting from Starr's breach of the Starr Policy, along with attorneys' fees and costs;

    b.  A declaration that the Starr Policy provides coverage for the AHG Companies' loss as set forth in paragraph 113, along with attorneys' fees and costs;

    c.  Actual damages (as set forth in paragraph 118), costs and attorneys' fees, and an award of treble damages pursuant to Tex. Ins. Code § 541.152;

    d.  Economic damages (as set forth in paragraph 112), costs and attorneys' fees, and an award of treble damages pursuant to Tex. Bus. & Com. Code § 17.50;

    e.  Actual damages (as set forth in paragraph 129) caused by Starr's breach of its duty of good faith and fair dealing;

    f.  18% annual interest pursuant to the Texas Prompt Payment of Claims Act;

    g.  Exemplary damages as determined by the trier of fact;

    h.  Pre-judgment and post-judgment interest as permitted by law;

    i.  All costs of Court; and

    j.  Such other relief, at law or in equity, to which the AHG Companies are justly entitled.

Respectfully submitted,

SAXE DOERNBERGER & VITA P.C.

By:     /s/ Tracy Alan Saxe_____
       Tracy Alan Saxe
       Texas State Bar No. 24094388
       35 Nutmeg Drive, Suite 140
       Trumbull, CT 06611
       Telephone: (203) 287-2100
       Fax: (213) 784-9073
       E-mail: tas@sdvlaw.com

Attorneys for Plaintiffs,
*The AHG Companies*

Certified Document Number: 85013321 - Page 28 of 28



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 8, 2019

Certified Document Number:        85013321 Total Pages:  28

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# **<u>EXHIBIT A</u>**

Certified Document Number: 85013322 - Page 1 of 71

## STARR INDEMNITY AND LIABILITY COMPANY

399 Park Avenue, New York, NY 10022 • Tel. (646) 227-6377

## RESOLUTE PORTFOLIO<sup>SM</sup>

For Private Companies

**POLICY NUMBER: 1000057336161**
**RENEWAL OF: N/A**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section):**
**EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section):**
**THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS.  AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section):**
**THE INSURER HAS NO DUTY TO DEFEND ANY CLAIM UNDER THIS POLICY EXCEPT WITH RESPECT TO ANY CLAIM FOR WHICH THE POLICY SPECIFICALLY STATES THAT DUTY TO DEFEND COVERAGE IS PROVIDED.**

**NOTICE (Applicable to All Coverage Sections): PLEASE READ THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

## DECLARATIONS - TEXAS

**ITEM 1:**  **PARENT COMPANY:**       AHG Properties, LLC

  **ADDRESS:**       1980 Post Oak Blvd
                     Suite 2020
                     Houston, TX 77056

**ITEM 2:**  **POLICY PERIOD:**       From: November 3, 2016       To: November 3, 2017
                     (12:01 a.m. Standard Time at the address stated in Item 1)

**ITEM 3:**  **COVERAGE SECTIONS**

This policy provides coverage only for the following Coverage Sections if purchased by the **Insured** and indicated by an X.

| | | |
|---|---|---|
| Directors & Officers Liability Coverage Section | Yes  X | No |
| Derivative Demand Coverage | Yes  X | No |
| Employment Practices Liability Coverage Section | Yes ___ | No  X |
| Third-Party Liability Coverage | Yes ___ | No  X |
| Fiduciary Liability Coverage Section | Yes ___ | No  X |

1 of 5

CVS FL 10549 PV (6/09)

Certified Document Number: 85013322 - Page 2 of 71

| Voluntary Compliance Program Coverage | Yes _____ | No _X____ |
| Crime and Fidelity Coverage Section | Yes _X____ | No _____ |

**DECLARATIONS** (continued)                          **POLICY NO.: 1000057336161**

**ITEM 4:  LIMITS OF LIABILITY**

The Limits of Liability of this policy apply solely to the Coverage Section(s) for which a corresponding limit of liability amount is set forth below.

**A.     AGGREGATE LIMIT OF LIABILITY FOR EACH SEPARATE COVERAGE SECTION OTHER THAN THE CRIME AND FIDELITY COVERAGE SECTION**

**(i)**

| Separate Coverage Section: Directors & Officers Liability | $1,000,000 |
| Sublimit of Liability for Derivative Demand Coverage | $250,000 |

**(ii)**

| Separate Coverage Section: Employment Practices Liability | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |

**(iii)**

| Separate Coverage Section: Fiduciary Liability | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

Each Sublimit of Liability set forth in Item 4 A. above is part of, and not in addition to, the Limit of Liability for the corresponding Separate Coverage Section.

**B.     AGGREGATE LIMIT OF LIABILITY FOR EACH COMBINED COVERAGE SECTION OTHER THAN THE CRIME AND FIDELITY COVERAGE SECTION**

**(i)**

| Combined Coverage Section: Directors & Officers Liability / Employment Practices Liability / Fiduciary Liability | N/A |
| Sublimit of Liability for Derivative Demand Coverage | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

**(ii)**

| Combined Coverage Section: Directors & Officers Liability / Employment Practices Liability | N/A |
| Sublimit of Liability for Derivative Demand Coverage | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |

**(iii)**

| Combined Coverage Section: Directors & Officers Liability / Fiduciary Liability | N/A |

CVS FL 10549 PV (6/09)

Certified Document Number: 85013322 - Page 3 of 71

| Sublimit of Liability for Derivative Demand Coverage | N/A |
|---|---|
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

**DECLARATIONS** (continued)                    **POLICY NO.: 1000057336161**

**(iv)**

| Combined Coverage Section:<br>Employment Practices Liability / Fiduciary Liability | N/A |
|---|---|
| Sublimit of Liability for Third-Party Liability Coverage | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

Each Sublimit of Liability set forth in Item 4 B. above is part of, and not in addition to, the Limit of Liability for the corresponding Combined Coverage Section.

The Limits of Liability set forth in Item 4 A. and B. above are the maximum limits of liability for all **Loss** including **Defense Costs,** under the applicable Coverage Section(s).

**C.   AGGREGATE POLICY LIMIT OF LIABILITY**                    $2,000,000

The above Limit of Liability set forth in Item 4 C. above is the maximum limit of liability for all **Loss,** including **Defense Costs,** for all Coverage Sections purchased other than the Crime and Fidelity Coverage Section.

**D.   PER OCCURRENCE LIMIT OF LIABILITY- CRIME AND FIDELITY COVERAGE SECTION**

The Limits of Liability of this policy apply solely to the Crime and Fidelity Coverage Section(s) for which a corresponding limit of liability amount is set forth below.

**Crime and Fidelity Coverage Section:**

| (i) | Insuring Agreement A, Employee Theft | $1,000,000 |
|---|---|---|
| (ii) | Insuring Agreement B, Forgery or Alteration | $1,000,000 |
| (iii) | Insuring Agreement C, Inside the Premises – Loss of Money and Securities | $1,000,000 |
| (iv) | Insuring Agreement D, Inside the Premises - Robbery or Safe Burglary of Other Property | $1,000,000 |
| (v) | Insuring Agreement E, Outside the Premises | $1,000,000 |
| (vi) | Insuring Agreement F, Computer Fraud | $1,000,000 |
| (vii) | Insuring Agreement G, Funds Transfer | $1,000,000 |
| (viii) | Insuring Agreement H, Money Orders and Counterfeit Money | $1,000,000 |
| (ix) | Insuring Agreement I, Credit, Debit, Charge Card Forgery | $100,000 |
| (x) | Insuring Agreement J, Clients' Property | N/A |
| (xi) | Insuring Agreement K, Investigative Expense Incurred to Establish Amount of Covered Loss | N/A |

Certified Document Number: 85013322 - Page 4 of 71

CVS FL 10549 PV (6/09)

**DECLARATIONS** (continued)                              **POLICY NO.: 1000057336161**

**ITEM 5:        RETENTION OR DEDUCTIBLE AMOUNTS**

**RETENTION AMOUNTS**

**A. Directors & Officers Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. | $0 |
| (ii)  Insuring Agreement B. and C. | $25,000 |
| (iii) Insuring Agreement D. | $0 |

**B. Employment Practices Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. - Employment Practices Liability Coverage | N/A |
| (ii)  Insuring Agreement B. - Third-Party Liability Coverage | N/A |

**C. Fiduciary Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. - Fiduciary Liability Coverage | |
|          All Claims, except HIPAA Claims | N/A |
|          HIPAA Claims | N/A |
| (ii)  Insuring Agreement B. - Voluntary Compliance Program Coverage | N/A |

**DEDUCTIBLE AMOUNTS**

**D.  Crime and Fidelity Coverage Section:**

| | | |
|---|---|---|
| (i) | Insuring Agreement A, Employee Theft | $10,000 |
| (ii) | Insuring Agreement B, Forgery or Alteration | $10,000 |
| (iii) | Insuring Agreement C, Inside the Premises – Loss of Money and Securities | $10,000 |
| (iv) | Insuring Agreement D, Inside the Premises - Robbery or Safe Burglary of Other Property | $10,000 |
| (v) | Insuring Agreement E, Outside the Premises | $10,000 |
| (vi) | Insuring Agreement F, Computer Fraud | $10,000 |
| (vii) | Insuring Agreement G, Funds Transfer | $10,000 |
| (viii) | Insuring Agreement H, Money Orders and Counterfeit Money | $10,000 |
| (ix) | Insuring Agreement I, Credit, Debit, Charge Card Forgery | $10,000 |
| (x) | Insuring Agreement J, Clients' Property | N/A |
| (xi) | Insuring Agreement K, Investigative Expense Incurred to Establish Amount of Covered Loss | N/A |

**ITEM 6:        PENDING OR PRIOR DATE**

**A. Directors & Officers Liability Coverage Section:**

| | |
|---|---|
| (i) Insuring Agreement A. | **November 4, 2015** |
| (ii) Insuring Agreement B. and C. | **November 4, 2015** |

**B. Employment Practices Liability Coverage Section:**

| | |
|---|---|
| (i) Insuring Agreement A - Employment Practices Liability Coverage | **Not Applicable** |
| (ii) Insuring Agreement B. – Third-Party Liability Coverage | **Not Applicable** |

**C. Fiduciary Liability Coverage Section:**

| | |
|---|---|
| (i) Fiduciary Liability Coverage | **Not Applicable** |

**D. Crime and Fidelity Coverage Section:**                    **Not Applicable**

CVS FL 10549 PV (6/09)

Certified Document Number: 85013322 - Page 5 of 71

**DECLARATIONS** (continued)                              **POLICY NO.: 1000057336161**

**ITEM 7:    PREMIUM**

| A. Directors & Officers Liability Coverage Section: | ▮▮▮▮ |
|---|---|
| B. Employment Practices Liability Coverage Section: | N/A |
| C. Fiduciary Liability Coverage Section: | N/A |
| D. Crime and Fidelity Coverage Section: | ▮▮▮▮ |
| E.  Total Policy Premium: | ▮▮▮▮ |

**ITEM 8:    DISCOVERY PERIOD (APPLICABLE TO ALL COVERAGE SECTIONS OTHER THAN CRIME AND FIDELITY)**

    A.    One Year: **150% of the applicable premium**

    B.    Two Years: **200% of the applicable premium**

    C.    Three Years: **250% of the applicable premium**

**ITEM 9:    ADDRESS OF INSURER AND ITS AUTHORIZED CLAIMS AGENT FOR NOTICES UNDER THIS POLICY**

    A.    **Claims-Related Notices**

        STARR ADJUSTMENT SERVICES, INC.
        399 PARK AVENUE, 9TH FLOOR
        NEW YORK, NY 10022

        e-mail: StarrFLPLClaims@starrcompanies.com

    B.    **All Other Notices To The Insurer:**

        STARR INDEMNITY AND LIABILITY COMPANY
        ATTN:  FINANCIAL LINES DEPARTMENT
        399 PARK AVE.  8TH FLOOR
        NEW YORK, NY 10022

In Witness Whereof, the **Insurer** has caused this policy to be executed and attested. This policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.

_____
**Charles H. Dangelo, President**

_____
**Honora M. Keane, General Counsel**

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 6 of 71

CVS FL 10549 PV (6/09)

**STARR INDEMNITY AND LIABILITY COMPANY**

---

### RESOLUTE PORTFOLIO℠
For Private Companies

***General Terms & Conditions Section***

In consideration of the payment of the premium and in reliance upon the **Application**, as applicable to each Coverage Section, which shall be deemed to be attached to, incorporated into, and made a part of this policy, and subject to this General Terms & Conditions Section and any applicable Coverage Section(s), if purchased by the **Insured** as indicated in Item 3 of the Declarations, **STARR INDEMNITY AND LIABILITY COMPANY** (the **"Insurer"**) and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

**1.  TERMS & CONDITIONS**

The terms and conditions set forth in this General Terms & Conditions Section shall apply to all applicable Coverage Sections of this policy. The terms appearing in this General Terms & Conditions Section, which are defined in a Coverage Section, shall have the meaning provided for such terms in such Coverage Section for purposes of coverage under such Coverage Section. All defined terms used in this Policy, whether defined in Clause 2, below, or in a Coverage Section, appear in this Policy in boldface and initial-capitalized. The terms and conditions of each Coverage Section apply only to that particular Coverage Section. If any term or condition in this General Terms & Conditions Section is inconsistent or in conflict with the terms and conditions of any Coverage Section, the terms and conditions of such Coverage Section shall control.

**2.  GENERAL DEFINITIONS**

(a)  **"Application"** means all signed applications, including any attachments and other materials provided therewith or incorporated therein, submitted in connection with the underwriting of this policy or for any other policy of which this policy is a renewal, replacement or which it succeeds in time. **Application** shall also include, and incorporate, all publicly available documents.

(b)  **"Cleanup Costs"** means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(c)  **"Company"** means:

(1)  the **Parent Company**;

(2)  any **Subsidiary** of the **Parent Company**; and

(3)  the **Parent Company** or any **Subsidiary** as a debtor, a debtor-in-possession or equivalent status;

provided, however, that this Definition (c) (3) shall not apply to the Fiduciary Liability Coverage Section.

Certified Document Number: 85013322 - Page 7 of 71

(d) "**Defense Costs**" means:

    (1)    reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

    (2)    premium for an appeal, attachment or similar bond, but without any obligation to apply for and obtain such bond;

    (3)    reasonable and necessary fees, costs, charges or expenses incurred in response to any extradition or similar proceeding brought against an **Insured** in connection with a **Claim**; and

    (4)    any fees, costs, charges or expenses incurred by the **Insured** at the specific request of the Insurer to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

"**Defense Costs**" does not include: (i) amounts incurred prior to the date a Claim is first made and reported to the **Insurer**, pursuant to the terms of the applicable Coverage Section; and (ii) compensation or benefits of any **Insured Person** or any overhead expenses of the Company.

(e) "**Financial Impairment**" means the **Company** becoming a debtor-in-possession, or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company**.

(f) "**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation; the management committee members of a joint venture; or the **Members** of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

(g) "**Manager**" means a person serving in a directorial capacity for a limited liability company.

(h) "**Member**" means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(i) "**Parent Company**" means the entity named in Item 1 of the Declarations.

(j) "**Policy Period**" means the period from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy. If one or more Coverage Sections have different inception, expiration or cancellation dates from those shown in Item 2 of the Declarations, the **Policy Period** for those Coverage Sections shall be set forth in an endorsement to this Policy.

(k) "**Pollutants**" means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on, any list of hazardous substances issued by the United States Environmental Protection Agency or any foreign, state, county, municipality, or locality counterpart thereof. Such substances shall include, without limitation, nuclear material or waste, any solid, liquid, gaseous or thermal irritant or contaminant, or smoke, vapor, soot, fumes, acids, alkalis,

Certified Document Number: 85013322 - Page 8 of 71

chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

(l)    "**Pollution**" means the actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere. **Pollution** also means any **Cleanup Costs**.

**3.**    **LIMITS OF LIABILITY**

The Aggregate Limit of Liability For Each Separate Coverage Section, as set forth in Item 4 A. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs**, from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for each applicable Separate Coverage Section.

The Aggregate Limit of Liability For Each Combined Coverage Section, as set forth in Item 4 B. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs**, from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for all of the Coverage Sections that comprise the applicable Combined Coverage Section. Any **Loss** paid under one of the Coverage Sections that comprises a Combined Coverage Section will reduce, and may exhaust, the limit of liability available under the other Coverage Section(s) that comprise(s) such Combined Coverage Section.

Any Sublimit(s) of Liability, whether set forth in Item 4 of the Declarations or as otherwise provided under the terms of this policy, shall be part of, and not in addition to, the applicable Aggregate Limit of Liability set forth in Item 4 A. or 4 B. of the Declarations. Each Sublimit of Liability is the maximum limit of liability of the **Insurer** for all **Loss,** including **Defense Costs,** from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, to which the Sublimit(s) of Liability applies.

The Aggregate Policy Limit of Liability, as set forth in Item 4 C. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs**, from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for all Coverage Section(s) combined.

If any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this policy as respects the applicable Coverage Section(s) will be completely fulfilled and the **Insurer** will have no further obligations under this policy of any kind as respects the applicable Coverage Section(s) and the premium as respects the applicable Coverage Section(s) as set forth in Item 7 of the Declarations will be fully earned.

**Any** payment of **Loss** under any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations shall reduce and may exhaust the Aggregate Policy Limit of Liability as set forth in Item 4 C. of the Declarations. If the Aggregate Policy Limit of Liability is exhausted by the payment of such **Loss**, the **Insurer** will have no further obligations of any kind as respects this policy and the applicable premium set forth in Item 7 of the Declarations will be fully earned.

**Defense Costs** are part of, and not in addition to, the Aggregate Limit of Liability as set forth in Item 4 of the Declarations for each applicable Coverage Section, other than the Crime and

Certified Document Number: 85013322 - Page 9 of 71

Fidelity Coverage Section, and payment by the **Insurer** of **Defense Costs** shall reduce and may exhaust such Aggregate Limit(s) of Liability. **Defense Costs** are subject to the Aggregate Policy Limit of Liability set forth in Item 4 C. of the Declarations.

If a Discovery Period is purchased by the **Insured** pursuant to Clause 8 of this General Terms & Conditions Section, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limits of Liability as set forth in Item 4 of the Declarations.

The Limit of Liability applicable to the Crime and Fidelity Coverage Section is set forth in Clause 4 of that Coverage Section.

**4.      RETENTION CLAUSE**

Subject to all other terms and conditions of this policy, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount as set forth in Item 5 of the Declarations for each Insuring Agreement of the applicable Coverage Section(s). A single Retention amount shall apply to all **Loss** alleging the same or related **Wrongful Acts**. The Retention amount shall be borne by the **Insureds** and remain uninsured.

The application of a Retention to **Loss** under one Insuring Agreement shall not reduce the Retention that applies to **Loss** under any other Insuring Agreement. If different Retention amounts apply to different parts of a single **Loss**, the applicable Retention shall be applied separately to each part of the **Loss** and the sum of such Retention amounts shall not exceed the largest of the applicable Retention amounts as set forth in Item 5 of the Declarations.

If the **Company** is required or permitted to indemnify an **Insured Person** for any **Loss** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company** and does not do so for any reason, the **Insurer** shall not require payment of the applicable Retention by the **Insured Person**. However, the **Company** hereby agrees to reimburse the **Insurer** for the full amount of such applicable Retention, unless the **Company** is unable to do so because of **Financial Impairment**.

Provided, however that this Clause No. 4, shall not apply to the Crime and Fidelity Coverage Section.

**5.      NOTICE OF CLAIM**

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice of a **Claim** made against an **Insured** or an **Occurrence**, as applicable under the appropriate Coverage Section, to the **Insurer** at the address set forth in Item 9 of the Declarations.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

With respect to the Directors & Officers Liability Coverage Section, the **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** pursuant to this Clause 5, of a **Claim** made against an **Insured** as soon as practicable after the **Company's** general counsel or risk manager (or individuals with equivalent responsibilities) becomes aware of the **Claim**; however, in no event shall such notice be provided later than sixty (60) days after the expiration of the **Policy Period** (or Discovery Period, if applicable).

With respect to the Employment Practices Liability Coverage Section and the Fiduciary Liability Coverage Section, the **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** pursuant to this Clause 5, of

Certified Document Number: 85013322 - Page 10 of 71

a **Claim** made against an **Insured** as soon as practicable after any **Insured Person** becomes aware of the **Claim**; however, in no event shall such notice be provided later than thirty (30) days after the expiration of the **Policy Period** (or Discovery Period, if applicable).

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if written notice of a **Claim** has been given to the **Insurer** pursuant to this Clause 5, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** pursuant to this Clause 5, alleging, arising out of, based upon or attributable to the facts alleged in the previously noticed **Claim**, or alleging the same or related **Wrongful Act** alleged in the previously noticed **Claim**, shall be considered related to the previously noticed **Claim** and shall be deemed to have been made at the time notice of the previously noticed **Claim** was provided to the **Insurer**.

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if during the **Policy Period** (or Discovery Period, if applicable) an **Insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured**, the **Insured** may provide written notice to the **Insurer's** authorized agent of such circumstances. This written notice shall include the **Wrongful Act** allegations anticipated and the reasons for anticipating a **Claim**, with full particulars as to dates, persons and entities involved. If a **Claim** is subsequently made against such **Insured** and reported to the **Insurer** arising out of, based upon or attributable to the previously noticed circumstances, such **Claim** shall be considered first made at the time notice of such circumstances was provided to the **Insurer**.

6.     **DEFENSE OF CLAIM AND SETTLEMENT**

The **Insurer** has the right and duty to defend any **Claim** against any **Insured** covered under this policy, even if such **Claim** is false, fraudulent or groundless; however, the **Insurer** shall not have the right or duty to defend any **Claim** under: (1) Insuring Agreement D.: Derivative Demand Coverage of the Directors & Officers Liability Coverage Section; or (2) Insuring Agreement B: Voluntary Compliance Program Coverage of the Fiduciary Liability Coverage Section.

With respect to Insuring Agreement D.: Derivative Demand Coverage of the Directors & Officers Liability Coverage Section, the **Company,** and not the **Insurer**, has the duty to investigate and evaluate the **Derivative Demand**. The **Insurer** shall have the right to effectively associate with the **Company** in such process.

With respect to Insuring Agreement B: Voluntary Compliance Program Coverage of the Fiduciary Liability Coverage Section, the **Company**, and not the **Insurer**, has the duty to investigate and evaluate the **Voluntary Compliance Program Loss**. The **Insurer** shall have the right to effectively associate with the **Company** in such process, including the negotiation of any settlement as respects the **Voluntary Compliance Program Loss.**

The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the **Insurer**. Any **Loss** incurred by the **Insured(s)** and/or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention.

Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defense and settlement of any **Claim** and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an **Insured's** indemnification or contribution rights.

Certified Document Number: 85013322 - Page 11 of 71

The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate. In the event the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled the **Claim**; plus (2) any **Defense Costs** incurred up to the date the **Insured** refused to settle such **Claim**; plus (3) eighty percent (80%) of covered **Loss**, other than **Defense Costs**, in excess of the amount for which the **Insurer** could have settled the **Claim**. However, in no event shall the **Insurer's** liability exceed the applicable Limit of Liability as set forth in Item 4 of the Declarations.

The **Insurer** shall pay **Defense Costs** prior to the final disposition of any **Claim**, excess of the applicable retention and subject to all other terms and conditions of this policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the terms and conditions of this policy, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests.

7.    **ALLOCATION**

In the event the **Insured(s)** incurs **Loss** that is both covered and not covered by this policy, either because the **Claim** includes both covered and uncovered matters or because the **Claim** includes both insured and uninsured parties, the **Insured** and the **Insurer** agree to use their best efforts to determine a fair and appropriate allocation between covered and uncovered **Loss** based upon the relative legal and financial exposures of the parties to such matters. In the event of a settlement of such **Claim**, the allocation shall also be based upon the relative benefits to the **Insureds** from such a settlement.

If an allocation of **Loss** cannot be agreed to by the **Insurer** and the **Insured**: (1) the **Insurer** shall pay those amounts which it believes to be fair and equitable until an amount shall be agreed upon or determined pursuant to the provisions of this policy; and (2) there will be no presumption of allocation of **Loss** in any arbitration, suit or other proceeding.

8.    **DISCOVERY CLAUSE**

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six years following the effective date of such non-renewal, termination or **Organizational Change.** In the event of the non-renewal of one or more Coverage Sections of this policy, the **Insured** may purchase a Discovery Period solely as respects the Coverage Section(s) that has been non-renewed.

The **Insured's** right to purchase a Discovery Period shall lapse unless written notice of election to purchase such Discovery Period and the additional premium for such Discovery Period is received by the **Insurer** or its authorized agent within sixty days after such non-renewal, termination or **Organizational Change**. The additional premium for a Discovery Period of one or two years is set forth in Item 8 of the Declarations and shall be determined by multiplying the applicable percentage set forth in Item 8 of the Declarations by the premium for each applicable Coverage Section(s) as set forth in Item 7 of the Declarations. The additional premium for a Discovery Period of more than two years shall be determined by the **Insurer**.

During such **Discovery Period**, the **Insured** may provide the **Insurer** with written notice, pursuant to Clause 5 of this policy, of **Claims** made against an **Insured** solely with respect to

Certified Document Number: 85013322 - Page 12 of 71

**Wrongful Acts** occurring prior to the effective date of the non-renewal or termination of the policy or the effective date of the **Organizational Change** and otherwise covered by this policy.

The Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limits of Liability set forth in Item 4 of the Declarations.

The Discovery Period premium shall be fully earned at the inception of the Discovery Period. The Discovery Period is non-cancellable.

9.    **OTHER INSURANCE**

The insurance provided by this policy shall apply only as excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**. This policy shall not be subject to the terms and conditions of any other insurance policy.

In connection with any covered **Claim** made against an **Outside Entity Insured Person**, a leased employee, or an **Independent Contractor**, and subject to all other terms and conditions herein, this policy shall apply specifically excess of any indemnification and any other insurance coverage available to an **Outside Entity Insured Person**, a leased employee or an **Independent Contractor**. In the event such other insurance coverage available to an **Outside Entity Insured Person**, a leased employee or an **Independent Contractor** is provided by the **Insurer** (or would be provided except for the application of any retention, exhaustion of a limit of liability or failure to submit notice of a claim) then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in whole or in part, by this policy and such other insurance policy, shall be the greater of (1) the Limit of Liability of the applicable Coverage Section(s) of this policy; or (2) the limit of liability of such other insurance policy.

10.    **REPRESENTATIONS AND SEVERABILITY**

It is agreed that the **Insurer** has relied upon the information contained in the **Application**, as applicable to each Coverage Section, in issuing this policy.  In regard to the statements, warranties, representations and information contained in the **Application**, no knowledge of any **Insured** shall be imputed to any other **Insured** for the purpose of determining whether coverage is available under this policy for any **Claim** made against such **Insured**.  However, the knowledge possessed by any **Insured Person** who is a past or current chairman of the board, chief executive officer, president or chief financial officer of the **Company** shall be imputed to the **Company**.

11.    **COVERAGE EXTENSIONS**

This policy shall cover **Loss** arising from any **Claims** made against the estates, heirs, or legal representatives of any deceased person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such estates, heirs, or legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

This policy shall also cover **Loss** arising from any **Claims** made against the legal representatives of any incompetent, insolvent or bankrupt person who was an **Insured Person**

Certified Document Number: 85013322 - Page 13 of 71

at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

This policy shall also cover **Loss** arising from any **Claims** made against the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the

**Company**) of an **Insured Person** for all **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

The coverage extensions set forth in this Clause 11 are subject to all other terms and conditions of this policy.

12.  **CANCELLATION AND NON RENEWAL CLAUSE**

This policy, or any applicable Coverage Section(s), may be cancelled by the **Parent Company** by sending written prior notice to the **Insurer** or its authorized agent as set forth in Item 9 of the Declarations stating when thereafter the cancellation of the policy, or the applicable Coverage Section(s), shall be effective. The policy, or the applicable Coverage Section(s), terminates at the date and hour specified in such notice. This policy may also be cancelled by the **Parent Company** by surrender of this policy to the **Insurer** or its authorized agent as set forth in Item 9 of the Declarations. The policy terminates as of the date and time of surrender. The **Insurer** shall retain the customary short rate proportion of the premium, unless stated otherwise herein.

This policy, or any applicable Coverage Section(s), shall not be cancelled by or on behalf of the **Insurer** except by reason of non-payment of the premium set forth in Item 7 of the Declarations. The **Insurer** may cancel the policy by delivering to the **Parent Company** or by mailing to the **Parent Company**, by registered mail, or by courier at the **Parent Company's** address set forth in the Declarations, written notice stating when, not less than twenty (20) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice.  In the event of such cancellation, the policy will be deemed terminated as of the date indicated in the **Insurer's** written notice of cancellation to the **Parent Company**.

Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable. If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

The **Insurer** shall have no obligation to renew this policy or any applicable Coverage Section. In the event the **Insurer** decides to non-renew this policy or any applicable Coverage Section, it shall deliver or mail to the **Parent Company**, as identified in Item 1 of the Declarations, written notice of such decision at least sixty (60) days prior to the expiration of the **Policy Period**.

Certified Document Number: 85013322 - Page 14 of 71

13.     **ORGANIZATIONAL CHANGES**

If during the **Policy Period:**

(1)     the **Parent Company** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2)     any person or entity or group of persons or entities acting in concert shall acquire more than 50% of the **Parent Company,**

(any events described in (1) or (2) are referred to herein as an **"Organizational Change")** then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of an **Organizational Change.** However, there shall be no coverage afforded by this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Organizational Change**. This policy shall be non-cancellable and the entire premium shall be deemed fully earned upon the effective time of the **Organizational Change**. The **Insured(s)** shall also have the right to purchase a Discovery Period described in Clause 8 in the event of an **Organizational Change**.

The **Parent Company** shall give the **Insurer** written notice of the **Organizational Change** as soon as practicable, but no later than thirty days after the effective date of the **Organizational Change**.

14.     **AUTHORIZATION AND NOTICES**

**The Parent Company** shall act on behalf of all **Insureds** with respect to all matters as respects this policy including: (1) giving of notice of **Claim**; (2) giving and receiving of all correspondence and information; (3) giving and receiving notice of cancellation; (4) payment of premiums; (5) receiving of any return premiums; (6) receiving and accepting of any endorsements issued to form a part of this policy; and (7) the exercising of any right to a Discovery Period.

15.     **VALUATION AND CURRENCY**

All amounts stated in this policy are expressed in United States dollars and all amounts payable under this policy are payable in United States dollars.  If a judgment rendered or settlement entered into under this policy are stated in a currency other than United States dollars, then payment under this policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the final judgment is rendered or the settlement payment is established.

16.     **TERRITORY**

This policy extends to **Wrongful Acts** taking place, **Occurrences**, or **Claims** made anywhere in the world to the extent permitted by law.

17.     **ASSIGNMENT AND CHANGES TO THE POLICY**

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**.

Notice to any agent or knowledge possessed by any agent or person acting on behalf of the **Insurer**, other than the **Insurer's** authorized agent as identified in Item 9 of the Declarations, will not result in a waiver or change in any part of this policy or prevent the **Insurer** from

Certified Document Number: 85013322 - Page 15 of 71

asserting any right under the terms and conditions of this policy. The terms and conditions of this policy may only be waived or changed by written endorsement signed by the **Insurer** or its authorized agent.

## 18.   BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations hereunder.

It is understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding involving the **Company** is commenced (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "Bankruptcy Law") then, in regard to a covered **Claim** under this policy, the **Insureds** shall:

a.      waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the policy or its proceeds under such Bankruptcy Law; and

b.      agree not to oppose or object to any efforts by the **Company**, the **Insurer** or any **Insured Person** to obtain relief from any such stay or injunction.

In the event the **Company** becomes a debtor-in-possession or equivalent status under such Bankruptcy Law, and the total covered **Loss** under this policy exceeds the available applicable Limit of Liability, the **Insurer** shall:

a.      first pay the **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted prior to the **Company** becoming a debtor-in-possession or some equivalent status, then

b.      pay any remaining **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted after the **Company** became a debtor-in-possession or some equivalent status.

## 19.   SUBROGATION

In addition to any right of subrogation existing at law, in equity or otherwise, in the event of any payment by the **Insurer** under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured(s)'** rights of recovery. The **Insured(s)** shall execute all papers required (including those documents necessary for the **Insurer** to bring suit or other form of proceeding in their name) and do everything that may be necessary to pursue and secure such rights.

## 20.   ACTION AGAINST THE INSURER

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all material terms of this policy and the amount of the **Insured's** obligation has been fully determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No person or entity shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the **Insurer** be impleaded by such **Insured** or legal representatives of such **Insured**.

CVS FL 12002 PV (1/09)                    10

21.   **CONFORMITY TO STATUTE**

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy, including any endorsement to this policy which is required by any state Department of Insurance, or equivalent authority ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall be construed to restrict the terms of any State Amendatory Endorsement.

In the event any portion of this policy shall be declared or deemed invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of any other portion of this policy.

22.   **HEADINGS**

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of this policy's terms or conditions.

Certified Document Number: 85013322 - Page 17 of 71

**STARR INDEMNITY AND LIABILITY COMPANY**

# RESOLUTE PORTFOLIO℠
## For Private Companies

### *Directors & Officers Liability Coverage Section*

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this policy, and subject to the General Terms & Conditions Section and this Coverage Section, if purchased by the **Insured** as indicated in Item 3 of the Declarations, STARR INDEMNITY AND LIABILITY COMPANY (the **"Insurer"**) and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

1. **INSURING AGREEMENTS**

   A. The **Insurer** shall pay on behalf of any **Insured Person** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy, except if the **Company** has indemnified the **Insured Person** for such **Loss**.

   B. The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against any **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy, if the **Company** has indemnified the **Insured Person** for such **Loss**.

   C. The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against the **Company** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy.

   D. The **Insurer** shall reimburse the **Company** for the **Derivative Costs** incurred by the **Company** in response to a **Derivative Demand** first made during the **Policy Period** (or Discovery Period, if applicable) for any **Wrongful Act** of any **Executive**, and reported to the **Insurer** in accordance with the terms of this policy. This Insuring Agreement D. shall apply only if purchased by the **Insured** as indicated in Item 3 of the Declarations and is subject to the Sublimit of Liability set forth in Item 4 of the Declarations which is the **Insurer's** maximum limit of liability under this Insuring Agreement D. for all **Derivative Costs** arising from all **Derivative Demands**. The Sublimit of Liability for **Derivative Costs** shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section. This Insuring Agreement D. shall not provide coverage for any civil proceeding that is based upon or arises from a **Derivative Demand**.

2. **DEFINITIONS**

   (a) **"Claim"** means any:

   (1) written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

   (2) judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured**, including any appeal therefrom, which is commenced by:

   (i)     service of a complaint or similar pleading;

    (ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (iii)    receipt or filing of a notice of charges;

(3)    arbitration proceeding commenced against an **Insured** by service of a demand for arbitration;

(4)    formal civil, criminal, administrative or regulatory investigation of an **Insured Person**, which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying such **Insured Person** as a person against whom a proceeding identified in (2) or (3) above may be commenced;

(5)    written request to toll or waive the applicable statute of limitations relating to a potential **Claim** against an **Insured** for a **Wrongful Act**; or

(6)    **Derivative Demand**, solely under Insuring Agreement D. if purchased by the **Insured**.

(b)    **"Derivative Costs"** means the reasonable and necessary fees, costs, charges, or expenses incurred by the **Company**, its board of directors or any committee of its board of directors, solely in response to a **Derivative Demand** and do not include any settlements, judgments or damages, nor any compensation or benefits of any **Insured Persons**, or any overhead expenses of the **Company**. **Derivative Costs** shall be reimbursed by the **Insurer** sixty (60) days after the **Company** provides written notice to the **Insurer** of its final decision not to bring a civil proceeding against an **Executive**.

(c)    **"Derivative Demand"** means a written demand by one or more shareholders of the **Company** upon the **Company's** board of directors to bring a civil proceeding on behalf of the **Company** against any **Executive** for a **Wrongful Act**.

(d)    **"Employee"** means:

(1)    any person who was, now is, or shall become a full-time, part-time, seasonal, or temporary employee of the **Company**, other than an **Executive**, but only while that person is acting in the capacity as such;

(2)    any person leased to the **Company** so long as this person is working solely for the **Company** and only for conduct within his or her duties as such, but only if the **Company** indemnifies such leased person in the same manner as the **Company's** employees; and

(3)    any volunteer whose labor and service is engaged and directed by the **Company**, but only while that person is acting in the capacity as such.

(e)    **"Executive"** means any:

(1)    past, present or future duly elected or appointed director, officer, trustee, governor, management committee **Member** or **Member** of the board of managers;

(2)    past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a foreign jurisdiction that is equivalent to an executive position listed in item (1) above; or

(3)    past, present or future general counsel and risk manager (or equivalent position) of the **Company**.

(f)    **"Insured"** means the **Company** and any **Insured Person**.

CVS FL 12003 PV (1/09)

Certified Document Number: 85013322 - Page 19 of 71

(g) **"Insured Person(s)"** means any:

    (1)  **Executive;**

    (2)  **Employee;** or

    (3)  **Outside Entity Insured Person.**

(h) **"Loss"** means:

    (1)  damages, settlements or judgments;

    (2)  pre-judgment or post-judgment interest;

    (3)  costs or fees awarded in favor of the claimant;

    (4)  punitive, exemplary or the multiplied portion of any multiple damages awards, but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;

    (5)  **Derivative Costs,** solely under Insuring Agreement D. if purchased by the **Insured;** and

    (6)  **Defense Costs.**

**"Loss"** does not include:

      (i)  any amounts for which the **Insureds** are not legally liable;

      (ii)  any amounts which are without legal recourse to the **Insureds;**

      (iii)  taxes;

      (iv)  fines and penalties, except as provided for in Definition (h) (4) above;

      (v)  matters which may be deemed uninsurable under applicable law;  or

      (vi)  any amounts paid or incurred in complying with a judgment or settlement for non-monetary or injunctive relief, but solely as respects the **Company.**

(i) **"Outside Entity"** means: (1) any not-for-profit entity which is exempt from taxation under Section 501(c)(3), (4) or (10) of the IRS Code, as amended, or any rule or regulation promulgated thereunder; or (2) any other entity listed as such by endorsement to this policy, for which an **Executive** acts as a director, officer, trustee or governor (or the equivalent thereof) at the written request of the **Company.** Any such person shall be referred to herein as an **"Outside Entity Insured Person",** but only while that person is acting in the capacity as a director, officer, trustee or governor (or the equivalent thereof) of an **Outside Entity.**

(j) **"Securities Claim"** means a **Claim,** other than an administrative or regulatory proceeding against the **Company** or an investigation of the **Company,** made against any **Insured:**

    (1)  alleging a violation of any foreign, federal, state or local regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

Certified Document Number: 85013322 - Page 20 of 71

3

(i)  brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the **Company**; or

(ii)  brought by a security holder of the **Company** with respect to such security holder's interest in securities of such **Company**; or

(2)  brought derivatively on behalf of the **Company** by a security holder of such **Company**.

Notwithstanding the foregoing, **Securities Claim** shall include any formal administrative or regulatory proceeding against the **Company**, but only if and only during the time that such proceeding also constitutes a **Securities Claim** commenced and continuously maintained against an **Insured Person**.

The **Insurer** shall not assert that a **Loss** incurred in a **Securities Claim** alleging violations of Section 11 or 12 of the Securities Act of 1933, as amended, constitutes uninsurable loss and, subject to all other terms and conditions of this policy, shall deem that portion of such **Loss** as constituting **Loss** under this policy.

(k)  **"Subsidiary"** means any privately-held for-profit entity (except a partnership) of which the **Parent Company**:

(1)  has **Management Control** ("Controlled Entity") before the inception of the **Policy Period,** either directly or indirectly through one or more other Controlled Entities;

(2)  first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities,  if such entity's annual revenue totals less than 25% of the consolidated revenue of the **Parent Company** as of its latest fiscal year; or

(3)  first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities,  if such entity's annual revenue totals 25% or more of the consolidated revenue of the **Parent Company** as of its latest fiscal year, but only if the **Parent Company** provides the **Insurer** with full particulars of the new **Subsidiary** within ninety (90) days after its creation or acquisition and pays any additional premium with respect to such entity within thirty (30) days after being requested to do so by the **Insurer**;

provided, however, that **Subsidiary** as defined in items (2) and (3) above shall not mean any entity which is a financial institution, including but not limited to a bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund, unless such entity is included in the definition of **Subsidiary** by specific written endorsement attached to this policy.

**"Subsidiary"** also means any not-for-profit entity which is under the exclusive control of the **Company**.

With respect to a **Claim** made against any **Subsidiary** or any **Insured Person** thereof, this policy shall only apply to **Wrongful Acts** committed or allegedly committed after the effective time such entity becomes a **Subsidiary** and prior to the effective time that such entity ceases to be a **Subsidiary**.

(l)  **"Wrongful Act(s)"** means:

(1)  with respect to an **Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty,  breach of trust, misstatement, or misleading statement by an **Insured**

**Person** in his or her capacity as such or any matter claimed against an **Insured Person** by reason of such capacity;

(2)    with respect to an **Outside Entity Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by a person in his or her capacity as an **Outside Entity Insured Person** or any matter claimed against such **Outside Entity Insured Person** by reason of such capacity; or

(3)    with respect to the **Company,** any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the **Company**.

## 3.  EXCLUSIONS

This policy shall not cover any **Loss** in connection with any **Claim**:

(a)    arising out of, based upon or attributable to the gaining of any profit or advantage or improper or illegal remuneration if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

(b)    arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an **Insured** if a final judgment or adjudication establishes that such act or violation occurred;

(c)    arising out of, based upon or attributable to the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and any amendments thereto or similar provisions of any state statutory law if a final judgment or adjudication establishes that a violation of Section 16(b) occurred;

In determining the applicability of Exclusions (a), (b) and (c), the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured** shall not be imputed to any other **Insured**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current chairman of the board, chief executive officer, president or chief financial officer of the **Company** shall be imputed to the **Company**.

(d)    alleging, arising out of, based upon or attributable to any facts or circumstances of which an **Insured Person** had actual knowledge or information of, as of the Pending or Prior Date set forth in Item 6 of the Declarations as respects this Coverage Section, and that he or she reasonably believed may give rise to a **Claim** under this policy;

(e)    based upon, arising from, or in consequence of any actual or alleged liability of  any **Insured** under any express contract or agreement, except to the extent that  such **Insured** would have been liable in the absence of such contract or agreement; provided, however, that this exclusion shall apply only to any **Claim** under Insuring Agreement C.;

(f)    alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 6 of the Declarations as respects this Coverage Section, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Act(s)**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(g) alleging, arising out of, based upon or attributable to the same or essentially the same facts alleged, or to the same or related **Wrongful Act(s)** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the inception date of this policy as set forth in Item 2 of the Declarations, under any policy, whether excess or underlying, of which this policy is a renewal or replacement or which it may succeed in time;

(h) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of any **Insured Person** serving in any capacity other than as an **Executive** or an **Employee** or   an **Outside Entity Insured Person:**

(i) brought by or on behalf of any **Insured**, other than an **Employee**;  provided, however, that this exclusion shall not apply to:

  (i) any **Claim** brought by an **Insured Person** that is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

  (ii) a shareholder derivative action, but only if such action is brought and maintained without the solicitation, approval, assistance, active participation or intervention of any **Insured**;

  (iii) any **Claim** brought by any **Executive** who has not served in such capacity, nor has acted as a consultant to the **Company**,   for at least three (3) years prior to the **Claim** being first made;

  (iv) any **Claim** brought against an **Insured   Person** arising out of or based upon any protected activity specified in any "whistleblower" protection pursuant to any foreign, federal, state or local law;

  (v) any **Claim** brought by any **Executive** of a **Company** formed and operating in a foreign jurisdiction against such **Company** and any **Insured Person** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);  or

  (vi) any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Company** or any assignee of such trustee, examiner, receiver or similar official.

(j) alleging, arising out of, based upon, attributable to, directly or indirectly resulting from, or in consequence of, or in any way involving, **Pollution**; provided, however, that this exclusion shall not apply to any **Claim** under Insuring Agreement A. or any **Securities Claim**, except for **Loss** constituting **Cleanup Costs**;

(k) alleging, arising out of, based upon or attributable to  any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law;

(l) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly any public offering of securities by the **Company** or an **Outside Entity**, or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to:

CVS FL 12003 PV (1/09)

Certified Document Number: 85013322 - Page 23 of 71

(i)     any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall be conditioned solely upon the **Company** giving the **Insurer** written notice of any such public offering, including all details thereof, as soon as practicable, but not later than thirty days after the effective date of such offering; or

(ii)    any public offering of securities, other than an offering described in paragraph (i) above, as well as any purchase or sale of securities subsequent to such public offering. Coverage for such transaction shall be conditioned upon, within thirty days prior to the effective time of such public offering, the **Company**: (a) giving the **Insurer** written notice of such offering, including all details thereof, and any underwriting information required by the **Insurer**; and (b) accepting such terms, conditions and additional premium required by the **Insurer** for such coverage. Coverage provided pursuant to this paragraph is also subject to the **Company** paying such additional premium when due. The **Insurer** shall provide the **Company** with a quote for such coverage if the **Company** gives written notice of the offering as required in this paragraph.

(m)   for any **Wrongful Act** arising out of any **Insured Person** serving as a director, officer, trustee or governor of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or by any director, officer, trustee or governor thereof; or which is brought by any securities holder of the **Outside Entity**, whether directly or derivatively, unless such securities holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Outside Entity**, any director, officer, trustee or governor thereof, an **Executive** or the **Company**; provided, however, that this exclusion shall not apply to:

(i)     any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

(ii)    any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Outside Entity** or any assignee of such trustee, examiner, receiver or similar official;

(iii)   any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** who has not served in such capacity, nor acted as a consultant to the **Outside Entity**, for at least three (3) years prior to such **Claim** being first made; or

(iv)   any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity**, formed and operating in a foreign jurisdiction against any **Outside Entity Insured Person** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(n)    for bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, violation of any right of privacy, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to any **Securities Claim**;

(o)    alleging, arising out of, based upon, or attributable to any actual or alleged: (i) violation of the Foreign Corrupt Practices Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law; (ii) payments, commissions, gratuities, benefits or

CVS FL 12003 PV (1/09)

Certified Document Number: 85013322 - Page 24 of 71

other favors for the direct or indirect benefit of any officials, directors, agents, partners, representatives, principal shareholders, or owners of the **Company** or employees of any customers of the **Company;** or (iii) political contributions;

(p)     alleging, arising out of, based upon, or attributable to any actual or alleged discrimination, harassment, retaliation, wrongful discharge, termination or any other employment-related or employment practice claim, including but not limited to any wage-hour claim or any third-party discrimination or harassment claim; provided, however, that this exclusion shall not apply to any **Securities Claim;**

(q)     alleging, arising out of, based upon, or attributable to the ownership, management, maintenance, operation and/or control by the **Company** of any captive insurance company or entity, including but not limited to any **Claim** alleging the insolvency or bankruptcy of the **Company** as a result of such ownership, management, maintenance, operation and/or control;

(r)     alleging, arising out of, based upon, or attributable to based upon, arising from, or in consequence of any actual or alleged plagiarism, infringement or violation of any copyright, patent, trademark or service mark or the misappropriation of intellectual property, ideas or trade secrets; provided, however, that this exclusion shall apply only to any **Claim** under Insuring Agreement C.;

(s)     alleging, arising out of, based upon or attributable to the rendering or failure to render any professional service to a customer or client of the **Insured**; provided, however, that this exclusion shall not apply to any **Securities Claim**, but only if such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Company** or any **Insured Person**.

## 4.  ORDER OF PAYMENTS

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Coverage Section, the **Insurer** shall in all events:

(1) first, pay **Loss** for which coverage is provided under this Coverage Section for any **Insured Person** under Insuring Agreement A.;

(2) second, only after payment of **Loss** has been made pursuant to item (1) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available, pay the **Loss** for which coverage is provided under this Coverage Section for the **Company** under Insuring Agreement B.; and

(3) third, only after payment of **Loss** has been made pursuant to items (1) and (2) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available, pay the **Loss** for which coverage is provided under this Coverage Section for the **Company** under Insuring Agreement C. and D.

## 5.  NON-RESCINDABLE CLAUSE

The **Insurer** irrevocably waives any right it may have to rescind coverage available under Insuring Agreement A. of this Coverage Section, in whole or in part, on any grounds.

Certified Document Number: 85013322 - Page 25 of 71

CVS FL 12003 PV (1/09)

**STARR INDEMNITY AND LIABILITY COMPANY**

---

# RESOLUTE PORTFOLIO℠
## For Private Companies

### *Crime and Fidelity Coverage Section*

In consideration of the payment of the premium and subject to the Insuring Agreements, terms, conditions and exclusions of this Coverage Section, if purchased by the **Company** as indicated in Item 3 of the Declarations, STARR INDEMNITY AND LIABILITY COMPANY (the "**Insurer**") and the **Parent Company**, on behalf of the **Company**, agree as follows:

**1.      INSURING AGREEMENTS**

Coverage is provided under the following Insuring Agreements for which a Limit of Liability is indicated in Item **4** of the Declarations, and, applies to loss sustained by the **Company** resulting directly from an **Occurrence** taking place during the **Policy Period**, except as indicated in Condition 6.(a)(10), Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or Condition 6.(a)(11), Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, and which is **Discovered** by the **Company** during the **Policy Period** or during the period of time provided in Condition 6.(a)(6), Extended Period To Discover Loss, of this Coverage Section.

**A.      Employee Theft Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for direct loss of **Money, Securities** or **Other Property** sustained by the **Company** resulting from **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

**B.      Forgery Or Alteration Insuring Agreement**

(1)      The **Insurer** shall pay the **Parent Company** for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

a.      made or drawn by or drawn upon the **Company**, or
b.      made or drawn by one acting as an agent of the **Company**, or
c.      that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement B, a substitute check as defined in the *Check Clearing for the 21ˢᵗ Century Act* shall be treated the same as the original it replaced.

(2)      If the **Company** is sued for refusing to pay any instrument covered item in B.(1) above, on the basis that it has been forged or altered, and the **Company** has the written consent of the **Insurer** to defend against the suit, the **Insurer** will pay for any reasonable legal expenses incurred and paid by the **Company** in that defense.  The amount that the **Insurer** shall pay is in addition to the Limit of Liability applicable to Insuring Agreement B.(1).

Certified Document Number: 85013322 - Page 26 of 71

C.  **Inside the Premises – Loss of Money and Securities Insuring Agreement**

    (1)    The **Insurer** shall pay the **Parent Company** for the loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

        a.    resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

        b.    resulting directly from disappearance or destruction.

    (2)    The **Insurer** shall pay the **Parent Company** for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Company** is the owner of the **Premises** or is liable for damage to it.

    (3)    The **Insurer** shall pay the **Parent Company** for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

D.  **Inside the Premises – Robbery Or Safe Burglary of Other Property Insuring Agreement**

    (1)    The **Insurer** shall pay the **Parent Company** for loss of or damage to **Other Property**:

        a.    inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

        b.    inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

    (2)    The **Insurer** shall pay the **Parent Company** for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** of **Other Property**, if the **Company** is the owner of the **Premises** or is liable for damage to it.

    (3)    The **Insurer** will pay the **Parent Company** for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

E.  **Outside The Premises Insuring Agreement**

    (1)    The **Insurer** shall pay the **Parent Company** for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

    (2)    The **Insurer** shall pay the **Parent Company** for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

F.  **Computer Fraud Insuring Agreement**

Certified Document Number: 85013322 - Page 27 of 71

The **Insurer** shall pay the **Parent Company** for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

a.    to a person (other than a **Messenger**) outside those **Premises**.
b.    to a place outside those **Premises**.

**G.**    **Funds Transfer Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Company's Transfer Account**.

**H.**    **Money Orders and Counterfeit Money Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss resulting directly from the **Company** having accepted in good faith, in exchange for merchandise, **Money**, or services:

a.    money orders issued by any post office, express company or bank that are not paid upon presentation; or
b.    **Counterfeit Money** that is acquired during the regular course of business.

**I.**    **Credit, Debit, Charge Card Forgery Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss sustained by the **Company** resulting directly from **Credit Card Forgery** committed by a **Third Party**.

**J.**    **Clients Property Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for the direct loss of **Money**, **Securities**, or **Other Property** sustained by a **Client** resulting from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client's** employees.

**K.**    **Investigative Expense Incurred to Establish Amount of Covered Loss Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for reasonable investigative expense incurred by the **Company**, excluding the **Company's** internal corporate costs (such as salary, wages, commissions, benefits or overhead expenses), to establish the existence and amount of a covered loss.  Investigative expenses shall not include expenses incurred by any **Client**.  Coverage as provided by this Insuring Agreement K shall be subject to the prior written consent of the **Insurer**.

**2)**    **DEFINITIONS**

(a)    "**Banking Premises**" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

(b)    "**Client**" means a customer of the **Company** to whom the **Company** provides goods or services for a fee under written contract.

(c)     **"Credit Card Forgery"** means the **Forgery** or alteration of, on or in any written instrument required in connection with any credit, debit or charge card issued to the **Company** or, at the request of the **Company**, to an **Employee**.

(d)     **"Counterfeit Money"** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

(e)     **"Custodian"** means the **Company**, any partners, any **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

(f)     **"Discover(s)"**, **"Discovery"** or **"Discovered"** means the time when the **Company's** General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or any **Employee** or officer at the level of corporate Vice President or above first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Coverage Section has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

    **"Discover(s)"**, **"Discovery"** or **"Discovered"** also means the time when the **Company's** General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or any **Employee** or officer at the level of corporate Vice President or above first receives notice of an actual or potential claim in which it is alleged that the **Company** is liable to a **Third Party** under circumstances, which, if true, would constitute a loss under this Coverage Section.

(g)     **"Employee"** means
   (1)    any natural person:
      (i)    while in the regular service of the **Company** and for the first forty-five (**45**) days immediately after termination of service, unless such termination is due to **Theft** or any other dishonest act committed by the **Employee**;
      (ii)    who is compensated directly by the **Company** by salary, wages or commissions; and
      (iii)    who the **Company** has the right to direct and control while performing services for the **Company**;
   (2)    any natural person who is furnished temporarily to the **Company**:
      (i)    to substitute for a permanent **Employee** as defined in 2.(g)(1) above who is on leave; or
      (ii)    to meet seasonal or short-term workload conditions:
        a.    while that person is subject to the **Company's** direction and control, and
        b.    performing services for the **Company**, excluding, however, any such person while having care and custody of property outside the **Premises**;
   (3)    any natural person who is leased to the **Company** under a written agreement between the **Company** and a labor leasing firm to perform duties related to the conduct of the **Company's** business, but does not mean a temporary employee as defined in 2.(g)(2) above;
   (4)    any natural person who is:

Certified Document Number: 85013322 - Page 29 of 71

(i)      a trustee, officer, **Employee**, administrator or manager of any **Employee Benefit Plan,** except an administrator or manager who is an independent contractor; and

(ii)     a director or trustee of the **Company** while that person is engaged in handling **Funds** or **Other Property** of any **Employee Benefit Plan;**

(5)     Any natural person fiduciary, trustee, administrator or other plan official, while in the regular service of an **Employee Benefit Plan**, who is required to be bonded by the **Company** in connection with such **Employee Benefit Plan** as required by Title 1 of the *Employee Retirement Income Security Act of 1974*, as amended, but does not mean a natural person as defined in 2.(g)(4) above;

(6)     any natural person who is a former **Employee**, **Member, Manager**, director or trustee retained as a consultant while performing services for the **Company**;

(7)     any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the **Premises**;

(8)     any **Employee** of an entity merged or consolidated with the **Company** prior to the effective date of this Coverage Section; or

(9)     any **Managers**, directors or trustees of the **Company** while:

(i)      performing acts within the scope of the usual duties of an **Employee**; or

(ii)     acting as a member of any committee duly elected or appointed by resolution of the **Company's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on behalf of the **Company.**

"**Employee**" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in 2.(g)(1) through 2.(g)(9) above.

(h)     "**Employee Benefit Plan**" means any welfare or pension benefit plan, defined and required to be bonded under Title 1 of the *Employee Retirement Income Security Act of 1974*, as amended, which is operated solely by the **Company** or jointly by the **Company** and a labor organization for the benefit of **Employees** and which existed on or before the inception date of the **Policy Period** or the inception date of this Coverage Section, if the dates differ.

(i)     "**Forgery**" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(j)     "**Fraudulent Instruction**" means

(1)     an electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Company**, but which was in fact fraudulently transmitted by someone else without the **Company's** knowledge or consent;

(2)     a written instruction (other than those described in Insuring Agreement B) issued by the **Company**, which was forged or altered by someone

Certified Document Number: 85013322 - Page 30 of 71

other than the **Company** without the **Company's** knowledge or consent, or which purports to have been issued by the **Company**, but was in fact fraudulently issued without the **Company's** knowledge or consent; or

(3) an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Company** which purports to have been transmitted by an **Employee** but which was in fact fraudulently transmitted by someone else without the **Employee's** knowledge or consent.

(k) "**Funds**" means **Money** and **Securities**.

(l) "**Messenger**" means the **Company**, a relative of the **Company,** or any partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

(m) "**Money**" means

 (1) currency, coins and bank notes in current use and having a face value; and

 (2) travelers checks, register checks and money orders held for sale to the public.

(n) "**Occurrence**" means

 (1) Under Insuring Agreement A
  (i) an individual act;
  (ii) the combined total of all separate acts whether or not related; or
  (iii) a series of acts whether or not related
  committed by an **Employee** acting alone or in collusion with other persons, during the **Policy Period**, except as provided under Condition 6.(a)(10) Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

 (2) Under Insuring Agreement B
  (i) an individual act;
  (ii) the combined total of all separate acts whether or not related; or
  (iii) a series of acts whether or not related
  committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the **Policy Period**, except as provided under Condition 6.(a)(10) Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

 (3) Under All Other Insuring Agreements:
  (i) an individual act or event;
  (ii) the combined total of all separate acts or events whether or not related; or
  (iii) a series of acts or events whether or not related
  committed by a person acting alone or in collusion with other persons, or not committed by any person, during the **Policy Period**, except as indicated under Condition 6.(a)(10) Loss Sustained During Prior

Certified Document Number: 85013322 - Page 31 of 71

Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

(o) **"Other Property"** means any tangible property other than **Money** and **Securities** that has intrinsic value. **Other Property** does not include computer programs, electronic data or any property specifically excluded under this Coverage Section.

(p) **"Premises"** means the interior of that portion of any building occupied by the **Company** in conducting its business.

(q) **"Robbery"** means the unlawful taking of property from the care and custody of a person by one who has:
(1)     caused or threatened to cause that person bodily harm; or
(2)     committed an obviously unlawful act witnessed by that person.

(r) **"Safe Burglary"** means the unlawful taking of
(1)     property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or
(2)     a safe or vault from inside the **Premises**.

(s) **"Securities"** means negotiable and non negotiable instruments or contracts representing either **Money** or property and includes
(1)     tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and
(2)     evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Company**;
but does not include **Money**.

(t) **"Subsidiary"** means any privately-held for-profit entity of which the **Parent Company**
(1)     has **Management Control** ("Controlled Entity") before the inception of the **Policy Period**, either directly or indirectly through one or more other Controlled Entities;
(2)     first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's annual revenue totals less than 25% of the consolidated revenue of the **Parent Company** as of its latest fiscal year; or

(3)     first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled entities, if such entity's annual revenue totals 25% or more of the consolidated revenue of the **Parent Company** as of its latest fiscal year, but only if the **Parent Company** provides the **Insurer** with full particulars of the new **Subsidiary** within ninety (90) days after its creation or acquisition and pays any additional premium with respect to such entity within thirty (30) days after being requested to do so by the **Insurer**.

Certified Document Number: 85013322 - Page 32 of 71

Provided, however, that **Subsidiary** as indicated in items 2.(t)(2) and 2.(t)(3) above shall not include any entity which is a financial institution, such as a bank, insurance company, insurance agent or broker, securities broker or dealer, investment advisor, mutual fund or hedge fund, unless such entity is included in the definition of **Subsidiary** by specific written endorsement attached to this policy.

"**Subsidiary**" also means any not-for-profit entity which is under the exclusive control of the **Company**.

(u)      "**Theft**" means the unlawful taking of property to the deprivation of the **Company**.

(v)      "**Third Party**" means a natural person other than:
        (1)      an **Employee**; or
        (2)      a natural person acting in collusion with an **Employee**.

(w)      "**Transfer Account**" means an account maintained by the **Company** at a financial institution from which the **Company** can initiate the transfer, payment or delivery of **Funds**:
        (1)      by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or
        (2)      by means of written instructions (other than those described in Insuring Agreement B) establishing conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

(x)      "**Watchperson**" means any person the **Company** retains specifically to have care and custody of property inside the **Premises** and who has no other duties.

## 3.      EXCLUSIONS

(a)      The insurance afforded under this Coverage Section shall not apply to:

**(1)**      Loss resulting from **Theft** or any other dishonest act committed by:
        (i)      the **Company**; or
        (ii)      any partners or **Members** of the **Company**;
        whether acting alone or in collusion with other persons.

**(2)**      Loss caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this policy and the **Company** or any of partners, **Members**, **Managers**, officers, directors or trustees, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the inception date of the **Policy Period** or the inception date of this Coverage Section, if the dates differ; However, this exclusion shall not apply if the value of that **Theft** or dishonest act was valued at $10,000 or less.

**(3)**      Loss resulting from **Theft** or any other dishonest act committed by any of the **Company's Employees**, **Managers,** directors, trustees, or authorized representatives:
        (i)      whether acting alone or in collusion with other persons; or
        (ii)      while performing services for the **Company** or otherwise;

Certified Document Number: 85013322 - Page 33 of 71

except when covered under Insuring Agreement A.

**(4)** Loss resulting from:

(i) the unauthorized disclosure of the **Company's** confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

(ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Company** including, but not limited to, financial information, credit card information or similar non-public information.

**(5)** Loss resulting from seizure or destruction of property by order of governmental authority.

**(6)** Loss that is an indirect result of an **Occurrence** covered by this Coverage Section including, but not limited to, loss resulting from:

(i) The **Company's** inability to realize income that would have been realized by the **Company** had there been no loss of or damage to **Money**, **Securities**, or **Other Property**;

(ii) Payment of damages of any type for which the **Company** is legally liable. But the **Insurer** will pay compensatory damages arising directly from a loss covered under this Coverage Section;

(iii) Payment of costs, fees or other expenses incurred by the **Company** in establishing either the existence or the amount of loss under this Coverage Section, except when covered under Insuring Agreement K.

**(7)** Fees, costs and expenses incurred by the **Company** which are related to any legal action, except when covered under Insuring Agreement B.

**(8)** Loss or damage resulting from nuclear reaction or radiation or radioactive contamination, however caused.

**(9)** Loss or damage resulting from:

(i) war, including undeclared or civil war;

(ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

(b) The insurance afforded under Insuring Agreement A shall not apply to:

**(1)** Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

However, where the **Company** establishes wholly apart from such computations that the **Company** has sustained a loss, then the **Company** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

Certified Document Number: 85013322 - Page 34 of 71

**(2)**   Loss resulting from trading, whether in the **Company's** name or in a genuine or fictitious account.

**(3)**   Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

(c)   The insurance afforded under Insuring Agreements C, D, and E shall not apply to:

**(1)**   Loss resulting from accounting or arithmetical errors or omissions.

**(2)**   Loss resulting from the giving or surrendering of property in any exchange or purchase.

**(3)**   Loss or damage resulting from fire, however caused, except:
   (i)     loss of or damage to **Money** and **Securities**, and,
   (ii)    loss from damage to a safe or a vault.

**(4)**   Loss of property contained in any **Money** operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

**(5)**   Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**(6)**   Loss of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:
   (i)     on the basis of unauthorized instructions;
   (ii)    as a result of a threat to do bodily harm to any person;
   (iii)   as a result of a threat to do damage to any property;
   (iv)    as a result of a threat to introduce a denial of service attack into the **Company's** computer system;
   (v)     as a result of a threat to introduce a virus or other malicious instruction into the **Company's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Company's** computer system;
   (vi)    as a result of a threat to contaminate, pollute or render substandard the **Company's** products or goods; or

   (vii)   as a result of a threat to disseminate, divulge or utilize:
      a.      the **Company's** confidential information; or
      b.      weaknesses in the **Company's** source code within its computer system.

However this exclusion shall not apply, under Insuring Agreement E, to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Company**:
   (i)     had no knowledge of any threat at the time the conveyance began; or
   (ii)    had knowledge of a threat at the time the conveyance began, but, the loss was not related to the threat.

Certified Document Number: 85013322 - Page 35 of 71

(7)     Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

(8)     Loss resulting from the **Company's**, or anyone acting on the **Company's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

(d)     The insurance afforded under Insuring Agreement F shall not apply to:

(1)     Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

(2)     Loss resulting from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Company's Transfer Account**.

(3)     Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:
    (i)     an inventory computation; or
    (ii)    a profit and loss computation.

(e)     The insurance afforded under Insuring Agreement G shall not apply to loss resulting from the use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property**.

## 4.     LIMIT OF LIABILITY

The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** is the applicable Limit of Liability as indicated in Item **4** D. of the Declarations.

If any loss is covered under more than one Insuring Agreement in this Coverage Section, the most the **Insurer** will pay for such loss shall not exceed the largest Limit of Liability indicated in Item **4** D. of the Declarations under any one of the Insuring Agreements.

## 5.     DEDUCTIBLE

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the Deductible Amount shown in Item 5 D. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Liability as indicated in Item **4**.D of the Declarations .

## 6.     CONDITIONS

(a)     **Conditions Applicable To All Insuring Agreements**

(1)     **Additional Premises Or Employees**
If, while this Coverage Section is in force, the **Company** establishes any additional **Premises** or hires additional **Employees**, other than through consolidation or merger with, or purchase or acquisition or assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this Coverage Section. Notice to the **Insurer** of an increase in the number

Certified Document Number: 85013322 - Page 36 of 71

of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the **Policy Period**.

(2)   **Concealment, Misrepresentation Or Fraud**
Notwithstanding Section 10 in the General Terms & Conditions Section, this Coverage Section is void in any case of fraud by the **Company** as it relates to this Coverage Section at any time.  It is also void if the **Company**, at any time, intentionally conceals or misrepresents a material fact concerning:
(i)      this Coverage Section;
(ii)     the property covered under this Coverage Section;
(iii)    the **Company's** interest in the property covered under this Coverage Section; or
(iv)     a claim under this Coverage Section.

(3)   **Duties In the Event of Loss**
After the **Company Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities**, or **Other Property**, the **Company** must:
(i)      notify the **Insurer** as soon as possible if the **Company** has reason to believe that the value of any loss will equal or exceed one-fourth (1/4) of the Deductible Amount specified in Item 5. D of the Declarations
(ii)     if the **Company** has reason to believe that any loss (except for loss covered under Insuring Agreements A and B) involves a violation of law, the **Company** must also notify the local law enforcement authorities.
(iii)    submit to examination under oath at the **Insurer's** request and give the **Insurer** a signed statement of its answers.
(iv)     produce for the **Insurer's** examination all pertinent records.
(v)      give the **Insurer** a detailed, sworn proof of loss within 120 days.
(vi)     cooperate with the **Insurer** in the investigation and settlement of any claim.

With respect to knowledge, belief or **Discovery** referenced in this Condition 6.(a)(3), **Company** shall mean the **Company's** Corporate Compliance, Ethics or Responsibility Officer, General Counsel, any **Employee** of the Risk Management Department or Human Resources Department.

(4)   **Employee Benefit Plans**
(i)      **Employee Benefit Plans** are included in the definition of **Company** solely with respect to Insuring Agreement A.
(ii)     If any **Employee Benefit Plan** is covered jointly with any other entity under this Coverage Section, the **Company** or the plan administrator must select a Limit of Liability for Insuring Agreement A that is sufficient to provide a Limit of Liability for each **Employee Benefit Plan** that is at least equal to that required if each **Employee Benefit Plan** were separately insured.
(iii)    With respect to loss sustained or **Discovered** by any such **Employee Benefit Plan**, Insuring Agreement A is replaced by the following: The **Insurer** will pay for loss of or damage to **Funds** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.
(iv)     If the **Parent Company** is an entity other than an **Employee Benefit Plan**, any payment the **Insurer** makes for loss sustained by any

**Employee Benefit Plan** will be made to the **Employee Benefit Plan** sustaining the loss.

(v)     If two or more **Employee Benefit Plans** are covered under this Coverage Section, any payment the **Insurer** makes for loss

      a.     sustained by two or more **Employee Benefit Plans**, or

      b.     of commingled **Funds** or **Other Property** of two or more **Employee Benefit Plans**,

resulting directly from an **Occurrence** will be made to each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Liability, as indicated in Item **4** D. of the Declarations, required for each **Employee Benefit Plan** bears to the total Limit of Liability of all **Employee Benefit Plans** sustaining loss.

(vi)     The Deductible Amount as indicated in Item 5 D. of the Declarations and applicable to Insuring Agreement A does not apply to loss sustained by any **Employee Benefit Plan**.

(5)     **Examination Of The Company's Books And Records**

The **Insurer** may examine and audit the **Company's** books and records as they relate to this Coverage Section at any time during the **Policy Period** and up to three (3) years thereafter.

(6)     **Extended Period To Discover Loss**

The **Insurer** will pay for loss sustained by the **Company** prior to the effective date of cancellation of this Coverage Section, which is **Discovered** by the **Company**:

(i)     no later than one (1) year from the effective date of such cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Company**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this Coverage Section, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(ii)     no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plans**

(7)     **Inspections And Surveys**

(i)     The **Insurer** has the right to:

      a.     make inspections and surveys at any time;

      b.     give the **Company** reports on the conditions found; and

      c.     recommend changes.

(ii)     The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions undertaken by the **Insurer** relate only to insurability and the premiums charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health and safety of workers or the public. The **Insurer** does not warrant that conditions:

      a.     are safe or healthful; or

      b.     comply with laws, regulations, codes or standards.

Conditions   6.(a)(7)(i) and 6.(a)(7)(ii) above apply not only to the **Insurer** but also to any rating, advisory, rate service or similar organization which makes

Certified Document Number: 85013322 - Page 38 of 71

insurance inspections, surveys, reports or recommendations.

(8)     **Parent Company**
    (i)     If the **Parent Company**, or any partner, **Member**, or officer of the **Parent Company** or of any **Company** has knowledge of any information relevant to this Coverage Section, that knowledge is considered knowledge of the **Company**.
    (ii)    An **Employee** of the **Parent Company** or of any **Company** covered under this Coverage Section is considered to be an **Employee** of the **Parent Company** and every **Company** covered under this Coverage Section.
    (iii)   If this Coverage Section or any of its Agreements is cancelled as to any **Company**, loss sustained by that **Company** is covered only if it is **Discovered** by the **Company**:
        a.      no later than one (1) year from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Company**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this Coverage Section, whether or not such other insurance provides coverage for loss sustained prior to its effective date.
        b.      no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.
    (iv)    The **Insurer** will not pay more for loss sustained by the **Parent Company,** any one or more **Subsidiary** and/or any one or more **Employee Benefit Plan** than the amount the **Insurer** would pay if all such loss had been sustained only by the **Parent Company** or only one **Subsidiary**, or only one **Employee Benefit Plan**.
    (v)     Payment by the **Insurer** to the **Parent Company** for loss sustained by any **Company**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

(9)     **Liberalization**
If the **Insurer** adopts any revision that would broaden the coverage under this Coverage Section without additional premium within forty-five (45) days prior to or during the **Policy Period**, the broadened coverage will immediately apply to this Coverage Section.

(10)    **Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate**
    (i)     Loss Sustained Partly During This Coverage Section and Partly During Prior Insurance
If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place:
        a.      partly during the **Policy Period**; and
        b.      partly during the **Policy Period(s)** of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Company** or any predecessor in interest;

Certified Document Number: 85013322 - Page 39 of 71

and this Coverage Section became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss sustained by the **Company** during this **Policy Period**. The **Insurer** will then settle the remaining amount of loss sustained by the **Company** during the policy period(s) of the prior insurance.

(ii)    Loss Sustained Entirely During Prior Insurance

If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place entirely during the policy period(s) of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Company** or any predecessor in interest, the **Insurer** will pay for the loss provided:

    a.    this Coverage Section became effective at the time of cancellation of the prior insurance; and

    b.    the loss would have been covered under this Coverage Section had it been in effect at the time of the **Occurrence**.

(iii)    In settling loss subject to this Condition:

    a.    the most the **Insurer** will pay for the entire loss is the highest single Limit of Liability applicable during the period of loss, whether such limit was written under this Coverage Section or was written under the prior insurance issued by the **Insurer**.

    b.    the **Insurer** will apply the applicable Deductible Amount shown in Item 5 D. of the Declarations to the amount of loss sustained under the **Policy Period**. If no loss was sustained under the **Policy Period**, the **Insurer** will apply the Deductible Amount shown in Item 5 D. of the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount, provided in Item 5 D. of the Declarations, is larger than the amount of loss sustained under this Coverage Section, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance. The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

(iv)    The following examples demonstrate how the **Insurer** will settle losses subject to this Condition:

**EXAMPLE NO. 1:**

The Company sustained a covered loss of $10,000 resulting directly from an occurrence taking place during the terms of Policy **A** and Policy **B.**

### POLICY A

The current policy. Written at a limit of liability of $50,000 and a deductible amount of $5,000.

### POLICY B

Issued prior to Policy **A.** Written at a limit of liability of $50,000 and a deductible amount of $5,000.

The amount of loss sustained under Policy A is $2,500 and under Policy B is $7,500.

The highest single limit of liability applicable to this entire loss is $50,000 written under Policy **A.** The Policy **A** deductible amount of $5,000 applies. The loss is settled as follows:

Certified Document Number: 85013322 - Page 40 of 71

1.      The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount the Insurer will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00).

2.      The **remaining** amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining deductible amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most the Insurer will pay for this loss is $5,000.

## EXAMPLE NO. 2:

The Company sustained a covered loss of $250,000 resulting directly from an occurrence taking place during the terms of Policy **A** and Policy **B.**

### POLICY A

The current policy. Written at a limit of liability of $125,000 and a deductible amount of $10,000.

### POLICY B

Issued prior to Policy **A.** Written at a limit of liability of $150,000 and a deductible amount of $25,000.

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B** is $75,000.

The highest single limit of liability applicable to this entire loss is $150,000 written under Policy **B.** The Policy **A** deductible amount of $10,000 applies. The loss is settled as follows:

1.      The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount the Insurer will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000 which is greater than the $125,000 policy limit.

2.      The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount the Insurer will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most the Insurer will pay for this loss is $150,000.

## EXAMPLE NO. 3:

The Company sustained a covered loss of $2,000,000 resulting directly from an occurrence taking place during the terms of Policies **A, B, C** and **D.**

### POLICY A

The current policy. Written at a limit of liability of $1,000,000 and a deductible amount of $100,000.

### POLICY B

Issued prior to Policy **A.** Written at a limit of liability of $750,000 and a deductible amount of $75,000.

### POLICY C

Certified Document Number: 85013322 - Page 41 of 71

Issued prior to Policy **B.** Written at a limit of liability of $500,000 and a deductible amount of $50,000.

## POLICY D

Issued prior to Policy **C.** Written at a limit of liability of $500,000 and a deductible amount of $50,000.

The amount of loss sustained under Policy **A** is $350,000, under Policy **B** is $250,000, under Policy **C** is $600,000 and under Policy **D** is $800,000.

The highest single limit of liability applicable to this entire loss is $1,000,000 written under Policy **A.** The Policy **A** deductible amount of $100,000 applies. The loss is settled as follows:

1.   The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount the Insurer will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

2.   The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount the Insurer will pay is $250,000 (no deductible is applied).

3.   The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount the Insurer will pay is $500,000, the policy limit (no deductible is applied).

4.   The Insurer will not make any further payment under Policy **D** as the maximum amount payable under the highest single limit of liability applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most the Insurer will pay for this loss is $1,000,000.

Certified Document Number: 85013322 - Page 42 of 71

(11)     **Loss Sustained During Prior Insurance Not Issued By the Insurer Or Any Affiliate**

    (i)    If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place during the policy period of any prior cancelled insurance that was issued to the **Company** or to a predecessor in interest by another insurer, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this Coverage Section, provided:

        a.    this Coverage Section became effective at the time of cancellation of the prior insurance; and

        b.    the loss would have  been covered under this Coverage Section had it been in effect at the time of the **Occurrence**.

    (ii)    In settling loss subject to this Condition:

        a.    the most the **Insurer** will pay for the entire loss is the lesser of the Limits of Liability as indicated in Item 4.D of the Declarations applicable during the period of loss, whether such limit was written under this Coverage Section or was written under the prior cancelled insurance.

        b.    the **Insurer** will apply the applicable Deductible Amount as indicated in Item 5.D of the Declarations to the amount of loss sustained under the prior cancelled insurance.

    (iii)    The insurance provided under this section is subject to the following:

        a.    If loss covered under this Condition 6.(a)(11) is also partially covered under Condition 6.(a)(10) above, the amount recoverable under this Condition 6.(a)(11) is part of, not in addition to, the amount recoverable under Condition 6.(a)(10) above.

        b.    For loss covered under this Condition 6.(a)(11) the amount recoverable under this section is part of, not in addition to, the Limit of Liability as indicated in Item 4 of the Declarations applicable to the loss covered under this Coverage Section and is limited to the lesser of the amount recoverable under:

            i.    this Coverage Section as of its effective date; or

            ii.    the prior cancelled insurance had it remained in effect.

(12)     **Ownership of Property; Interests Covered**

The property covered under this Coverage Section is limited to property:

    (i)    that the **Company** owns or leases; or

    (ii)    that the **Company** holds for others whether or not the **Company** is legally liable for the loss of such property.

However, this Coverage Section is for the **Company's** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this Coverage Section must be presented by the **Company**.

(13)     **Records**

The **Company** must keep records of all property covered under this Coverage Section so the **Insurer** can verify the amount of any loss.

(14)     **Recoveries**

Any recoveries, whether effected before or after any payment under this Coverage Section, whether made by the **Insurer** or the **Company**, shall be applied net of the expense of such recovery:

Certified Document Number: 85013322 - Page 43 of 71

(i)     first, to the **Company** in satisfaction of the **Company's** covered loss in excess of the amount paid under this Coverage Section;

(ii)     second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Company's** claim;

(iii)     third, to the **Company** in satisfaction of any Deductible Amount as indicated in Item 5 of the Declarations; and

(iv)     fourth, to the **Company** in satisfaction of any loss not covered under this Coverage Section.

Recoveries do not include any recovery:

(i)     from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

(ii)     of original **Securities** after duplicates of them have been issued.

.

(15)     **Transfer Of The Company's Rights And Duties Under This Coverage Section**
The **Company's** rights and duties under this Coverage Section may not be transferred without the **Insurer's** written consent.

(16)     **Transfer Of The Company's Rights Of Recovery Against Others To The Insurer**
The **Company** must transfer to the **Insurer** all of its rights of recovery against any person or organization for any loss the **Company** sustained and for which the **Insurer** has paid or settled. The **Company** must also do everything necessary to secure those rights and do nothing after loss to impair them.

(17)     **Valuation-Settlement**

(i)     The value of any loss for purposes of coverage under this Coverage Section shall be determined as follows:

(a)     loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Company's** option, pay for loss of **Money** issued by any country other than the United States of America:

1.     At face value in the **Money** issued by that country; or

2.     In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(b)     loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at its option:

1.     pay the market value of such **Securities** or replace them in kind, in which event the **Company** must assign to the **Insurer** all the **Company's** rights, title and interest in and to those **Securities**; or

2.     pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(i)     market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

(ii)     the Limit of Liability applicable to the **Securities**.

Certified Document Number: 85013322 - Page 44 of 71

(c)    loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

1.    the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

2.    the amount the **Company** actually spends that is necessary to repair or replace the lost or damaged property; or

3.    the Limit of Liability applicable to the lost or damaged property.

With regard to Conditions 6.(a)(17)(i)(c)(1) through 6.(a)(17)(i)(c)(3), the **Insurer** shall not pay on a replacement cost basis for any loss or damage:

i.    until the lost or damaged property is actually repaired or replaced; and

ii.    unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

(ii)    the **Insurer** will, at the **Company's** option, settle loss or damage to property other than **Money**:

(a)    in the **Money** of the country in which the loss or damage occurred; or

(b)    in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(iii)    Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

**(b)**    **Conditions Applicable To Insuring Agreement A**

(1)    Termination As To Any Employee

This Insuring Agreement terminates as to any **Employee**:

a.    as soon as the **Company's** Corporate Compliance, Ethics or Responsibility Officer, General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or, any corporate Vice President or above not in collusion with the **Employee**; or

b.    as soon as any of the **Company's** partners, **Managers**, **Members**, officers, directors, or trustees not in collusion with the **Employee**;

learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after the **Employee** became employed by the **Company**.

c.    on the date specified in a notice mailed to the **Parent Company**. That date will be at least thirty (30) days after the date of mailing.  The **Insurer** will mail or deliver its notice to the **Parent Company's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**(c)**    **Conditions Applicable To Insuring Agreement B**

(1)    Deductible Amount

The Deductible Amount as provided in Item 5.D of the Declarations does not apply to legal expenses paid under Insuring Agreement B.

(2)    Electronic And Mechanical Signatures

Certified Document Number: 85013322 - Page 45 of 71

The **Insurer** will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

(3)    Proof Of Loss

The **Company** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**(d)    Conditions Applicable To Insuring Agreements D and E**

(1)    Armored Motor Vehicle Companies

a.    Under Insuring Agreement E, the **Insurer** will only pay for the amount of loss the **Company** cannot recover:

(i)    under the **Company's** contract with the armored motor vehicle company; and

(ii)    from any insurance or indemnity carried by, or for the benefit of customers of the armored motor vehicle company.

(2)    Special Limit of Liability For Specified Property

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to:

a.    precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

b.    manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**(e)    Conditions Applicable To Insuring Agreement F**

(1)    Special Limit of Liability For Specified Property

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

Certified Document Number: 85013322 - Page 46 of 71

Endorsement No.: 1
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## OFAC EXCLUSION
## (all Coverage Sections)

It is understood and agreed that Clause 3, EXCLUSIONS, of all applicable Coverage Sections is amended by adding the following exclusion:

This policy shall not cover any **Loss** in connection with any **Claim** in the event that such coverage would not be in compliance with any United States of America economic or trade sanctions, laws or regulations, including but not limited to the U.S. Treasury Department's Office of Foreign Assets Control, or any similar foreign, federal, state or statutory law or common law.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10005 PPVNP (07/08)

Endorsement No.: 2
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## ADD FULL NUCLEAR EXCLUSION

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is amended by adding the following exclusion:

This policy shall not cover any **Loss** in connection with any **Claim** alleging, arising out of, based upon or attributable to nuclear fission, nuclear fusion, radioactive contamination or the hazardous properties of any nuclear materials.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10013 PPVNP (03-08)

Endorsement No.: 3
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
**By: Starr Indemnity & Liability Company**

## TEXAS AMENDATORY ENDORSEMENT

This endorsement modifies insurance coverage provided under the RESOLUTE PORTFOLIO FOR PRIVATE COMPANIES INSURANCE POLICY.

COVERAGE PART: GENERAL TERMS AND CONDITIONS SECTION

It is understood and agreed:

A. The fifth and sixth paragraphs of Clause **3. LIMITS OF LIABILITY** are deleted and replaced by the following:

If any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this Policy as respects the applicable Coverage Section(s) will be completely fulfilled and the **Insurer** will have no further obligations under this policy of any as respects the applicable Coverage Section(s).

Any payment of **Loss** under any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations shall reduce and may exhaust the Aggregate Policy Limit of Liability as set forth in Item 4 C. of the Declarations. If the Aggregate Policy Limit of Liability is exhausted by the payment of such **Loss**, the **Insurer** will have no further obligations of any kind as respects this policy.

B. Clause **6. DEFENSE OF CLAIM AND SETTLEMENT** is amended by the following:

The **Insurer** shall provide written notice to the **Insured** of an initial offer to settle or compromise a **Claim** against the **Insureds**, not less than ten (10) days after the date on which the offer to settle or compromise is made, unless the **Insured** advised the **Insurer** of such initial offer to settle or compromise the **Claim**. The **Insurer** shall also provide written notice to the **Insured** of the settlement of a **Claim** against an **Insured**, not less than thirty (30) days after the settlement.

C. Clause **8. DISCOVERY CLAUSE** is deleted and replaced by the following:

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall receive, without payment of an additional premium, a Discovery Period of thirty (30) days following the effective date of such non-renewal, termination or **Organizational Change**. This thirty (30) day period is called the "Automatic Discovery Period" in this policy.

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six years following the effective date of the Automatic Discovery Period. In the event of the non-renewal of one or more Coverage Sections of this policy, the **Insured** may purchase a Discovery Period solely as respects the Coverage Section(s) that has been non-renewed.

CVS FL 10409 PV (11/08)

The **Insured's** right to purchase a Discovery Period shall lapse unless written notice of election to purchase such Discovery Period and the additional premium for such Discovery Period is received by the **Insurer** or its authorized agent within sixty (60) days after such non-renewal, termination or **Organizational Change**. The additional premium for a Discovery Period of one or two years is set forth in Item 8 of the Declarations and shall be determined by multiplying the applicable percentage set forth in Item 8 of the Declarations by the premium for each applicable Coverage Section(s) as set forth in Item 7 of the Declarations. The additional premium for a Discovery Period of more than two years shall be determined by the **Insurer**.

During such Automatic Discovery Period and such **Discovery Period**, the **Insured** may provide the **Insurer** with written notice, pursuant to Clause 5 of this policy, of **Claims** made against an **Insured** solely with respect to **Wrongful Acts** occurring prior to the effective date of the non-renewal or termination of the policy or the effective date of the **Organizational Change** and otherwise covered by this policy.

The Limit of Liability for the Automatic Discovery Period and, if purchased, the Discovery Period, shall be part of, and not in addition to, the applicable Limits of Liability set forth in Item 4 of the Declarations.

The Discovery Period premium shall be fully earned at the inception of the Discovery Period. The Discovery Period is non-cancellable.

D.  The first paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** is amended by the addition of the following:

The customary short rate return premium shall be calculated by multiplying the pro rata unearned premium by ninety percent (90%).

E.  The second paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** is amended by the addition of the following:

The notice of cancellation shall state the reason for cancellation. The **Insurer** shall not cancel this policy based solely on the fact that the **Insured** is an elected official.

F.  The last paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** shall be amended by the addition of the following:

The notice of non-renewal shall state the reason for non-renewal. If notice of non-renewal is delivered or mailed later than the sixtieth (60th) day prior to the expiration of the **Policy Period**, the policy's coverage shall remain in effect until the sixty-first (61st) day after the date on which the notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration of the **Policy Period** shall be computed pro rata based on the policy's current rate. If this policy is so extended, such period of extended coverage shall be part of and not in addition to the **Policy Period**. The **Insurer** shall not refuse to renew this policy based solely on the fact that the **Insured** is an elected official.

G.  The third sentence of Clause **13. ORGANIZATIONAL CHANGES** is deleted and replaced by the following:

This policy shall be non-cancellable upon the effective time of the **Organizational Change**.

CVS FL 10409 PV (11/08)

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10409 PV (11/08)

Endorsement No.: 4
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
**By: Starr Indemnity & Liability Company**

## TEXAS AMENDATORY ENDORSEMENT

This endorsement modifies insurance coverage provided under the RESOLUTE PORTFOLIO FOR PRIVATE COMPANIES INSURANCE POLICY.
COVERAGE PART: DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION

It is understood and agreed:

A. Paragraph (i)(ii) of Clause **3. EXCLUSIONS** is amended by inserting the word "express" before the word
   "approval".


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


_____
        **Authorized Representative**

Certified Document Number: 85013322 - Page 52 of 71

CVS FL 10550 PV (7/09)

Endorsement No.: 5
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
**By: Starr Indemnity & Liability Company**

# IMPORTANT NOTICE

To obtain information or make a complaint:

You may call Starr Indemnity and Liability Company's toll-free telephone number for information (including information regarding claims) or to make a complaint at:

**866-519-2522**

You may also write the Insurer at:

***Starr Indemnity and Liability Company***
***Attn: Financial Lines Department***
***399 Park Avenue***
***8th Floor***
***New York, NY 10022***

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the Texas Department of Insurance:

**P.O. Box 149104**
**Austin, TX 78714-9104**
**Fax: (512) 475-1771**
**Web: http://www.tdi.state.tx.us**
**Email: ConsumerProtection@tdi.state.tx.us**

**PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a Claim you should first contact Starr Indemnity and Liability Company. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

CVS FL 10407 PPVNP (10/08)

Endorsement No.: 6
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND DECLARATIONS PAGE:
## CHANGE DISCOVERY PERIOD PREMIUM

It is understood and agreed that Item 8 of the Declarations, DISCOVERY PERIOD, is deleted in its entirety and replaced with the following:

ITEM 8:   DISCOVERY PERIOD

    A.   One Year:  **100% of the applicable premium**

    B.   Two to Six Years:  **premium to be determined**

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 54 of 71

CVS FL 10737 PPVNP (3/10)

Endorsement No.: **7**
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## RELIANCE ENDORSEMENT
### (other applications)

In granting coverage under this policy, it is understood and agreed that the **Insurer** has relied upon the statements and representations contained in all applications, together with attachments and any other materials submitted for this policy (including all such previous policy applications, and their attachments and materials, for which this policy is a renewal or succeeds in time), as being accurate and complete. It is further understood and agreed that the **Insureds** represent to the **Insurer** that the statements and representations made in such application(s) were accurate on the date such statements and representations were so given. All such statements and representations in such application(s) are the basis of this policy and are to be considered as incorporated into this policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10036 PPVNP (1/09)

Endorsement No.: 8
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## STATE AMENDATORY INCONSISTENCY

It is understood and agreed that the General Terms & Conditions Section is amended by adding the following:

It is understood and agreed that in the event that there is an inconsistency between a state amendatory attached to this policy and any other term or condition of this policy, then where permitted by law, the **Insurer** shall apply those terms and conditions of either the amendatory or the policy which are more favorable to the **Insured**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10018 PPVNP (07/08)

Endorsement No.:  9
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

### AMEND CANCELLATION CLAUSE – INSURER RATING DOWNGRADE

It is understood and agreed that Clause 12. CANCELLATION AND NON RENEWAL CLAUSE, of the General Terms and Conditions Coverage Section is amended by adding the following at the end:

> Notwithstanding anything to the contrary herein, this policy may also be cancelled by the **Parent Company** immediately upon written notice to the Insurer by the **Parent Company** if the **Insurer's** financial strength rating for AM Best falls below "A-" and the **Insurer** shall return the customary pro-rata unearned proportion of the premium.

**Authorized Representative**

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Certified Document Number: 85013322 - Page 57 of 71

CVS FL 10995 PPV (11/10)

1

Endorsement No.: 10
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## 100% ALLOCATION DEFENSE COSTS

I. It is understood and agreed that Clause 7. ALLOCATION of the General Terms & Conditions Section is deleted and replaced by the following:

### 7. ALLOCATION

(a) If both **Loss** covered under this policy and loss not covered under this policy are incurred by the **Insureds** on account of any **Claim** because such **Claim** against the **Insureds** includes both covered and non-covered matters and/or parties, then coverage under this Coverage Section with respect to such **Claim** shall apply as follows:

(i) **Defense Costs**: One hundred percent (100%) of reasonable and necessary **Defense Costs** incurred by the **Insured** on account of such **Claim** will be considered covered **Loss**; and

(ii) **Loss** other than **Defense Costs**: All remaining loss incurred by the **Insured** on account of such **Claim** shall be allocated by the **Insurer** between covered **Loss** and non-covered loss based on the relative legal and financial exposures of the parties to such matters and, in the event of a settlement in such **Claim**, also based on the relative benefits to the **Insureds** from such settlement.

(b) If an allocation of **Loss** cannot be agreed to by the **Insurer** and the **Insured**:
(i) the **Insurer** shall pay those amounts which it believes to be fair and equitable until an amount shall be agreed upon or determined pursuant to the provisions of this policy; and
(ii) there will be no presumption of allocation of **Loss** in any arbitration, suit or other proceeding.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10837 PPVNP (4/10)

Endorsement No.:  11
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## ADD LIBERALIZATION CLAUSE
### (General Terms and Conditions Section)

It is understood and agreed that the General Terms and Conditions Section is amended by adding the following at the end:

LIBERALIZATION CLAUSE

In the event that the **Insurer** shall begin selling on an admitted basis in the state indicated in Item 1 of the Declarations, either (1) a new private company primary policy form, or coverage section, sold as a replacement of or alternative to this; or (2) an enhancement of coverage endorsement to this policy form, which is to be made available to all **Insureds** and for which no additional premium is required, then the **Parent Company** shall have the right to such new policy or such new coverage enhancement endorsement subject to all underwriting information or particulars as the **Insurer** may require for such new policy, coverage section or enhanced coverage.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10977 PV (9/10)

Endorsement No.:  12
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND DEFENSE OF CLAIM AND SETTLEMENT CLAUSE – 80% APPLIES TO DEFENSE COSTS AND 10% RETENTION REDUCTION FOR CONSENT

It is understood and agreed that the General Terms & Conditions Section is amended by deleting the sixth paragraph of Clause 6, DEFENSE OF CLAIM AND SETTLEMENT, in its entirety and replacing with the following:

> The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate.

> In the event the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled the **Claim**; plus (2) eighty percent (80%) of covered **Loss** in excess of the amount for which the **Insurer** could have settled the **Claim**. In the event the **Insured** consents to such settlement recommended by the **Insurer**, then the **Insured's** applicable Retention Amount stated in Item 5. of the DECLARATIONS shall be reduced by ten (10%) percent for such **Claim**. However, in no event shall the **Insurer's** liability exceed the applicable Limit of Liability as set forth in Item 4. of the Declarations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 60 of 71

Endorsement No.: 13
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND REPRESENTATIONS AND SEVERABILITY-TOP 3 IMPUTE TO COMPANY
### (General Terms and Conditions Section)

It is understood and agreed that Clause 10. REPRESENTATIONS AND SEVERABILITY of the General Terms and Conditions Section is deleted in its entirety and replaced by the following:

**10. REPRESENTATIONS AND SEVERABILITY**

It is agreed that the **Insurer** has relied upon the information contained in the **Application**, as applicable to each Coverage Section, in issuing this policy. In regard to the statements, warranties, representations and information contained in the **Application**, no knowledge of any **Insured** shall be imputed to any other **Insured** for the purpose of determining whether coverage is available under this policy for any **Claim** made against such **Insured**. However, the knowledge possessed by any **Insured Person** who is a past or current chief executive officer, chief financial officer, or chief operating officer of the **Company** shall be imputed to the **Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10878 PVP (5/10)

Endorsement No.:  14
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND SUBROGATION FINAL ADJUDICATION ENDORSEMENT

It is understood and agreed that Clause 19. SUBROGATION of the General Terms & Conditions
Section is deleted in its entirety and replaced by the following:

### 19.    SUBROGATION

In addition to any right of subrogation existing at law, in equity or otherwise, in the event
of any payment by the **Insurer** under this policy, the **Insurer** shall be subrogated to the
extent of such payment to all of the **Insured(s)'** rights of recovery; provided, however,
that the **Insurer** shall not exercise that right until the legal matter underlying the **Claim**
upon which such payment is based is subject to a final judgment or adjudication. The
**Insured(s)** shall execute all papers required (including those documents necessary for the
**Insurer** to bring suit or other form of proceeding in their name) and do everything that
may be necessary to pursue and secure such rights.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
            **Authorized Representative**

CVS FL 10834 PPV (4/10)

Endorsement No.: 15
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND CONDUCT EXCLUSIONS – ADD NON-APPEALABLE, DELETE IMPROPER & IMPUTATION TO COMPANY CEO & CFO ONLY
(Directors & Officers Liability Coverage Section)

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is amended by deleting Exclusions (a), (b) and (c) and replacing them with the following:

This policy shall not cover any **Loss** in connection with any **Claim**:

(a)     arising out of, based upon or attributable to the gaining of any profit or advantage or illegal remuneration if a final non-appealable judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

(b)     arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by **an Insured** if a final non-appealable judgment or adjudication establishes that such act or violation occurred;

(c)     arising out of, based upon or attributable to the purchase or sale by **an Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and any amendments thereto or similar provisions of any state statutory law if a final non-appealable judgment or adjudication establishes that a violation of Section 16(b) occurred;

In determining the applicability of Exclusions (a), (b) and (c) the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured** shall not be imputed to any other **Insured** in respect of the coverage afforded under Clause I. Insuring Agreements A. and B.; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current chief executive officer, or chief financial officer of the **Company** shall be imputed to the **Company** in respect of the coverage afforded under Clause I. Insuring Agreements C.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 63 of 71

Endorsement No.: 16
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

### ANTI - TRUST EXCLUSION –
### APPLIES TO ENTITY ONLY
### (D&O Coverage Section)

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability
Coverage Section is amended by adding the following exclusion:

> This policy shall not cover any **Loss** in connection with any **Claim** alleging, arising
> out of, based upon or attributable to any violation of any law, whether statutory,
> regulatory or common, as respects any of the following: anti-trust, business
> competition, unfair trade practices or tortious interference in another's business or
> contractual relationships; provided, however, that this exclusion shall apply only to
> the **Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 64 of 71

CVS FL 10093 PV (07/08)

Endorsement No.: 17
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND CONTRACT EXCLUSION
### (D&O Coverage Section)

It is understood and agreed that Exclusion (e) of Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is deleted and replaced by the following exclusion:

(e) based upon, arising from, or in consequence of any actual or alleged liability of any **Insured** under any express contract or agreement, except to the extent that such **Insured** would have been liable in the absence of such contract or agreement;

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10087 PV (07/08)

Endorsement No.: 18
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND DEFINITION OF COMPANY
### (General Terms & Conditions)

It is understood and agreed that Definition (c), **"Company"**, of the General Terms & Conditions Section is amended to include the following:

ZG Real Estate Holdings, Ltd.
AHG-C Hardy Residential, LP.
ZG Real Estate Management Group, Inc.
ZG Investment Properties, LTD.
Eastwood Terrace and Oakhill Plaza, LLC.
Gulf Coast Arms GP, LLC.
Gulf Coast Arms, Ltd.

It is further understood and agreed that this endorsement shall apply solely to the following Coverage Section(s):

Directors & Officers Liability

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10187 PPV (07/08)

Endorsement No.:  19
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

### AMEND DEFINITION OF COMPANY
### (General Terms & Conditions)

It is understood and agreed that Definition (c), **"Company"**, of the General Terms & Conditions Section is amended to include the following:

Zieben Homes GP
Zieben Homes Ltd
Estate of Herbert Zieben

It is further understood and agreed that this endorsement shall apply solely to the following Coverage Section(s):

Directors & Officers Liability
Crime & Fidelity

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**AUTHORIZED REPRESENTATIVE**

CVS FL 10187 PPV (07/08)

Endorsement No.:  20
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## LOSS PAYABLE

## SCHEDULE

| |
|---|
| **Name Of Loss Payee:**<br>Hunt Capital Partners Tax Credit Fund 2011-3, LP ISAOA ATIMA<br>c/o Alden Pacific Asset Management LLC<br><br>**Address Of Loss Payee:**<br>1225 17th Street Suite 1400<br>Denver CO 80202<br>ATTN: Insurance Monitoring |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

It is understood and agreed that:

1.  The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company**.

2.  This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

   Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10923 PV (7/10)

Endorsement No.:  21
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## LOSS PAYABLE

## SCHEDULE

| |
|---|
| **Name Of Loss Payee:**<br>FNBC Leasing Corporation<br>C/O JPMorgan Capital Corporation, Housing Investments<br><br>**Address Of Loss Payee:**<br>21 S. Clark 12th Floor<br>Chicago, IL 60603-0502<br>Attn: Jon Zywiciel |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

It is understood and agreed that:

1. The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company**.

2. This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

   Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 69 of 71

CVS FL 10923 PV (7/10)

Endorsement No.:  22
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## LOSS PAYABLE

## SCHEDULE

| |
|---|
| **Name Of Loss Payee:**<br>Greystone Funding Corporation<br>Its successors and/or assigns ATIMA<br><br><br>**Address Of Loss Payee:**<br>419 Belle Air Lane<br>Warrenton, VA  20186 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

It is understood and agreed that:

1.  The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company**.

2.  This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

    Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 70 of 71

CVS FL 10923 PV (7/10)

Endorsement No.:        22
This endorsement, effective:        November 3, 2017
(at 12:01 a.m. Standard Time at the address stated in Item 1 of the Declarations)
Forms a part of Policy No.:        1000057336161
Issued to: AHG Properties, LLC
By:        Starr Indemnity & Liability Company

## AMEND POLICY PERIOD

It is understood and agreed that Item 2 of the Declarations, POLICY PERIOD, is deleted in its entirety
and replaced with the following:

**ITEM 2:**        **POLICY PERIOD:**        From:   November 3, 2016   To:   November 30, 2017
                (12:01 a.m. Standard Time at the address stated in Item 1)

All **Claims** made during the **Policy Period** and during the amended or extended **Policy Period** set
forth in this endorsement shall be subject to the Limits of Liability set forth in Item 4 of the
Declarations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85013322 - Page 71 of 71

CVS FL 10025 PPVNP (07/08)



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 8, 2019

Certified Document Number:        85013322 Total Pages:  71

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

5/1/2019 1:35 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 33216535
By: Kimberly Garza
Filed: 5/1/2019 1:35 PM

## AFFIDAVIT OF SERVICE

**Exhibit**

**A-4**

State of Texas                    **County of Harris**          **152nd Judicial District Court**

Case Number: 201929904

Plaintiff:
**AHG Properties LLC**

LAW2019000573

vs.

Defendant:
**Starr Indemnity and Liability Company**

Received by Civil Process Direct, LLC on the 30th day of April, 2019 at 2:23 pm to be served on **Starr Indemnity and Liabilty Company By Delivering to its Registered Agent, C.T. Corporation System, 1999 Bryan St. Ste.900, Dallas, TX 75201**.

I, Whitnie Renee Climer, being duly sworn, depose and say that on the **30th day of April, 2019** at **3:00 pm, I:**

executed service upon an **AUTHORIZED** entity by delivering a true copy of the **Citation with Plaintiffs Original Petition, Exhibits** with the date of service endorsed thereon by me, to: **Melissa Torrez** as **Designee** at the address of: **1999 Bryan St. Ste.900, Dallas, TX 75201**, who accepted service for **Starr Indemnity and Liabilty Company**, and informed said person of the contents therein, in compliance with state statutes.

"I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the State of Texas. I have never been convicted of a felony or misdemenor involving moral turpitude in any state or federal jurisdiction. I declare that I have personal knowledge of these facts and the statements in this affidavit are true and correct."

**Whitnie Renee Climer**
PSC-11907, Exp. 3/31/21

Subscribed and sworn to before me on the 1st day of May, 2019 by the affiant who is personally known to me.

Notary Public

**Civil Process Direct, LLC**
**706 Main Street**
**Ste 100**
**Dallas, TX 75202**
**(214) 651-7111**

JASON M. COHEN
My Notary ID # 3102653
Expires April 23, 2022

Our Job Serial Number: LAW-2019000573

© 1992-2019 Database Services, Inc. - Process Server's Toolbox V7.2p

Receipt Number: 814600
Tracking Number: 73619199

**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 201929904

| | |
|---|---|
| PLAINTIFF: AHG PROPERTIES LLC | In the 152nd Judicial |
| vs. | District Court of |
| DEFENDANT: STARR INDEMNITY AND LIABILITY COMPANY | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: STARR INDEMNITY AND LIABILITY COMPANY BY SERVING CT CORPORATION SYSTEMS

1999 BRYAN STREET SUITE 900

DALLAS TX 75201

Attached is a copy of PLAINTIFFS' ORIGINAL PETITION.

This instrument was filed on April 29, 2019, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this April 30, 2019.

*Marilyn Burgess*

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: ANITA PEREZ

Issued at request of:
SAXE, TRACY ALAN
35 NUTMEG DRIVE, STE. 140
TRUMBULL, CT 06611
203-287-2100

Bar Number: 24094388

Tracking Number: 73619199

CAUSE NUMBER: 201929904

| | |
|---|---|
| PLAINTIFF: AHG PROPERTIES LLC | In the 152nd |
| vs. | Judicial District Court |
| DEFENDANT: STARR INDEMNITY AND LIABILITY COMPANY | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock _____. M., on the _____ day of
_____, 20_____.
Executed at (address) _____
in _____ County
at _____ o'clock _____. M., on the _____ day of
_____, 20 _____,
by delivering to _____ defendant,
in person, a true copy of this
Citation together with the accompanying _____ copy(ies) of the
_____ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _____ day of
_____, 20 _____.

FEE: $ _____

County, Texas

AFFIDAVIT ATTACHED

_____ of _____

By: _____
_____          Deputy
        Affiant

On this day, _____, known to me to be
the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn,
he/she stated that this citation was executed by him/her in the exact manner recited
on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this _____ of
_____, 20 _____

_____
Notary Public

CertifiedDocumentNumber:85081111-Page3f3



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   May 8, 2019

Certified Document Number:        85048111 Total Pages:  3

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

5/14/2019 12:30 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 33551140
By: KATINA WILLIAMS
Filed: 5/14/2019 12:30 PM

**CAUSE NO. 2019-29904**

<table>
<tr><td>

**AHG PROPERTIES, LLC AND**<br>
**EASTWOOD TERRACE AND**<br>
**OAKHILL PLAZA, LLC,**<br><br>

    **Plaintiffs,**<br><br><br>

**vs.**<br><br>

**STARR INDEMNITY AND LIABILITY**<br>
**COMPANY,**<br><br>

    **Defendant.**

</td><td>

§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§

</td><td>

**IN THE DISTRICT COURT OF**<br><br><br><br><br>

**HARRIS COUNTY, TEXAS**<br><br><br><br>

**152ND  JUDICIAL DISTRICT**

</td></tr>
</table>

**Exhibit**

**A-5**

## DEFENDANT STARR INDEMNITY AND LIABILITY COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' ORIGINAL PETITION

COMES NOW, Starr Indemnity and Liability Company ("Defendant" or "Starr") and files this, its Answer and Affirmative Defenses to AHG Properties, LLC ("AHG") and Eastwood Terrace and Oakhill Plaza, LLC's ("Eastwood" and collectively "Plaintiffs") Original Petition, and for same would respectfully show the Court as follows:

## I.
## GENERAL DENIAL

1.     Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendant generally denies each and every allegation pled by Plaintiffs in their Original Petition and requires that Plaintiffs prove same by the standard of proof provided by the Constitution and laws of this State.

Certified Document Number: 85243062 - Page 1 of 84

## II.
## <u>AFFIRMATIVE DEFENSES</u>

2.      Starr affirmatively asserts that Plaintiffs are barred in whole or in part by the terms, conditions, provisions, limits, exclusion, and endorsements of the Starr Resolute Portfolio policy number 1000057336161 issued to AHG for the policy period November 3, 2016 through November 30, 2017 with a pending or prior date of November 4, 2015 applicable to the Directors and Officers Liability Coverage Section ("Starr Policy").  A true and correct copy of the Starr Policy is attached hereto and incorporated by reference as if fully set forth verbatim.  All such terms, conditions, provisions, limits, exclusions, and endorsements are expressly asserted and incorporated herein as if fully copied and set forth at length.

3.      Starr affirmatively asserts that Plaintiffs have not suffered any damage or injury as a result of any alleged act or failure to act by Starr.

4.      Starr affirmatively asserts that the money Plaintiffs are obligated to pay the United States Department of Housing and Urban Development ("HUD") for unsupported vouchers/subsidies as stated on the HUD-9834 form (also referred to as a Management and Occupancy Review Summary Report or "MOR" Report) is not a "Loss" as defined by the Directors and Officers Liability Coverage Section of the Starr Policy.

5.      Starr affirmatively asserts that the money Plaintiffs are obligated to pay HUD for irregularities in tenant files, including but not limited to incomplete and/or inaccurate information in tenant HUD-50059 forms, incomplete move-in and move-out certifications, required documentation, and signatures on tenant paperwork that did not match prior signatures (suggesting forged signatures) is not a "Loss" as defined by the Directors and Officers Liability Coverage Section of the Starr Policy.

Certified Document Number: 85243062 - Page 2 of 84

6.      Starr affirmatively asserts that the HUD-9832 MOR Report is not a "Claim" as that term is defined by the Directors and Officers Liability Coverage Section of the Starr Policy.

7.      Starr affirmatively asserts that Plaintiffs' costs to comply with the HUD-9832 MOR Report are not "Defense Costs" as defined by the Directors and Officers Liability Coverage Section of the Starr Policy.

8.      Starr affirmatively asserts that "Defense Costs" as defined in the Directors and Officers Liability Coverage Section of the Starr Policy do not include amounts incurred prior to the date a "Claim" was first made and reported to Starr.

9.      Starr affirmatively asserts that Plaintiffs did not comply with the General Terms and Conditions Section of the Starr Policy providing that Plaintiffs shall not admit or assume liability, incur "Defense Costs", enter into any settlement agreement or stipulate to any judgment without the prior written consent of Starr.

10.      Starr affirmatively asserts that Plaintiffs did not comply with the General Terms and Conditions Section of the Starr Policy requiring that Plaintiffs give written notice to Starr of a "Claim" under the Directors and Officers Liability Coverage Section of the Starr Policy.

11.      Starr affirmatively asserts that under Endorsement 17, no coverage is afforded under the Directors and Officers Liability Coverage Section of the Starr Policy for any "Loss" in connection with any "Claim" based on, arising from, or in consequence of any actual or alleged liability of any Insured under any express contract or agreement, except to the extent that such Insured would have been liable in the absence of such contract or agreement.

12.      Starr affirmatively asserts that under Exclusion 3(s) of the Directors and Officers Liability Coverage Section of the Starr Policy, no coverage is afforded under the Directors and Officers Liability Coverage Section of the Starr Policy for any "Loss" in connection with any

**DEFENDANT STARR INDEMNITY AND LIABILITY COMPANY'S ANSWER**
**AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' ORIGINAL PETITION - Page 3**

"Claim" alleging, arising out of, based upon or attributable to the rendering of or failure to render any professional service to a customer or client of the Insured.

13.     Starr affirmatively asserts that no coverage is afforded under the Crime Coverage Section of the Starr Policy for the actions of Plaintiffs' employees because the definition of "Theft" is not met.  More specifically, according to the Starr Policy, "Theft" is defined as "unlawful taking of property to the deprivation of the Insured."  Here, the alleged unlawful actions of Plaintiffs' employees resulted in a deprivation to HUD not the Plaintiffs.

14.     Starr affirmatively asserts that under Exclusion (2) of the Crime Coverage Section of the Starr Policy, no coverage is afforded under the Crime Coverage Section of the Starr Policy for "Loss" caused by an "Employee" if the "Employee" had also committed "Theft" or any other dishonest act prior to the effective date of the Starr Policy and the "Company" or any of its partners, "Members", "Managers", officers, directors or trustees, not in collusion with the "Employee", learned of the "Theft" or dishonest act prior to the inception date of the Starr Policy.

15.     Starr affirmatively asserts that under Exclusion (3) of the Crime Coverage Section of the Starr Policy, no coverage is afforded for "Loss" resulting from "Theft" or any other dishonest act committed by any of the Plaintiffs' "Employees", "Managers", directors or trustees, or authorized representatives, whether acting alone or in collusion with other persons, or while performing services for the "Company" or otherwise except where covered under the Employee Theft Insuring Agreement.

16.     Starr affirmatively asserts that under Exclusion (6) of the Crime Coverage Section of the Starr Policy, no coverage is afforded for "Loss" that is an indirect result of an "Occurrence" covered by the Crime Coverage Section of the Starr Policy, including, but not

Certified Document Number: 85243062 - Page 4 of 84

limited to, "Loss" resulting from:  (i) the "Company's" inability to realize income that would have been realized by the Company had there been no loss or damage to "Money", "Securities", or "Other Property"; (ii) payment of damages of any type for which the "Company" is legally liable.  But Starr will pay compensatory damages arising directly from a "Loss" covered under the Crime Coverage Section; (iii) payment of costs, fees or other expenses incurred by the "Company" in establishing either the existence of or the amount of "Loss" under the Crime Coverage Section, except when covered under Insuring Agreement K.

17.     Starr affirmatively asserts that under Condition (b)(1) of the Crime Coverage Section of the Starr Policy, coverage as to any "Employee" terminates as soon as: the "Company's" Corporate Compliance, Ethics or Responsibility Officer, General Counsel, any "Employee" of the Risk Management Department or Human Resources Department, or, any corporate Vice President or above not in collusion with the" Employee"; or as soon as any of the "Company's" partners, "Managers", "Members", officers, directors, or trustees not in collusion with the "Employee" learn of the "Theft" or any other dishonest act committed by the "Employee" whether before or after the "Employee" becomes employed by the "Company".

18.     In the strict alternative, should the Court find that coverage is or was owed, Starr affirmatively denies the reasonableness of the damages sought by the Plaintiffs, including actual damages, asserted, attorneys' fees, costs, or otherwise.

19.     Starr affirmatively denies it violated the Texas Deceptive Trade Practices Act ("DTPA") and that it received proper written notice of violation of the DTPA.

20.     Starr affirmatively denies that it violated Chapter 541 of the Texas Insurance Code.

Certified Document Number: 85243062 - Page 5 of 84

21.     Starr affirmatively denies that it violated Chapter 542 of the Texas Insurance Code.

22.     Plaintiffs' statutory claims under Chapter 542 of the Texas Insurance Code are barred because their contract claims fail.

23.     Starr affirmatively denies that it violated any duty of good faith and fair dealing.

24.     Starr affirmatively denies that Plaintiffs are entitled to compensatory, actual, statutory, or exemplary damages.

25.     Starr affirmatively denies that Plaintiffs are entitled to attorneys' fees and costs.

26.     To the extent that Plaintiffs pray for punitive damages, Starr invokes its rights under the due process clause of the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment of the United States Constitution.  Starr affirmatively pleads that Plaintiffs' pleading of punitive and/or exemplary damages violates the due process clauses of the Fifth and Fourteenth Amendments inasmuch as punitive and/or exemplary damages can be assessed:

1.     In an amount left to the discretion of the jury and judge;

2.     Further, any party or representative thereof who is subject to any award, if any, does not have the right to refuse to testify against themselves, but must in fact take the stand and/or give deposition testimony or subject their company to the consequences of a default judgment;

3.     The assessment of such a punishment and/or exemplary award is not based upon a clearly defined statutory enactment setting forth a specific *mens rea* requirement and/or the prerequisites of criminal fine and in effect, allows the assessment of such awards even though there are no special standards, limits or other statutory requirements set forth that define the *mens rea* and scope and limit of such awards.  Therefore, the awards are unduly vague and do not meet the requirements of due process; and

4.      In essence, Starr is subject to all of the hazards and risks of what in essence amounts to a fine, and in fact, such awards often exceed normal criminal fines, but Starr received none of the basic rights accorded to a criminal Starr when being subjected to possible criminal penalties.

27.     To the extent Plaintiffs pray for punitive damages, such request should be denied as a violation of the equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, the provisions of the Eighth Amendment to the Constitution of the United States, and the Constitution of the State of Texas, Article 1, Sections 13 and 19.

28.     Starr affirmatively asserts that Plaintiffs are not entitled to punitive damages; however, in the alternative, if the Court makes an award of punitive damages such an award must not violate Starr's rights to due process by being arbitrary, unjust or grossly excessive.  An award of punitive damages must have a reasonable relationship to the harm to Plaintiffs and may not constitute an improper taking by attempting to compensate alleged victims not before the court.

29.     Starr affirmatively asserts that Plaintiffs are not entitled to punitive damages; however, in the alternative, if the Court makes an award of punitive damages, Starr affirmatively asserts that any such award of punitive damages is subject to Texas Civil Practice and Remedies Code Chapter 41 and all evidentiary standards, caps and limits on an award of punitive damages.

## III.
## <u>PRAYER</u>

**WHEREFORE,** Defendant Starr respectfully prays that Plaintiffs take nothing and that upon final hearing thereof, the Court enter judgment against Plaintiffs in favor of Starr, and that Starr recover its costs, fees, expenses, and for such other and further relief, both at law and in equity, to which Starr may justly be entitled.

**DEFENDANT STARR INDEMNITY AND LIABILITY COMPANY'S ANSWER
AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' ORIGINAL PETITION - Page 7**

Respectfully submitted:

**COZEN O'CONNOR**

By: _Alissa Christopher_
_____

Alissa K. Christopher
State Bar No. 12587500
1717 Main Street, Suite 3100
Dallas, Texas  75201-7335
Telephone:  (214) 462-3036
Telecopier: (214) 462-3299

**ATTORNEYS FOR STARR INDEMNITY
AND LIABILITY COMPANY**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the above document has been filed and forwarded to all counsel of record pursuant to the Texas Rules of Civil Procedure on this the 14th day of May, 2019:

Tracy Alan Saxe
Saxe Doernberger & Vita, P.C.
35 Nutmet Drive, Suite 140
Trumbull, CT 06611
***Attorneys for Plaintiffs***

/s/ Alissa K. Christopher
_____

Alissa K. Christopher

LEGAL\41090424\1

**DEFENDANT STARR INDEMNITY AND LIABILITY COMPANY'S ANSWER
AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' ORIGINAL PETITION - Page 8**

**STARR INDEMNITY AND LIABILITY COMPANY**

399 Park Avenue, New York, NY 10022 • Tel. (646) 227-6377

---

# RESOLUTE PORTFOLIO<sup>SM</sup>
## For Private Companies

**POLICY NUMBER: 1000057336161**
**RENEWAL OF: N/A**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section): EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section): THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS.  AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE  (Applicable to all Coverage Sections Other Than the Crime and Fidelity Coverage Section): THE INSURER HAS NO DUTY TO DEFEND ANY CLAIM UNDER THIS POLICY EXCEPT WITH RESPECT TO ANY CLAIM FOR WHICH THE POLICY SPECIFICALLY STATES THAT DUTY TO DEFEND COVERAGE IS PROVIDED.**

**NOTICE (Applicable to All Coverage Sections): PLEASE READ THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

---

## DECLARATIONS - TEXAS

**ITEM 1:** **PARENT COMPANY**:    AHG Properties, LLC

**ADDRESS:**    1980 Post Oak Blvd
Suite 2020
Houston, TX 77056

**ITEM 2:** **POLICY PERIOD**:    From: November 3, 2016    To: November 3, 2017
(12:01 a.m. Standard Time at the address stated in Item 1)

**ITEM 3:** **COVERAGE SECTIONS**

This policy provides coverage only for the following Coverage Sections if purchased by the **Insured** and indicated by an X.

| | | |
|---|---|---|
| Directors & Officers Liability Coverage Section | Yes _X___ | No ____ |
| Derivative Demand Coverage | Yes _X___ | No ____ |
| Employment Practices Liability Coverage Section | Yes ____ | No _X___ |
| Third-Party Liability Coverage | Yes ____ | No _X___ |
| Fiduciary Liability Coverage Section | Yes ____ | No _X___ |

1 of 5

Certified Document Number: 85243062 - Page 9 of 84

CVS FL 10549 PV (6/09)

| Voluntary Compliance Program Coverage | Yes _____ | No _X___ |
| Crime and Fidelity Coverage Section | Yes _X___ | No _____ |

**DECLARATIONS** (continued)                                    **POLICY NO.: 1000057336161**

**ITEM 4:  LIMITS OF LIABILITY**

The Limits of Liability of this policy apply solely to the Coverage Section(s) for which a corresponding limit of liability amount is set forth below.

**A.      AGGREGATE LIMIT OF LIABILITY FOR EACH SEPARATE COVERAGE SECTION OTHER THAN THE CRIME AND FIDELITY COVERAGE SECTION**

(i)

| Separate Coverage Section: Directors & Officers Liability | $1,000,000 |
| Sublimit of Liability for Derivative Demand Coverage | $250,000 |

(ii)

| Separate Coverage Section: Employment Practices Liability | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |

(iii)

| Separate Coverage Section: Fiduciary Liability | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

Each Sublimit of Liability set forth in Item 4 A. above is part of, and not in addition to, the Limit of Liability for the corresponding Separate Coverage Section.

**B.      AGGREGATE LIMIT OF LIABILITY FOR EACH COMBINED COVERAGE SECTION OTHER THAN THE CRIME AND FIDELITY COVERAGE SECTION**

(i)

| Combined Coverage Section: Directors & Officers Liability / Employment Practices Liability / Fiduciary Liability | N/A |
| Sublimit of Liability for Derivative Demand Coverage | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

(ii)

| Combined Coverage Section: Directors & Officers Liability / Employment Practices Liability | N/A |
| Sublimit of Liability for Derivative Demand Coverage | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |

(iii)

| Combined Coverage Section: Directors & Officers Liability / Fiduciary Liability | N/A |

2 of 5

CVS FL 10549 PV (6/09)

| Sublimit of Liability for Derivative Demand Coverage | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

**DECLARATIONS** (continued)                    **POLICY NO.: 1000057336161**

(iv)

| Combined Coverage Section:<br>Employment Practices Liability / Fiduciary Liability | N/A |
| Sublimit of Liability for Third-Party Liability Coverage | N/A |
| Sublimit of Liability for Voluntary Compliance Program Coverage | N/A |
| Sublimit of Liability for HIPAA Claim Coverage | N/A |

Each Sublimit of Liability set forth in Item 4 B. above is part of, and not in addition to, the Limit of Liability for the corresponding Combined Coverage Section.

The Limits of Liability set forth in Item 4 A. and B. above are the maximum limits of liability for all **Loss** including **Defense Costs,** under the applicable Coverage Section(s).

**C.     AGGREGATE POLICY LIMIT OF LIABILITY**          | $2,000,000 |

The above Limit of Liability set forth in Item 4 C. above is the maximum limit of liability for all **Loss**, including **Defense Costs,** for all Coverage Sections purchased other than the Crime and Fidelity Coverage Section.

**D.     PER OCCURRENCE LIMIT OF LIABILITY- CRIME AND FIDELITY COVERAGE SECTION**

The Limits of Liability of this policy apply solely to the Crime and Fidelity Coverage Section(s) for which a corresponding limit of liability amount is set forth below.

**Crime and Fidelity Coverage Section:**

| (i) | Insuring Agreement A, Employee Theft | $1,000,000 |
| (ii) | Insuring Agreement B, Forgery or Alteration | $1,000,000 |
| (iii) | Insuring Agreement C, Inside the Premises – Loss of Money and Securities | $1,000,000 |
| (iv) | Insuring Agreement D, Inside the Premises - Robbery or Safe Burglary of Other Property | $1,000,000 |
| (v) | Insuring Agreement E, Outside the Premises | $1,000,000 |
| (vi) | Insuring Agreement F, Computer Fraud | $1,000,000 |
| (vii) | Insuring Agreement G, Funds Transfer | $1,000,000 |
| (viii) | Insuring Agreement H, Money Orders and Counterfeit Money | $1,000,000 |
| (ix) | Insuring Agreement I, Credit, Debit, Charge Card Forgery | $100,000 |
| (x) | Insuring Agreement J, Clients' Property | N/A |
| (xi) | Insuring Agreement K, Investigative Expense Incurred to Establish Amount of Covered Loss | N/A |

CVS FL 10549 PV (6/09)

Certified Document Number: 85243062 - Page 11 of 84

**DECLARATIONS** (continued)                                    **POLICY NO.: 1000057336161**

**ITEM 5:        RETENTION OR DEDUCTIBLE AMOUNTS**

### RETENTION AMOUNTS

**A. Directors & Officers Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. | $0 |
| (ii)  Insuring Agreement B. and C. | $25,000 |
| (iii) Insuring Agreement D. | $0 |

**B. Employment Practices Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. - Employment Practices Liability Coverage | N/A |
| (ii)  Insuring Agreement B. - Third-Party Liability Coverage | N/A |

**C. Fiduciary Liability Coverage Section:**

| | |
|---|---|
| (i)   Insuring Agreement A. - Fiduciary Liability Coverage | |
|     All Claims, except HIPAA Claims | N/A |
|     HIPAA Claims | N/A |
| (ii)  Insuring Agreement B. - Voluntary Compliance Program Coverage | N/A |

### DEDUCTIBLE AMOUNTS

**D.  Crime and Fidelity Coverage Section:**

| | | |
|---|---|---|
| (i) | Insuring Agreement A, Employee Theft | $10,000 |
| (ii) | Insuring Agreement B, Forgery or Alteration | $10,000 |
| (iii) | Insuring Agreement C, Inside the Premises – Loss of Money and Securities | $10,000 |
| (iv) | Insuring Agreement D, Inside the Premises - Robbery or Safe Burglary of Other Property | $10,000 |
| (v) | Insuring Agreement E, Outside the Premises | $10,000 |
| (vi) | Insuring Agreement F, Computer Fraud | $10,000 |
| (vii) | Insuring Agreement G, Funds Transfer | $10,000 |
| (viii) | Insuring Agreement H, Money Orders and Counterfeit Money | $10,000 |
| (ix) | Insuring Agreement I, Credit, Debit, Charge Card Forgery | $10,000 |
| (x) | Insuring Agreement J, Clients' Property | N/A |
| (xi) | Insuring Agreement K, Investigative Expense Incurred to Establish Amount of Covered Loss | N/A |

**ITEM 6:        PENDING OR PRIOR DATE**

**A. Directors & Officers Liability Coverage Section:**

| | |
|---|---|
| (i) Insuring Agreement A. | **November 4, 2015** |
| (ii) Insuring Agreement B. and C. | **November 4, 2015** |

**B. Employment Practices Liability Coverage Section:**

| | |
|---|---|
| (i) Insuring Agreement A - Employment Practices Liability Coverage | **Not Applicable** |
| (ii) Insuring Agreement B. – Third-Party Liability Coverage | **Not Applicable** |

**C. Fiduciary Liability Coverage Section:**

| | |
|---|---|
| (i) Fiduciary Liability Coverage | **Not Applicable** |

**D. Crime and Fidelity Coverage Section:**                    **Not Applicable**

CVS FL 10549 PV (6/09)

Certified Document Number: 85243062 - Page 12 of 84

**DECLARATIONS** (continued)                                    **POLICY NO.: 1000057336161**

**ITEM 7:        PREMIUM**

| A. Directors & Officers Liability Coverage Section: | ███████ |
|---|---|
| B. Employment Practices Liability Coverage Section: | N/A |
| C. Fiduciary Liability Coverage Section: | N/A |
| D. Crime and Fidelity Coverage Section: | ███████ |
| E.  Total Policy Premium: | ███████ |

**ITEM 8:        DISCOVERY PERIOD (APPLICABLE TO ALL COVERAGE SECTIONS OTHER THAN CRIME AND FIDELITY)**

    A.      One Year:  **150% of the applicable premium**

    B.      Two Years: **200% of the applicable premium**

    C.      Three Years: **250% of the applicable premium**

**ITEM 9:        ADDRESS OF INSURER AND ITS AUTHORIZED CLAIMS AGENT FOR NOTICES UNDER THIS POLICY**

    A.      **Claims-Related Notices**

            STARR ADJUSTMENT SERVICES, INC.
            399 PARK AVENUE, 9TH FLOOR
            NEW YORK, NY 10022

            e-mail: StarrFLPLClaims@starrcompanies.com

    B.      **All Other Notices To The Insurer:**

            STARR INDEMNITY AND LIABILITY COMPANY
            ATTN:  FINANCIAL LINES DEPARTMENT
            399 PARK AVE.  8TH FLOOR
            NEW YORK, NY 10022

In Witness Whereof, the **Insurer** has caused this policy to be executed and attested. This policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.

_____                    _____
**Charles H. Dangelo, President**                            **Honora M. Keane, General Counsel**

                                                   _____
                                                   **Authorized Representative**

Certified Document Number: 85243062 - Page 13 of 84

CVS FL 10549 PV (6/09)

**STARR INDEMNITY AND LIABILITY COMPANY**
_____

## RESOLUTE PORTFOLIO℠

### For Private Companies

#### *General Terms & Conditions Section*

In consideration of the payment of the premium and in reliance upon the **Application**, as applicable to each Coverage Section, which shall be deemed to be attached to, incorporated into, and made a part of this policy, and subject to this General Terms & Conditions Section and any applicable Coverage Section(s), if purchased by the **Insured** as indicated in Item 3 of the Declarations, **STARR INDEMNITY AND LIABILITY COMPANY** (the **"Insurer"**) and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

1.    **TERMS & CONDITIONS**

The terms and conditions set forth in this General Terms & Conditions Section shall apply to all applicable Coverage Sections of this policy. The terms appearing in this General Terms & Conditions Section, which are defined in a Coverage Section, shall have the meaning provided for such terms in such Coverage Section for purposes of coverage under such Coverage Section.  All defined terms used in this Policy, whether defined in Clause 2, below, or in a Coverage Section, appear in this Policy in boldface and initial-capitalized. The terms and conditions of each Coverage Section apply only to that particular Coverage Section. If any term or condition in this General Terms & Conditions Section is inconsistent or in conflict with the terms and conditions of any Coverage Section, the terms and conditions of such Coverage Section shall control.

2.    **GENERAL DEFINITIONS**

(a)    **"Application"** means all signed applications, including any attachments and other materials provided therewith or incorporated therein, submitted in connection with the underwriting of this policy or for any other policy of which this policy is a renewal, replacement or which it succeeds in time. **Application** shall also include, and incorporate, all publicly available documents.

(b)    "**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(c)    "**Company**" means:

(1)    the **Parent Company**;

(2)    any **Subsidiary** of the **Parent Company**; and

(3)    the **Parent Company** or any **Subsidiary** as a debtor, a debtor-in-possession or equivalent status;

provided, however, that this Definition (c) (3) shall not apply to the Fiduciary Liability Coverage Section.

CVS FL 12002 PV (1/09)                              1

Certified Document Number: 85243062 - Page 14 of 84

(d)   "**Defense Costs**" means:

    (1)    reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

    (2)    premium for an appeal, attachment or similar bond, but without any obligation to apply for and obtain such bond;

    (3)    reasonable and necessary fees, costs, charges or expenses incurred in response to any extradition or similar proceeding brought against an **Insured** in connection with a **Claim**; and

    (4)    any fees, costs, charges or expenses incurred by the **Insured** at the specific request of the Insurer to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

"**Defense Costs**" does not include: (i) amounts incurred prior to the date a Claim is first made and reported to the **Insurer**, pursuant to the terms of the applicable Coverage Section; and (ii) compensation or benefits of any **Insured Person** or any overhead expenses of the Company.

(e)   "**Financial Impairment**" means the **Company** becoming a debtor-in-possession, or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company**.

(f)   "**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation; the management committee members of a joint venture; or the **Members** of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

(g)   "**Manager**" means a person serving in a directorial capacity for a limited liability company.

(h)   "**Member**" means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

(i)   "**Parent Company**" means the entity named in Item 1 of the Declarations.

(j)   "**Policy Period**" means the period from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.  If one or more Coverage Sections have different inception, expiration or cancellation dates from those shown in Item 2 of the Declarations, the **Policy Period** for those Coverage Sections shall be set forth in an endorsement to this Policy.

(k)   "**Pollutants**" means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on, any list of hazardous substances issued by the United States Environmental Protection Agency or any foreign, state, county, municipality, or locality counterpart thereof.  Such substances shall include, without limitation, nuclear material or waste, any solid, liquid, gaseous or thermal irritant or contaminant, or smoke, vapor, soot, fumes, acids, alkalis,

Certified Document Number: 85243062 - Page 15 of 84

chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

(l)   "**Pollution**" means the actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere. **Pollution** also means any **Cleanup Costs**.

### 3.   LIMITS OF LIABILITY

The Aggregate Limit of Liability For Each Separate Coverage Section, as set forth in Item 4 A. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs**, from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for each applicable Separate Coverage Section.

The Aggregate Limit of Liability For Each Combined Coverage Section, as set forth in Item 4 B. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs,** from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for all of the Coverage Sections that comprise the applicable Combined Coverage Section. Any **Loss** paid under one of the Coverage Sections that comprises a Combined Coverage Section will reduce, and may exhaust, the limit of liability available under the other Coverage Section(s) that comprise(s) such Combined Coverage Section.

Any Sublimit(s) of Liability, whether set forth in Item 4 of the Declarations or as otherwise provided under the terms of this policy, shall be part of, and not in addition to, the applicable Aggregate Limit of Liability set forth in Item 4 A. or 4 B. of the Declarations. Each Sublimit of Liability is the maximum limit of liability of the **Insurer** for all **Loss,** including **Defense Costs,** from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, to which the Sublimit(s) of Liability applies.

The Aggregate Policy Limit of Liability, as set forth in Item 4 C. of the Declarations, is the maximum limit of liability of the **Insurer** for all **Loss**, including **Defense Costs**, from all **Claims** first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this policy, for all Coverage Section(s) combined.

If any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this policy as respects the applicable Coverage Section(s) will be completely fulfilled and the **Insurer** will have no further obligations under this policy of any kind as respects the applicable Coverage Section(s) and the premium as respects the applicable Coverage Section(s) as set forth in Item 7 of the Declarations will be fully earned.

**Any** payment of **Loss** under any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations shall reduce and may exhaust the Aggregate Policy Limit of Liability as set forth in Item 4 C. of the Declarations. If the Aggregate Policy Limit of Liability is exhausted by the payment of such **Loss**, the **Insurer** will have no further obligations of any kind as respects this policy and the applicable premium set forth in Item 7 of the Declarations will be fully earned.

**Defense Costs** are part of, and not in addition to, the Aggregate Limit of Liability as set forth in Item 4 of the Declarations for each applicable Coverage Section, other than the Crime and

Certified Document Number: 85243062 - Page 16 of 84

Fidelity Coverage Section, and payment by the **Insurer** of **Defense Costs** shall reduce and may exhaust such Aggregate Limit(s) of Liability. **Defense Costs** are subject to the Aggregate Policy Limit of Liability set forth in Item 4 C. of the Declarations.

If a Discovery Period is purchased by the **Insured** pursuant to Clause 8 of this General Terms & Conditions Section, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limits of Liability as set forth in Item 4 of the Declarations.

The Limit of Liability applicable to the Crime and Fidelity Coverage Section is set forth in Clause 4 of that Coverage Section.

**4.      RETENTION CLAUSE**

Subject to all other terms and conditions of this policy, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount as set forth in Item 5 of the Declarations for each Insuring Agreement of the applicable Coverage Section(s). A single Retention amount shall apply to all **Loss** alleging the same or related **Wrongful Acts**.  The Retention amount shall be borne by the **Insureds** and remain uninsured.

The application of a Retention to **Loss** under one Insuring Agreement shall not reduce the Retention that applies to **Loss** under any other Insuring Agreement. If different Retention amounts apply to different parts of a single **Loss**, the applicable Retention shall be applied separately to each part of the **Loss** and the sum of such Retention amounts shall not exceed the largest of the applicable Retention amounts as set forth in Item 5 of the Declarations.

If the **Company** is required or permitted to indemnify an **Insured Person** for any **Loss** pursuant to law, contract or the charter, bylaws, operating agreement or similar documents of a **Company** and does not do so for any reason, the **Insurer** shall not require payment of the applicable Retention by the **Insured Person**. However, the **Company** hereby agrees to reimburse the **Insurer** for the full amount of such applicable Retention, unless the **Company** is unable to do so because of **Financial Impairment**.

Provided, however that this Clause No. 4, shall not apply to the Crime and Fidelity Coverage Section.

**5.      NOTICE OF CLAIM**

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice of a **Claim** made against an **Insured** or an **Occurrence**, as applicable under the appropriate Coverage Section, to the **Insurer** at the address set forth in Item 9 of the Declarations.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

With respect to the Directors & Officers Liability Coverage Section, the **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** pursuant to this Clause 5, of a **Claim** made against an **Insured** as soon as practicable after the **Company's** general counsel or risk manager (or individuals with equivalent responsibilities) becomes aware of the **Claim**; however, in no event shall such notice be provided later than sixty (60) days after the expiration of the **Policy Period** (or Discovery Period, if applicable).

With respect to the Employment Practices Liability Coverage Section and the Fiduciary Liability Coverage Section, the **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** pursuant to this Clause 5, of

Certified Document Number: 85243062 - Page 17 of 84

a **Claim** made against an **Insured** as soon as practicable after any **Insured Person** becomes aware of the **Claim**; however, in no event shall such notice be provided later than thirty (30) days after the expiration of the **Policy Period** (or Discovery Period, if applicable).

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if written notice of a **Claim** has been given to the **Insurer** pursuant to this Clause 5, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** pursuant to this Clause 5, alleging, arising out of, based upon or attributable to the facts alleged in the previously noticed **Claim**, or alleging the same or related **Wrongful Act** alleged in the previously noticed **Claim**, shall be considered related to the previously noticed **Claim** and shall be deemed to have been made at the time notice of the previously noticed **Claim** was provided to the **Insurer**.

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if during the **Policy Period** (or Discovery Period, if applicable) an **Insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured**, the **Insured** may provide written notice to the **Insurer's** authorized agent of such circumstances. This written notice shall include the **Wrongful Act** allegations anticipated and the reasons for anticipating a **Claim**, with full particulars as to dates, persons and entities involved. If a **Claim** is subsequently made against such **Insured** and reported to the **Insurer** arising out of, based upon or attributable to the previously noticed circumstances, such **Claim** shall be considered first made at the time notice of such circumstances was provided to the **Insurer**.

6. **DEFENSE OF CLAIM AND SETTLEMENT**

The **Insurer** has the right and duty to defend any **Claim** against any **Insured** covered under this policy, even if such **Claim** is false, fraudulent or groundless; however, the **Insurer** shall not have the right or duty to defend any **Claim** under: (1) Insuring Agreement D.: Derivative Demand Coverage of the Directors & Officers Liability Coverage Section; or (2) Insuring Agreement B: Voluntary Compliance Program Coverage of the Fiduciary Liability Coverage Section.

With respect to Insuring Agreement D.: Derivative Demand Coverage of the Directors & Officers Liability Coverage Section, the **Company,** and not the **Insurer**, has the duty to investigate and evaluate the **Derivative Demand**. The **Insurer** shall have the right to effectively associate with the **Company** in such process.

With respect to Insuring Agreement B: Voluntary Compliance Program Coverage of the Fiduciary Liability Coverage Section, the **Company**, and not the **Insurer**, has the duty to investigate and evaluate the **Voluntary Compliance Program Loss.** The **Insurer** shall have the right to effectively associate with the **Company** in such process, including the negotiation of any settlement as respects the **Voluntary Compliance Program Loss.**

The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the **Insurer**. Any **Loss** incurred by the **Insured(s)** and/or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention.

Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defense and settlement of any **Claim** and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an **Insured's** indemnification or contribution rights.

Certified Document Number: 85243062 - Page 18 of 84

The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate.  In the event the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled the **Claim**; plus (2) any **Defense Costs** incurred up to the date the **Insured** refused to settle such **Claim**; plus (3) eighty percent (80%) of covered **Loss**, other than **Defense Costs**, in excess of the amount for which the **Insurer** could have settled the **Claim**. However, in no event shall the **Insurer's** liability exceed the applicable Limit of Liability as set forth in Item 4 of the Declarations.

The **Insurer** shall pay **Defense Costs** prior to the final disposition of any **Claim**, excess of the applicable retention and subject to all other terms and conditions of this policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the terms and conditions of this policy, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests.

7.     **ALLOCATION**

In the event the **Insured(s)** incurs **Loss** that is both covered and not covered by this policy, either because the **Claim** includes both covered and uncovered matters or because the **Claim** includes both insured and uninsured parties, the **Insured** and the **Insurer** agree to use their best efforts to determine a fair and appropriate allocation between covered and uncovered **Loss** based upon the relative legal and financial exposures of the parties to such matters. In the event of a settlement of such **Claim**, the allocation shall also be based upon the relative benefits to the **Insureds** from such a settlement.

If an allocation of **Loss** cannot be agreed to by the **Insurer** and the **Insured**: (1) the **Insurer** shall pay those amounts which it believes to be fair and equitable until an amount shall be agreed upon or determined pursuant to the provisions of this policy; and (2) there will be no presumption of allocation of **Loss** in any arbitration, suit or other proceeding.

8.     **DISCOVERY CLAUSE**

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six years following the effective date of such non-renewal, termination or **Organizational Change.** In the event of the non-renewal of one or more Coverage Sections of this policy, the **Insured** may purchase a Discovery Period solely as respects the Coverage Section(s) that has been non-renewed.

The **Insured's** right to purchase a Discovery Period shall lapse unless written notice of election to purchase such Discovery Period and the additional premium for such Discovery Period is received by the **Insurer** or its authorized agent within sixty days after such non-renewal, termination or **Organizational Change**. The additional premium for a Discovery Period of one or two years is set forth in Item 8 of the Declarations and shall be determined by multiplying the applicable percentage set forth in Item 8 of the Declarations by the premium for each applicable Coverage Section(s) as set forth in Item 7 of the Declarations. The additional premium for a Discovery Period of more than two years shall be determined by the **Insurer**.

During such **Discovery Period**, the **Insured** may provide the **Insurer** with written notice, pursuant to Clause 5 of this policy, of **Claims** made against an **Insured** solely with respect to

Certified Document Number: 85243062 - Page 19 of 84

**Wrongful Acts** occurring prior to the effective date of the non-renewal or termination of the policy or the effective date of the **Organizational Change** and otherwise covered by this policy.

The Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limits of Liability set forth in Item 4 of the Declarations.

The Discovery Period premium shall be fully earned at the inception of the Discovery Period. The Discovery Period is non-cancellable.

9.     **OTHER INSURANCE**

The insurance provided by this policy shall apply only as excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**. This policy shall not be subject to the terms and conditions of any other insurance policy.

In connection with any covered **Claim** made against an **Outside Entity Insured Person**, a leased employee, or an **Independent Contractor**, and subject to all other terms and conditions herein, this policy shall apply specifically excess of any indemnification and any other insurance coverage available to an **Outside Entity Insured Person,** a leased employee or an **Independent Contractor**.  In the event such other insurance coverage available to an **Outside Entity Insured Person**, a leased employee or an **Independent Contractor** is provided by the **Insurer** (or would be provided except for the application of any retention, exhaustion of a limit of liability or failure to submit notice of a claim) then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in whole or in part, by this policy and such other insurance policy, shall be the greater of (1) the Limit of Liability of the applicable Coverage Section(s) of this policy; or (2) the limit of liability of such other insurance policy.

10.     **REPRESENTATIONS AND SEVERABILITY**

It is agreed that the **Insurer** has relied upon the information contained in the **Application**, as applicable to each Coverage Section, in issuing this policy.  In regard to the statements, warranties, representations and information contained in the **Application**, no knowledge of any **Insured** shall be imputed to any other **Insured** for the purpose of determining whether coverage is available under this policy for any **Claim** made against such **Insured**.  However, the knowledge possessed by any **Insured Person** who is a past or current chairman of the board, chief executive officer, president or chief financial officer of the **Company** shall be imputed to the **Company**.

11.     **COVERAGE EXTENSIONS**

This policy shall cover **Loss** arising from any **Claims** made against the estates, heirs, or legal representatives of any deceased person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such estates, heirs, or legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

This policy shall also cover **Loss** arising from any **Claims** made against the legal representatives of any incompetent, insolvent or bankrupt person who was an **Insured Person**

Certified Document Number: 85243062 - Page 20 of 84

at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

This policy shall also cover **Loss** arising from any **Claims** made against the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the

**Company**) of an **Insured Person** for all **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

The coverage extensions set forth in this Clause 11 are subject to all other terms and conditions of this policy.

12.   **CANCELLATION AND NON RENEWAL CLAUSE**

This policy, or any applicable Coverage Section(s), may be cancelled by the **Parent Company** by sending written prior notice to the **Insurer** or its authorized agent as set forth in Item 9 of the Declarations stating when thereafter the cancellation of the policy, or the applicable Coverage Section(s), shall be effective. The policy, or the applicable Coverage Section(s), terminates at the date and hour specified in such notice. This policy may also be cancelled by the **Parent Company** by surrender of this policy to the **Insurer** or its authorized agent as set forth in Item 9 of the Declarations.  The policy terminates as of the date and time of surrender. The **Insurer** shall retain the customary short rate proportion of the premium, unless stated otherwise herein.

This policy, or any applicable Coverage Section(s), shall not be cancelled by or on behalf of the **Insurer** except by reason of non-payment of the premium set forth in Item 7 of the Declarations.  The **Insurer** may cancel the policy by delivering to the **Parent Company** or by mailing to the **Parent Company**, by registered mail, or by courier at the **Parent Company's** address set forth in the Declarations, written notice stating when, not less than twenty (20) days thereafter, the cancellation shall be effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice.  In the event of such cancellation, the policy will be deemed terminated as of the date indicated in the **Insurer's** written notice of cancellation to the **Parent Company**.

Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable. If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

The **Insurer** shall have no obligation to renew this policy or any applicable Coverage Section. In the event the **Insurer** decides to non-renew this policy or any applicable Coverage Section, it shall deliver or mail to the **Parent Company**, as identified in Item 1 of the Declarations, written notice of such decision at least sixty (60) days prior to the expiration of the **Policy Period**.

Certified Document Number: 85243062 - Page 21 of 84

13.   **ORGANIZATIONAL CHANGES**

If during the **Policy Period**:

(1)   the **Parent Company** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2)   any person or entity or group of persons or entities acting in concert shall acquire more than 50% of the **Parent Company**,

(any events described in (1) or (2) are referred to herein as an **"Organizational Change"**) then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of an **Organizational Change**.   However, there shall be no coverage afforded by this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Organizational Change**. This policy shall be non-cancellable and the entire premium shall be deemed fully earned upon the effective time of the **Organizational Change**. The **Insured(s)** shall also have the right to purchase a Discovery Period described in Clause 8 in the event of an **Organizational Change**.

The **Parent Company** shall give the **Insurer** written notice of the **Organizational Change** as soon as practicable, but no later than thirty days after the effective date of the **Organizational Change**.

14.   **AUTHORIZATION AND NOTICES**

**The Parent Company** shall act on behalf of all **Insureds** with respect to all matters as respects this policy including: (1) giving of notice of **Claim**; (2) giving and receiving of all correspondence and information; (3) giving and receiving notice of cancellation; (4) payment of premiums; (5) receiving of any return premiums; (6) receiving and accepting of any endorsements issued to form a part of this policy; and (7) the exercising of any right to a Discovery Period.

15.   **VALUATION AND CURRENCY**

All amounts stated in this policy are expressed in United States dollars and all amounts payable under this policy are payable in United States dollars.  If a judgment rendered or settlement entered into under this policy are stated in a currency other than United States dollars, then payment under this policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the final judgment is rendered or the settlement payment is established.

16.   **TERRITORY**

This policy extends to **Wrongful Acts** taking place, **Occurrences**, or **Claims** made anywhere in the world to the extent permitted by law.

17.   **ASSIGNMENT AND CHANGES TO THE POLICY**

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**.

Notice to any agent or knowledge possessed by any agent or person acting on behalf of the **Insurer**, other than the **Insurer's** authorized agent as identified in Item 9 of the Declarations, will not result in a waiver or change in any part of this policy or prevent the **Insurer** from

Certified Document Number: 85243062 - Page 22 of 84

asserting any right under the terms and conditions of this policy. The terms and conditions of this policy may only be waived or changed by written endorsement signed by the **Insurer** or its authorized agent.

18.   **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations hereunder.

It is understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding involving the **Company** is commenced (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "Bankruptcy Law") then, in regard to a covered **Claim** under this policy, the **Insureds** shall:

a.     waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the policy or its proceeds under such Bankruptcy Law; and

b.     agree not to oppose or object to any efforts by the **Company**, the **Insurer** or any **Insured Person** to obtain relief from any such stay or injunction.

In the event the **Company** becomes a debtor-in-possession or equivalent status under such Bankruptcy Law, and the total covered **Loss** under this policy exceeds the available applicable Limit of Liability, the **Insurer** shall:

a.     first pay the **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted prior to the **Company** becoming a debtor-in-possession or some equivalent status, then

b.     pay any remaining **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted after the **Company** became a debtor-in-possession or some equivalent status.

19.   **SUBROGATION**

In addition to any right of subrogation existing at law, in equity or otherwise, in the event of any payment by the **Insurer** under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured(s)'** rights of recovery. The **Insured(s)** shall execute all papers required (including those documents necessary for the **Insurer** to bring suit or other form of proceeding in their name) and do everything that may be necessary to pursue and secure such rights.

20.   **ACTION AGAINST THE INSURER**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all material terms of this policy and the amount of the **Insured's** obligation has been fully determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No person or entity shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the **Insurer** be impleaded by such **Insured** or legal representatives of such **Insured**.

CVS FL 12002 PV (1/09)                    10

21.    **CONFORMITY TO STATUTE**

Any terms of this policy which are in conflict with the terms of any applicable laws construing this policy, including any endorsement to this policy which is required by any state Department of Insurance, or equivalent authority ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall be construed to restrict the terms of any State Amendatory Endorsement.

In the event any portion of this policy shall be declared or deemed invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of any other portion of this policy.

22.    **HEADINGS**

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of this policy's terms or conditions.

CVS FL 12002 PV (1/09)                                    11

**STARR INDEMNITY AND LIABILITY COMPANY**

_____

## RESOLUTE PORTFOLIO℠
### For Private Companies

#### *Directors & Officers Liability Coverage Section*

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this policy, and subject to the General Terms & Conditions Section and this Coverage Section, if purchased by the **Insured** as indicated in Item 3 of the Declarations, STARR INDEMNITY AND LIABILITY COMPANY (the **"Insurer"**) and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

1. **INSURING AGREEMENTS**

   **A.**   The **Insurer** shall pay on behalf of any **Insured Person** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy, except if the **Company** has indemnified the **Insured Person** for such **Loss**.

   **B.**   The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against any **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy, if the **Company** has indemnified the **Insured Person** for such **Loss**.

   **C.**   The **Insurer** shall pay  on behalf of the **Company** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against the **Company** for any **Wrongful Act**, and reported to the **Insurer** in accordance with the terms of this policy.

   **D.**   The **Insurer** shall reimburse the **Company** for the **Derivative Costs** incurred by the **Company** in response to  a **Derivative Demand** first made during the **Policy Period** (or Discovery Period, if applicable) for any **Wrongful Act** of any **Executive**, and reported to the **Insurer** in accordance with the terms of this policy.  This Insuring Agreement D. shall apply only if purchased by the **Insured** as indicated in Item 3 of the Declarations and is subject to the Sublimit of Liability set forth in Item 4 of the Declarations which is the **Insurer's** maximum limit of liability under this Insuring Agreement D. for all **Derivative Costs** arising from all **Derivative Demands**.  The Sublimit of Liability for **Derivative Costs** shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section.  This Insuring Agreement D. shall not provide coverage for any civil proceeding that is based upon or arises from a **Derivative Demand**.

2. **DEFINITIONS**

   (a)   **"Claim"** means any:

      (1)   written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

      (2)   judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured**, including any appeal therefrom, which is commenced by:

         (i)      service of a complaint or similar pleading;

1

Certified Document Number: 85243062 - Page 25 of 84

    (ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (iii)   receipt or filing of a notice of charges;

(3)    arbitration proceeding commenced against an **Insured** by service of a demand for arbitration;

(4)    formal civil, criminal, administrative or regulatory investigation of an **Insured Person**, which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying such **Insured Person** as a person against whom a proceeding identified in (2) or (3) above may be commenced;

(5)    written request to toll or waive the applicable statute of limitations relating to a potential **Claim** against an **Insured** for a **Wrongful Act**; or

(6)    **Derivative Demand**, solely under Insuring Agreement D. if purchased by the **Insured**.

(b)  **"Derivative Costs"** means the reasonable and necessary fees, costs, charges, or expenses incurred by the **Company**, its board of directors or any committee of its board of directors, solely in response to a **Derivative Demand** and do not include any settlements, judgments or damages, nor any compensation or benefits of any **Insured Persons**, or any overhead expenses of the **Company**.  **Derivative Costs** shall be reimbursed by the **Insurer** sixty (60) days after the **Company** provides written notice to the **Insurer** of its final decision not to bring a civil proceeding against an **Executive**.

(c)  **"Derivative Demand"** means a written demand by one or more shareholders of the **Company** upon the **Company's** board of directors to bring a civil proceeding on behalf of the **Company** against any **Executive** for a **Wrongful Act**.

(d)  **"Employee"** means:

(1)    any person who was, now is, or shall become a full-time, part-time, seasonal, or temporary employee of the **Company**, other than an **Executive**, but only while that person is acting in the capacity as such;

(2)    any person leased to the **Company** so long as this person is working solely for the **Company** and only for conduct within his or her duties as such, but only if the **Company** indemnifies such leased person in the same manner as the **Company's** employees; and

(3)    any volunteer whose labor and service is engaged and directed by the **Company**, but only while that person is acting in the capacity as such.

(e)  **"Executive"** means any:

(1)    past, present or future duly elected or appointed director, officer, trustee, governor, management committee **Member** or **Member** of the board of managers;

(2)    past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a foreign jurisdiction that is equivalent to an executive position listed in item (1) above; or

(3)    past, present or future general counsel and risk manager (or equivalent position) of the **Company**.

(f)  **"Insured"** means the **Company** and any **Insured Person**.

Certified Document Number: 85243062 - Page 26 of 84

CVS FL 12003 PV (1/09)

(g) **"Insured Person(s)"** means any:

    (1)  **Executive;**

    (2)  **Employee;** or

    (3)  **Outside Entity Insured Person**.

(h) **"Loss"** means:

    (1)  damages, settlements or judgments;

    (2)  pre-judgment or post-judgment interest;

    (3)  costs or fees awarded in favor of the claimant;

    (4)  punitive, exemplary or the multiplied portion of any multiple damages awards, but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;

    (5)  **Derivative Costs**, solely under Insuring Agreement D. if purchased by the **Insured**; and

    (6)  **Defense Costs**.

    **"Loss"** does not include:

        (i)  any amounts for which the **Insureds** are not legally liable;

        (ii)  any amounts which are without legal recourse to the **Insureds**;

        (iii)  taxes;

        (iv)  fines and penalties, except as provided for in Definition (h) (4) above;

        (v)  matters which may be deemed uninsurable under applicable law;  or

        (vi)  any amounts paid or incurred in complying with a judgment or settlement for non-monetary or injunctive relief, but solely as respects the **Company**.

(i) **"Outside Entity"** means: (1) any not-for-profit entity which is exempt from taxation under Section 501(c)(3), (4) or (10) of the IRS Code, as amended, or any rule or regulation promulgated thereunder; or (2) any other entity listed as such by endorsement to this policy, for which an **Executive** acts as a director, officer, trustee or governor (or the equivalent thereof) at the written request of the **Company.** Any such person shall be referred to herein as an **"Outside Entity Insured Person"**, but only while that person is acting in the capacity as a director, officer, trustee or governor (or the equivalent thereof) of an **Outside Entity**.

(j) **"Securities Claim"** means a **Claim,** other than an administrative or regulatory proceeding against the **Company** or an investigation of the **Company**, made against any **Insured**:

    (1)  alleging a violation of any foreign, federal, state or local regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

(i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the **Company**; or

(ii) brought by a security holder of the **Company** with respect to such security holder's interest in securities of such **Company**; or

(2) brought derivatively on behalf of the **Company** by a security holder of such **Company**.

Notwithstanding the foregoing, **Securities Claim** shall include any formal administrative or regulatory proceeding against the **Company**, but only if and only during the time that such proceeding also constitutes a **Securities Claim** commenced and continuously maintained against an **Insured Person**.

The **Insurer** shall not assert that a **Loss** incurred in a **Securities Claim** alleging violations of Section 11 or 12 of the Securities Act of 1933, as amended, constitutes uninsurable loss and, subject to all other terms and conditions of this policy, shall deem that portion of such **Loss** as constituting **Loss** under this policy.

(k) **"Subsidiary"** means any privately-held for-profit entity (except a partnership) of which the **Parent Company**:

(1) has **Management Control** ("Controlled Entity") before the inception of the **Policy Period,** either directly or indirectly through one or more other Controlled Entities;

(2) first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's annual revenue totals less than 25% of the consolidated revenue of the **Parent Company** as of its latest fiscal year; or

(3) first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's annual revenue totals 25% or more of the consolidated revenue of the **Parent Company** as of its latest fiscal year, but only if the **Parent Company** provides the **Insurer** with full particulars of the new **Subsidiary** within ninety (90) days after its creation or acquisition and pays any additional premium with respect to such entity within thirty (30) days after being requested to do so by the **Insurer**;

provided, however, that **Subsidiary** as defined in items (2) and (3) above shall not mean any entity which is a financial institution, including but not limited to a bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund, unless such entity is included in the definition of **Subsidiary** by specific written endorsement attached to this policy.

**"Subsidiary"** also means any not-for-profit entity which is under the exclusive control of the **Company**.

With respect to a **Claim** made against any **Subsidiary** or any **Insured Person** thereof, this policy shall only apply to **Wrongful Acts** committed or allegedly committed after the effective time such entity becomes a **Subsidiary** and prior to the effective time that such entity ceases to be a **Subsidiary**.

(l) **"Wrongful Act(s)"** means:

(1) with respect to an **Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by an **Insured**

4

**Person** in his or her capacity as such or any matter claimed against an **Insured Person** by reason of such capacity;

(2)    with respect to an **Outside Entity Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by a person in his or her capacity as an **Outside Entity Insured Person** or any matter claimed against such **Outside Entity Insured Person** by reason of such capacity; or

(3)    with respect to the **Company,** any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the **Company**.

## 3.  EXCLUSIONS

This policy shall not cover any **Loss** in connection with any **Claim**:

(a)    arising out of, based upon or attributable to the gaining of any profit or advantage or improper or illegal remuneration if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

(b)    arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an **Insured** if a final judgment or adjudication establishes that such act or violation occurred;

(c)    arising out of, based upon or attributable to the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and any amendments thereto or similar provisions of any state statutory law if a final judgment or adjudication establishes that a violation of Section 16(b) occurred;

In determining the applicability of Exclusions (a), (b) and (c), the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured** shall not be imputed to any other **Insured**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current chairman of the board, chief executive officer, president or chief financial officer of the **Company** shall be imputed to the **Company**.

(d)    alleging, arising out of, based upon or attributable to any facts or circumstances of which an **Insured Person** had actual knowledge or information of, as of the Pending or Prior Date set forth in Item 6 of the Declarations as respects this Coverage Section, and that he or she reasonably believed may give rise to a **Claim** under this policy;

(e)    based upon, arising from, or in consequence of any actual or alleged liability of  any **Insured** under any express contract or agreement, except to the extent that  such **Insured** would have been liable in the absence of such contract or agreement; provided, however, that this exclusion shall apply only to any **Claim** under Insuring Agreement C.;

(f)    alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 6 of the Declarations as respects this Coverage Section, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Act(s)**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

Certified Document Number: 85243062 - Page 29 of 84

CVS FL 12003 PV (1/09)

(g) alleging, arising out of, based upon or attributable to the same or essentially the same facts alleged, or to the same or related **Wrongful Act(s)** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the inception date of this policy as set forth in Item 2 of the Declarations, under any policy, whether excess or underlying, of which this policy is a renewal or replacement or which it may succeed in time;

(h) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of any **Insured Person** serving in any capacity other than as an **Executive** or an **Employee** or   an **Outside Entity Insured Person:**

(i) brought by or on behalf of any **Insured**, other than an **Employee**;  provided, however, that this exclusion shall not apply to:

 (i) any **Claim** brought by an **Insured Person** that is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

 (ii) a shareholder derivative action, but only if such action is brought and maintained without the solicitation, approval, assistance, active participation or intervention of any **Insured**;

 (iii) any **Claim** brought by any **Executive** who has not served in such capacity, nor has acted as a consultant to the **Company**,  for at least three (3) years prior to the **Claim** being first made;

 (iv) any **Claim** brought against an **Insured  Person** arising out of or based upon any protected activity specified in any "whistleblower" protection pursuant to any foreign, federal, state or local law;

 (v) any **Claim** brought by any **Executive** of a **Company** formed and operating in a foreign jurisdiction against such **Company** and any **Insured Person** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);  or

 (vi) any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Company** or any assignee of such trustee, examiner, receiver or similar official.

(j) alleging, arising out of, based upon, attributable to, directly or indirectly resulting from, or in consequence of, or in any way involving, **Pollution**; provided, however, that this exclusion shall not apply to any **Claim** under Insuring Agreement A. or any **Securities Claim**, except for **Loss** constituting **Cleanup Costs**;

(k) alleging, arising out of, based upon or attributable to  any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law;

(l) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly any public offering of securities by the **Company** or an **Outside Entity**, or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to:

CVS FL 12003 PV (1/09)

Certified Document Number: 85243062 - Page 30 of 84

(i)     any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall be conditioned solely upon the **Company** giving the **Insurer** written notice of any such public offering, including all details thereof, as soon as practicable, but not later than thirty days after the effective date of such offering; or

(ii)    any public offering of securities, other than an offering described in paragraph (i) above, as well as any purchase or sale of securities subsequent to such public offering. Coverage for such transaction shall be conditioned upon, within thirty days prior to the effective time of such public offering, the **Company**: (a) giving the **Insurer** written notice of such offering, including all details thereof, and any underwriting information required by the **Insurer**; and (b) accepting such terms, conditions and additional premium required by the **Insurer** for such coverage. Coverage provided pursuant to this paragraph is also subject to the **Company** paying such additional premium when due. The **Insurer** shall provide the **Company** with a quote for such coverage if the **Company** gives written notice of the offering as required in this paragraph.

(m)    for any **Wrongful Act** arising out of any **Insured Person** serving as a director, officer, trustee or governor of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or by any director, officer, trustee or governor thereof; or which is brought by any securities holder of the **Outside Entity**, whether directly or derivatively, unless such securities holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Outside Entity**, any director, officer, trustee or governor thereof, an **Executive** or the **Company**; provided, however, that this exclusion shall not apply to:

(i)     any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

(ii)    any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Outside Entity** or any assignee of such trustee, examiner, receiver or similar official;

(iii)   any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** who has not served in such capacity, nor acted as a consultant to the **Outside Entity**, for at least three (3) years prior to such **Claim** being first made; or

(iv)   any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity**, formed and operating in a foreign jurisdiction against any **Outside Entity Insured Person** of such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(n)    for bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, violation of any right of privacy, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to any **Securities Claim**;

(o)    alleging, arising out of, based upon, or attributable to any actual or alleged: (i) violation of the Foreign Corrupt Practices Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law; (ii) payments, commissions, gratuities, benefits or

Certified Document Number: 85243062 - Page 31 of 84

other favors for the direct or indirect benefit of any officials, directors, agents, partners, representatives, principal shareholders, or owners of the **Company** or employees of any customers of the **Company;**  or (iii) political contributions;

(p)    alleging, arising out of, based upon, or attributable to any actual or alleged discrimination, harassment, retaliation, wrongful discharge, termination or any other employment-related or employment practice claim,  including but not limited to any wage-hour claim or any third-party discrimination or harassment claim;  provided, however, that this exclusion shall not apply to any **Securities Claim**;

(q)    alleging, arising out of, based upon, or attributable to the ownership, management, maintenance, operation and/or control by the **Company** of any captive insurance company or entity, including but not limited to any **Claim** alleging the insolvency or bankruptcy of the **Company** as a result of such ownership, management, maintenance, operation and/or control;

(r)    alleging, arising out of, based upon, or attributable to based upon, arising from, or in consequence of any actual or alleged plagiarism,  infringement or violation of any copyright, patent, trademark or service mark or the misappropriation of intellectual property, ideas or trade secrets; provided, however, that this exclusion shall apply only to any **Claim** under Insuring Agreement C.;

(s)    alleging, arising out of, based upon or attributable to the rendering or failure to render any professional service to a customer or client of the **Insured**; provided, however, that this exclusion shall not apply to any **Securities Claim**, but only if such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Company** or any **Insured Person**.

## 4.  ORDER OF PAYMENTS

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Coverage Section, the **Insurer** shall in all events:

(1) first, pay **Loss** for which coverage is provided under this Coverage Section for any **Insured Person** under Insuring Agreement A.;

(2) second, only after payment of **Loss** has been made pursuant to item (1) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available, pay the **Loss** for which coverage is provided under this Coverage Section for  the **Company** under Insuring Agreement B.; and

(3) third, only after payment of **Loss** has been made pursuant to items (1) and (2) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available,  pay the **Loss** for which coverage is provided under this Coverage Section for  the **Company** under Insuring Agreement C. and D.

## 5.  NON-RESCINDABLE CLAUSE

The **Insurer** irrevocably waives any right it may have to rescind coverage available under Insuring Agreement A. of this Coverage Section, in whole or in part, on any grounds.

Certified Document Number: 85243062 - Page 32 of 84

CVS FL 12003 PV (1/09)

**STARR INDEMNITY AND LIABILITY COMPANY**

---

## RESOLUTE PORTFOLIO℠
### For Private Companies

*Crime and Fidelity Coverage Section*

In consideration of the payment of the premium and subject to the Insuring Agreements, terms, conditions and exclusions of this Coverage Section, if purchased by the **Company** as indicated in Item 3 of the Declarations, STARR INDEMNITY AND LIABILITY COMPANY (the "**Insurer**") and the **Parent Company**, on behalf of the **Company**, agree as follows:

**1.    INSURING AGREEMENTS**

Coverage is provided under the following Insuring Agreements for which a Limit of Liability is indicated in Item 4 of the Declarations, and, applies to loss sustained by the **Company** resulting directly from an **Occurrence** taking place during the **Policy Period**, except as indicated in Condition 6.(a)(10), Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or Condition 6.(a)(11), Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, and which is **Discovered** by the **Company** during the **Policy Period** or during the period of time provided in Condition 6.(a)(6), Extended Period To Discover Loss, of this Coverage Section.

**A.    Employee Theft Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for direct loss of **Money, Securities** or **Other Property** sustained by the **Company** resulting from **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

**B.    Forgery Or Alteration Insuring Agreement**

(1)    The **Insurer** shall pay the **Parent Company** for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

a.    made or drawn by or drawn upon the **Company**, or
b.    made or drawn by one acting as an agent of the **Company**, or
c.    that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement B, a substitute check as defined in the *Check Clearing for the 21ˢᵗ Century Act* shall be treated the same as the original it replaced.

(2)    If the **Company** is sued for refusing to pay any instrument covered item in B.(1) above, on the basis that it has been forged or altered, and the **Company** has the written consent of the **Insurer** to defend against the suit, the **Insurer** will pay for any reasonable legal expenses incurred and paid by the **Company** in that defense.   The amount that the **Insurer** shall pay is in addition to the Limit of Liability applicable to Insuring Agreement B.(1).

Certified Document Number: 85243062 - Page 33 of 84

**C.      Inside the Premises – Loss of Money and Securities Insuring Agreement**

(1)      The **Insurer** shall pay the **Parent Company** for the loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

      a.      resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

      b.      resulting directly from disappearance or destruction.

(2)      The **Insurer** shall pay the **Parent Company** for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Company** is the owner of the **Premises** or is liable for damage to it.

(3)      The **Insurer** shall pay the **Parent Company** for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

**D.      Inside the Premises – Robbery Or Safe Burglary of Other Property Insuring Agreement**

(1)      The **Insurer** shall pay the **Parent Company** for loss of or damage to **Other Property**:

      a.      inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

      b.      inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

(2)      The **Insurer** shall pay the **Parent Company** for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** of **Other Property**, if the **Company** is the owner of the **Premises** or is liable for damage to it.

(3)      The **Insurer** will pay the **Parent Company** for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

**E.      Outside The Premises Insuring Agreement**

(1)      The **Insurer** shall pay the **Parent Company** for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

(2)      The **Insurer** shall pay the **Parent Company** for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

**F.      Computer Fraud Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

    a.    to a person (other than a **Messenger**) outside those **Premises**.
    b.    to a place outside those **Premises**.

**G.**    **Funds Transfer Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Company's Transfer Account**.

**H.**    **Money Orders and Counterfeit Money Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss resulting directly from the **Company** having accepted in good faith, in exchange for merchandise, **Money**, or services:

    a.    money orders issued by any post office, express company or bank that are not paid upon presentation; or
    b.    **Counterfeit Money** that is acquired during the regular course of business.

**I.**    **Credit, Debit, Charge Card Forgery Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for loss sustained by the **Company** resulting directly from **Credit Card Forgery** committed by a **Third Party**.

**J.**    **Clients Property Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for the direct loss of **Money**, **Securities**, or **Other Property** sustained by a **Client** resulting from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client's** employees.

**K.**    **Investigative Expense Incurred to Establish Amount of Covered Loss Insuring Agreement**

The **Insurer** shall pay the **Parent Company** for reasonable investigative expense incurred by the **Company**, excluding the **Company's** internal corporate costs (such as salary, wages, commissions, benefits or overhead expenses), to establish the existence and amount of a covered loss. Investigative expenses shall not include expenses incurred by any **Client**. Coverage as provided by this Insuring Agreement K shall be subject to the prior written consent of the **Insurer**.

**2)**    **DEFINITIONS**

    (a)    "**Banking Premises**" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

    (b)    "**Client**" means a customer of the **Company** to whom the **Company** provides goods or services for a fee under written contract.

Certified Document Number: 85243062 - Page 35 of 84

(c)    "**Credit Card Forgery**" means the **Forgery** or alteration of, on or in any written instrument required in connection with any credit, debit or charge card issued to the **Company** or, at the request of the **Company**, to an **Employee**.

(d)    "**Counterfeit Money**" means an imitation of **Money** that is intended to deceive and to be taken as genuine.

(e)    "**Custodian**" means the **Company**, any partners, any **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

(f)    "**Discover(s)**", "**Discovery**" or "**Discovered**" means the time when the **Company's** General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or any **Employee** or officer at the level of corporate Vice President or above first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Coverage Section has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"**Discover(s)**", "**Discovery**" or "**Discovered**" also means the time when the **Company's** General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or any **Employee** or officer at the level of corporate Vice President or above first receives notice of an actual or potential claim in which it is alleged that the **Company** is liable to a **Third Party** under circumstances, which, if true, would constitute a loss under this Coverage Section.

(g)    "**Employee**" means
    (1)    any natural person:
        (i)    while in the regular service of the **Company** and for the first forty-five (45) days immediately after termination of service, unless such termination is due to **Theft** or any other dishonest act committed by the **Employee**;
        (ii)    who is compensated directly by the **Company** by salary, wages or commissions; and
        (iii)    who the **Company** has the right to direct and control while performing services for the **Company**;
    (2)    any natural person who is furnished temporarily to the **Company**:
        (i)    to substitute for a permanent **Employee** as defined in 2.(g)(1) above who is on leave; or
        (ii)    to meet seasonal or short-term workload conditions:
            a.    while that person is subject to the **Company's** direction and control, and
            b.    performing services for the **Company**, excluding, however, any such person while having care and custody of property outside the **Premises**;
    (3)    any natural person who is leased to the **Company** under a written agreement between the **Company** and a labor leasing firm to perform duties related to the conduct of the **Company's** business, but does not mean a temporary employee as defined in 2.(g)(2) above;
    (4)    any natural person who is:

Certified Document Number: 85243062 - Page 36 of 84

(i)      a trustee, officer, **Employee**, administrator or manager of any **Employee Benefit Plan,** except an administrator or manager who is an independent contractor; and

(ii)     a director or trustee of the **Company** while that person is engaged in handling **Funds** or **Other Property** of any **Employee Benefit Plan**;

(5)     Any natural person fiduciary, trustee, administrator or other plan official, while in the regular service of an **Employee Benefit Plan**, who is required to be bonded by the **Company** in connection with such **Employee Benefit Plan** as required by Title 1 of the *Employee Retirement Income Security Act of 1974*, as amended, but does not mean a natural person as defined in 2.(g)(4) above;

(6)     any natural person who is a former **Employee**, **Member, Manager**, director or trustee retained as a consultant while performing services for the **Company**;

(7)     any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the **Premises**;

(8)     any **Employee** of an entity merged or consolidated with the **Company** prior to the effective date of this Coverage Section; or

(9)     any **Managers**, directors or trustees of the **Company** while:

(i)      performing acts within the scope of the usual duties of an **Employee**; or

(ii)     acting as a member of any committee duly elected or appointed by resolution of the **Company's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on behalf of the **Company.**

"**Employee**" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in 2.(g)(1) through 2.(g)(9) above.

(h)    "**Employee Benefit Plan**" means any welfare or pension benefit plan, defined and required to be bonded under Title 1 of the *Employee Retirement Income Security Act of 1974*, as amended, which is operated solely by the **Company** or jointly by the **Company** and a labor organization for the benefit of **Employees** and which existed on or before the inception date of the **Policy Period** or the inception date of this Coverage Section, if the dates differ.

(i)    "**Forgery**" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(j)    "**Fraudulent Instruction**" means

(1)     an electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Company**, but which was in fact fraudulently transmitted by someone else without the **Company's** knowledge or consent;

(2)     a written instruction (other than those described in Insuring Agreement B) issued by the **Company**, which was forged or altered by someone

Certified Document Number: 85243062 - Page 37 of 84

other than the **Company** without the **Company's** knowledge or consent, or which purports to have been issued by the **Company**, but was in fact fraudulently issued without the **Company's** knowledge or consent; or

(3) an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Company** which purports to have been transmitted by an **Employee** but which was in fact fraudulently transmitted by someone else without the **Employee's** knowledge or consent.

(k) "**Funds**" means **Money** and **Securities**.

(l) "**Messenger**" means the **Company**, a relative of the **Company,** or any partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

(m) "**Money**" means
(1) currency, coins and bank notes in current use and having a face value; and
(2) travelers checks, register checks and money orders held for sale to the public.

(n) "**Occurrence**" means
(1) Under Insuring Agreement A
    (i) an individual act;
    (ii) the combined total of all separate acts whether or not related; or
    (iii) a series of acts whether or not related
committed by an **Employee** acting alone or in collusion with other persons, during the **Policy Period**, except as provided under Condition 6.(a)(10) Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

(2) Under Insuring Agreement B
    (i) an individual act;
    (ii) the combined total of all separate acts whether or not related; or
    (iii) a series of acts whether or not related
committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the **Policy Period**, except as provided under Condition 6.(a)(10) Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

(3) Under All Other Insuring Agreements:
    (i) an individual act or event;
    (ii) the combined total of all separate acts or events whether or not related; or
    (iii) a series of acts or events whether or not related
committed by a person acting alone or in collusion with other persons, or not committed by any person, during the **Policy Period**, except as indicated under Condition 6.(a)(10) Loss Sustained During Prior

Certified Document Number: 85243062 - Page 38 of 84

Insurance Issued By The Insurer Or Any Affiliate, or, Condition 6.(a)(11) Loss Sustained During Prior Insurance Not Issued By The Insurer Or Any Affiliate, of this Coverage Section.

(o)   "**Other Property**" means any tangible property other than **Money** and **Securities** that has intrinsic value. **Other Property** does not include computer programs, electronic data or any property specifically excluded under this Coverage Section.

(p)   "**Premises**" means the interior of that portion of any building occupied by the **Company** in conducting its business.

(q)   "**Robbery**" means the unlawful taking of property from the care and custody of a person by one who has:
(1)   caused or threatened to cause that person bodily harm; or
(2)   committed an obviously unlawful act witnessed by that person.

(r)   "**Safe Burglary**" means the unlawful taking of
(1)   property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or
(2)   a safe or vault from inside the **Premises**.

(s)   "**Securities**" means negotiable and non negotiable instruments or contracts representing either **Money** or property and includes
(1)   tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and
(2)   evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Company**;
but does not include **Money**.

(t)   "**Subsidiary**" means any privately-held for-profit entity of which the **Parent Company**
(1)   has **Management Control** ("Controlled Entity") before the inception of the **Policy Period**, either directly or indirectly through one or more other Controlled Entities;
(2)   first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's annual revenue totals less than 25% of the consolidated revenue of the **Parent Company** as of its latest fiscal year; or

(3)   first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled entities, if such entity's annual revenue totals 25% or more of the consolidated revenue of the **Parent Company** as of its latest fiscal year, but only if the **Parent Company** provides the **Insurer** with full particulars of the new **Subsidiary** within ninety (90) days after its creation or acquisition and pays any additional premium with respect to such entity within thirty (30) days after being requested to do so by the **Insurer**.

Certified Document Number: 85243062 - Page 39 of 84

Provided, however, that **Subsidiary** as indicated in items 2.(t)(2) and 2.(t)(3) above shall not include any entity which is a financial institution, such as a bank, insurance company, insurance agent or broker, securities broker or dealer, investment advisor, mutual fund or hedge fund, unless such entity is included in the definition of **Subsidiary** by specific written endorsement attached to this policy.

"**Subsidiary**" also means any not-for-profit entity which is under the exclusive control of the **Company**.

(u)    "**Theft**" means the unlawful taking of property to the deprivation of the **Company**.

(v)    "**Third Party**" means a natural person other than:
(1)    an **Employee**; or
(2)    a natural person acting in collusion with an **Employee**.

(w)    "**Transfer Account**" means an account maintained by the **Company** at a financial institution from which the **Company** can initiate the transfer, payment or delivery of **Funds**:
(1)    by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or
(2)    by means of written instructions (other than those described in Insuring Agreement B) establishing conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

(x)    "**Watchperson**" means any person the **Company** retains specifically to have care and custody of property inside the **Premises** and who has no other duties.

## 3.    EXCLUSIONS

(a)    The insurance afforded under this Coverage Section shall not apply to:

**(1)**    Loss resulting from **Theft** or any other dishonest act committed by:
(i)    the **Company**; or
(ii)    any partners or **Members** of the **Company**;
whether acting alone or in collusion with other persons.

**(2)**    Loss caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this policy and the **Company** or any of partners, **Members**, **Managers**, officers, directors or trustees, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the inception date of the **Policy Period** or the inception date of this Coverage Section, if the dates differ; However, this exclusion shall not apply if the value of that **Theft** or dishonest act was valued at $10,000 or less.

**(3)**    Loss resulting from **Theft** or any other dishonest act committed by any of the **Company's Employees**, **Managers,** directors, trustees, or authorized representatives:
(i)    whether acting alone or in collusion with other persons; or
(ii)    while performing services for the **Company** or otherwise;

Certified Document Number: 85243062 - Page 40 of 84

except when covered under Insuring Agreement A.

**(4)** Loss resulting from:
- (i) the unauthorized disclosure of the **Company's** confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or
- (ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Company** including, but not limited to, financial information, credit card information or similar non-public information.

**(5)** Loss resulting from seizure or destruction of property by order of governmental authority.

**(6)** Loss that is an indirect result of an **Occurrence** covered by this Coverage Section including, but not limited to, loss resulting from:

- (i) The **Company's** inability to realize income that would have been realized by the **Company** had there been no loss of or damage to **Money**, **Securities**, or **Other Property**;
- (ii) Payment of damages of any type for which the **Company** is legally liable.  But the **Insurer** will pay compensatory damages arising directly from a loss covered under this Coverage Section;
- (iii) Payment of costs, fees or other expenses incurred by the **Company** in establishing either the existence or the amount of loss under this Coverage Section, except when covered under Insuring Agreement K.

**(7)** Fees, costs and expenses incurred by the **Company** which are related to any legal action, except when covered under Insuring Agreement B.

**(8)** Loss or damage resulting from nuclear reaction or radiation or radioactive contamination, however caused.

**(9)** Loss or damage resulting from:
- (i) war, including undeclared or civil war;
- (ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in  hindering or defending against any of these.

(b) The insurance afforded under Insuring Agreement A shall not apply to:

**(1)** Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:
- (i) an inventory computation; or
- (ii) a profit and loss computation.

However, where the **Company** establishes wholly apart from such computations that the **Company** has sustained a loss, then the **Company** may offer its inventory records and actual physical count of inventory in support of the amount of loss claimed.

**(2)**      Loss resulting from trading, whether in the **Company's** name or in a genuine or fictitious account.

**(3)**      Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

(c)    The insurance afforded under Insuring Agreements C, D, and E shall not apply to:

**(1)**      Loss resulting from accounting or arithmetical errors or omissions.

**(2)**      Loss resulting from the giving or surrendering of property in any exchange or purchase.

**(3)**      Loss or damage resulting from fire, however caused, except:
       (i)      loss of or damage to **Money** and **Securities**, and,
       (ii)      loss from damage to a safe or a vault.

**(4)**      Loss of property contained in any **Money** operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

**(5)**      Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**(6)**      Loss of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:
       (i)      on the basis of unauthorized instructions;
       (ii)      as a result of a threat to do bodily harm to any person;
       (iii)      as a result of a threat to do damage to any property;
       (iv)      as a result of a threat to introduce a denial of service attack into the **Company's** computer system;
       (v)      as a result of a threat to introduce a virus or other malicious instruction into the **Company's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Company's** computer system;
       (vi)      as a result of a threat to contaminate, pollute or render substandard the **Company's** products or goods; or

       (vii)      as a result of a threat to disseminate, divulge or utilize:
          a.      the **Company's** confidential information; or
          b.      weaknesses in the **Company's** source code within its computer system.

       However this exclusion shall not apply, under Insuring Agreement E, to loss of **Money**, **Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Company**:
       (i)      had no knowledge of any threat at the time the conveyance began; or
       (ii)      had knowledge of a threat at the time the conveyance began, but, the loss was not related to the threat.

**(7)**    Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

**(8)**    Loss resulting from the **Company's**, or anyone acting on the **Company's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

(d)    The insurance afforded under Insuring Agreement F shall not apply to:

**(1)**    Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**(2)**    Loss resulting from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Company's Transfer Account**.

**(3)**    Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:
(i)    an inventory computation; or
(ii)    a profit and loss computation.

(e)    The insurance afforded under Insuring Agreement G shall not apply to loss resulting from the use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property**.

**4.    LIMIT OF LIABILITY**

The most the **Insurer** will pay for all loss resulting directly from an **Occurrence** is the applicable Limit of Liability as indicated in Item 4 D. of the Declarations.

If any loss is covered under more than one Insuring Agreement in this Coverage Section, the most the **Insurer** will pay for such loss shall not exceed the largest Limit of Liability indicated in Item 4 D. of the Declarations under any one of the Insuring Agreements.

**5.    DEDUCTIBLE**

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the Deductible Amount shown in Item 5 D. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Liability as indicated in Item 4.D of the Declarations .

**6.    CONDITIONS**

**(a)    Conditions Applicable To All Insuring Agreements**

(1)    **Additional Premises Or Employees**
If, while this Coverage Section is in force, the **Company** establishes any additional **Premises** or hires additional **Employees**, other than through consolidation or merger with, or purchase or acquisition or assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this Coverage Section. Notice to the **Insurer** of an increase in the number

Certified Document Number: 85243062 - Page 43 of 84

of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the **Policy Period**.

(2)     **Concealment, Misrepresentation Or Fraud**

Notwithstanding Section 10 in the General Terms & Conditions Section, this Coverage Section is void in any case of fraud by the **Company** as it relates to this Coverage Section at any time.  It is also void if the **Company**, at any time, intentionally conceals or misrepresents a material fact concerning:

(i)        this Coverage Section;

(ii)       the property covered under this Coverage Section;

(iii)      the **Company's** interest in the property covered under this Coverage Section; or

(iv)      a claim under this Coverage Section.

(3)     **Duties In the Event of Loss**

After the **Company Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities**, or **Other Property**, the **Company** must:

(i)        notify the **Insurer** as soon as possible if the **Company** has reason to believe that the value of any loss will equal or exceed one-fourth (1/4) of the Deductible Amount specified in Item 5. D of the Declarations

(ii)       if the **Company** has reason to believe that any loss (except for loss covered under Insuring Agreements A and B) involves a violation of law, the **Company** must also notify the local law enforcement authorities.

(iii)      submit to examination under oath at the **Insurer's** request and give the **Insurer** a signed statement of its answers.

(iv)      produce for the **Insurer's** examination all pertinent records.

(v)       give the **Insurer** a detailed, sworn proof of loss within 120 days.

(vi)      cooperate with the **Insurer** in the investigation and settlement of any claim.

With respect to knowledge, belief or **Discovery** referenced in this Condition 6.(a)(3), **Company** shall mean the **Company's** Corporate Compliance, Ethics or Responsibility Officer, General Counsel, any **Employee** of the Risk Management Department or Human Resources Department.

(4)     **Employee Benefit Plans**

(i)        **Employee Benefit Plans** are included in the definition of **Company** solely with respect to Insuring Agreement A.

(ii)       If any **Employee Benefit Plan** is covered jointly with any other entity under this Coverage Section, the **Company** or the plan administrator must select a Limit of Liability for Insuring Agreement A that is sufficient to provide a Limit of Liability for each **Employee Benefit Plan** that is at least equal to that required if each **Employee Benefit Plan** were separately insured.

(iii)      With respect to loss sustained or **Discovered** by any such **Employee Benefit Plan**, Insuring Agreement A is replaced by the following: The **Insurer** will pay for loss of or damage to **Funds** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(iv)      If the **Parent Company** is an entity other than an **Employee Benefit Plan**, any payment the **Insurer** makes for loss sustained by any

CVS FL 12006 PV (1/09)              12

**Employee Benefit Plan** will be made to the **Employee Benefit Plan** sustaining the loss.

(v) If two or more **Employee Benefit Plans** are covered under this Coverage Section, any payment the **Insurer** makes for loss

    a.     sustained by two or more **Employee Benefit Plans**, or

    b.     of commingled **Funds** or **Other Property** of two or more **Employee Benefit Plans**,

resulting directly from an **Occurrence** will be made to each **Employee Benefit Plan** sustaining loss in the proportion that the Limit of Liability, as indicated in Item 4 D. of the Declarations, required for each **Employee Benefit Plan** bears to the total Limit of Liability of all **Employee Benefit Plans** sustaining loss.

(vi) The Deductible Amount as indicated in Item 5 D. of the Declarations and applicable to Insuring Agreement A does not apply to loss sustained by any **Employee Benefit Plan**.

(5) **Examination Of The Company's Books And Records**

The **Insurer** may examine and audit the **Company's** books and records as they relate to this Coverage Section at any time during the **Policy Period** and up to three (3) years thereafter.

(6) **Extended Period To Discover Loss**

The **Insurer** will pay for loss sustained by the **Company** prior to the effective date of cancellation of this Coverage Section, which is **Discovered** by the **Company**:

(i) no later than one (1) year from the effective date of such cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Company**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this Coverage Section, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(ii) no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plans**

(7) **Inspections And Surveys**

(i) The **Insurer** has the right to:

    a.     make inspections and surveys at any time;

    b.     give the **Company** reports on the conditions found; and

    c.     recommend changes.

(ii) The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions undertaken by the **Insurer** relate only to insurability and the premiums charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health and safety of workers or the public. The **Insurer** does not warrant that conditions:

    a.     are safe or healthful; or

    b.     comply with laws, regulations, codes or standards.

Conditions 6.(a)(7)(i) and 6.(a)(7)(ii) above apply not only to the **Insurer** but also to any rating, advisory, rate service or similar organization which makes

Certified Document Number: 85243062 - Page 45 of 84

insurance inspections, surveys, reports or recommendations.

   (8)    **Parent Company**

      (i)    If the **Parent Company**, or any partner, **Member**, or officer of the **Parent Company** or of any **Company** has knowledge of any information relevant to this Coverage Section, that knowledge is considered knowledge of the **Company**.

      (ii)    An **Employee** of the **Parent Company** or of any **Company** covered under this Coverage Section is considered to be an **Employee** of the **Parent Company** and every **Company** covered under this Coverage Section.

      (iii)    If this Coverage Section or any of its Agreements is cancelled as to any **Company**, loss sustained by that **Company** is covered only if it is **Discovered** by the **Company**:

          a.    no later than one (1) year from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Company**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this Coverage Section, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

          b.    no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

      (iv)    The **Insurer** will not pay more for loss sustained by the **Parent Company,** any one or more **Subsidiary** and/or any one or more **Employee Benefit Plan** than the amount the **Insurer** would pay if all such loss had been sustained only by the **Parent Company** or only one **Subsidiary**, or only one **Employee Benefit Plan**.

      (v)    Payment by the **Insurer** to the **Parent Company** for loss sustained by any **Company**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

   (9)    **Liberalization**

If the **Insurer** adopts any revision that would broaden the coverage under this Coverage Section without additional premium within forty-five (45) days prior to or during the **Policy Period**, the broadened coverage will immediately apply to this Coverage Section.

   (10)    **Loss Sustained During Prior Insurance Issued By The Insurer Or Any Affiliate**

      (i)    Loss Sustained Partly During This Coverage Section and Partly During Prior Insurance

If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place:

          a.    partly during the **Policy Period**; and

          b.    partly during the **Policy Period(s)** of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Company** or any predecessor in interest;

and this Coverage Section became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss sustained by the **Company** during this **Policy Period**. The **Insurer** will then settle the remaining amount of loss sustained by the **Company** during the policy period(s) of the prior insurance.

(ii) Loss Sustained Entirely During Prior Insurance

If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place entirely during the policy period(s) of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Company** or any predecessor in interest, the **Insurer** will pay for the loss provided:

a. this Coverage Section became effective at the time of cancellation of the prior insurance; and

b. the loss would have been covered under this Coverage Section had it been in effect at the time of the **Occurrence**.

(iii) In settling loss subject to this Condition:

a. the most the **Insurer** will pay for the entire loss is the highest single Limit of Liability applicable during the period of loss, whether such limit was written under this Coverage Section or was written under the prior insurance issued by the **Insurer**.

b. the **Insurer** will apply the applicable Deductible Amount shown in Item 5 D. of the Declarations to the amount of loss sustained under the **Policy Period**. If no loss was sustained under the **Policy Period**, the **Insurer** will apply the Deductible Amount shown in Item 5 D. of the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount, provided in Item 5 D. of the Declarations, is larger than the amount of loss sustained under this Coverage Section, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance. The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

(iv) The following examples demonstrate how the **Insurer** will settle losses subject to this Condition:

**EXAMPLE NO. 1:**

The Company sustained a covered loss of $10,000 resulting directly from an occurrence taking place during the terms of Policy **A** and Policy **B.**

### POLICY A

The current policy. Written at a limit of liability of $50,000 and a deductible amount of $5,000.

### POLICY B

Issued prior to Policy **A.** Written at a limit of liability of $50,000 and a deductible amount of $5,000.

The amount of loss sustained under Policy A is $2,500 and under Policy B is $7,500.

The highest single limit of liability applicable to this entire loss is $50,000 written under Policy **A.** The Policy **A** deductible amount of $5,000 applies. The loss is settled as follows:

CVS FL 12006 PV (1/09)            15

1.  The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount the Insurer will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00).

2.  The **remaining** amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining deductible amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most the Insurer will pay for this loss is $5,000.

## EXAMPLE NO. 2:

The Company sustained a covered loss of $250,000 resulting directly from an occurrence taking place during the terms of Policy **A** and Policy **B**.

### POLICY A

The current policy. Written at a limit of liability of $125,000 and a deductible amount of $10,000.

### POLICY B

Issued prior to Policy **A**. Written at a limit of liability of $150,000 and a deductible amount of $25,000.

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B** is $75,000.

The highest single limit of liability applicable to this entire loss is $150,000 written under Policy **B**. The Policy **A** deductible amount of $10,000 applies. The loss is settled as follows:

1.  The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount the Insurer will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000 which is greater than the $125,000 policy limit.

2.  The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount the Insurer will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most the Insurer will pay for this loss is $150,000.

## EXAMPLE NO. 3:

The Company sustained a covered loss of $2,000,000 resulting directly from an occurrence taking place during the terms of Policies **A, B, C** and **D**.

### POLICY A

The current policy. Written at a limit of liability of $1,000,000 and a deductible amount of $100,000.

### POLICY B

Issued prior to Policy **A**. Written at a limit of liability of $750,000 and a deductible amount of $75,000.

### POLICY C

Certified Document Number: 85243062 - Page 48 of 84

Issued prior to Policy **B.** Written at a limit of liability of $500,000 and a deductible amount of $50,000.

**POLICY D**

Issued prior to Policy **C.** Written at a limit of liability of $500,000 and a deductible amount of $50,000.

The amount of loss sustained under Policy **A** is $350,000, under Policy **B** is $250,000, under Policy **C** is $600,000 and under Policy **D** is $800,000.

The highest single limit of liability applicable to this entire loss is $1,000,000 written under Policy **A.** The Policy **A** deductible amount of $100,000 applies. The loss is settled as follows:

1. The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount the Insurer will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

2. The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount the Insurer will pay is $250,000 (no deductible is applied).

3. The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount the Insurer will pay is $500,000, the policy limit (no deductible is applied).

4. The Insurer will not make any further payment under Policy **D** as the maximum amount payable under the highest single limit of liability applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most the Insurer will pay for this loss is $1,000,000.

CVS FL 12006 PV (1/09)

(11) **Loss Sustained During Prior Insurance Not Issued By the Insurer Or Any Affiliate**

 (i) If the **Company Discovers** loss during the **Policy Period**, resulting directly from an **Occurrence** taking place during the policy period of any prior cancelled insurance that was issued to the **Company** or to a predecessor in interest by another insurer, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this Coverage Section, provided:

  a. this Coverage Section became effective at the time of cancellation of the prior insurance; and

  b. the loss would have  been covered under this Coverage Section had it been in effect at the time of the **Occurrence**.

 (ii) In settling loss subject to this Condition:

  a. the most the **Insurer** will pay for the entire loss is the lesser of the Limits of Liability as indicated in Item 4.D of the Declarations applicable during the period of loss, whether such limit was written under this Coverage Section or was written under the prior cancelled insurance.

  b. the **Insurer** will apply the applicable Deductible Amount as indicated in Item 5.D of the Declarations to the amount of loss sustained under the prior cancelled insurance.

 (iii) The insurance provided under this section is subject to the following:

  a. If loss covered under this Condition 6.(a)(11) is also partially covered under Condition 6.(a)(10) above, the amount recoverable under this Condition 6.(a)(11) is part of, not in addition to, the amount recoverable under Condition 6.(a)(10) above.

  b. For loss covered under this Condition 6.(a)(11) the amount recoverable under this section is part of, not in addition to, the Limit of Liability as indicated in Item 4 of the Declarations applicable to the loss covered under this Coverage Section and is limited to the lesser of the amount recoverable under:

   i. this Coverage Section as of its effective date; or

   ii. the prior cancelled insurance had it remained in effect.

(12) **Ownership of Property; Interests Covered**

The property covered under this Coverage Section is limited to property:

 (i) that the **Company** owns or leases; or

 (ii) that the **Company** holds for others whether or not the **Company** is legally liable for the loss of such property.

However, this Coverage Section is for the **Company's** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this Coverage Section must be presented by the **Company**.

(13) **Records**

The **Company** must keep records of all property covered under this Coverage Section so the **Insurer** can verify the amount of any loss.

(14) **Recoveries**

Any recoveries, whether effected before or after any payment under this Coverage Section, whether made by the **Insurer** or the **Company**, shall be applied net of the expense of such recovery:

Certified Document Number: 85243062 - Page 50 of 84

(i)    first, to the **Company** in satisfaction of the **Company's** covered loss in excess of the amount paid under this Coverage Section;

(ii)    second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Company's** claim;

(iii)    third, to the **Company** in satisfaction of any Deductible Amount as indicated in Item 5 of the Declarations; and

(iv)    fourth, to the **Company** in satisfaction of any loss not covered under this Coverage Section.

Recoveries do not include any recovery:

(i)    from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

(ii)    of original **Securities** after duplicates of them have been issued.
.

(15)  **Transfer Of The Company's Rights And Duties Under This Coverage Section**
The **Company's** rights and duties under this Coverage Section may not be transferred without the **Insurer's** written consent.

(16)  **Transfer Of The Company's Rights Of Recovery Against Others To The Insurer**
The **Company** must transfer to the **Insurer** all of its rights of recovery against any person or organization for any loss the **Company** sustained and for which the **Insurer** has paid or settled. The **Company** must also do everything necessary to secure those rights and do nothing after loss to impair them.

(17)  **Valuation-Settlement**

(i)    The value of any loss for purposes of coverage under this Coverage Section shall be determined as follows:

(a)    loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Company's** option, pay for loss of **Money** issued by any country other than the United States of America:

1.    At face value in the **Money** issued by that country; or

2.    In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(b)    loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at its option:

1.    pay the market value of such **Securities** or replace them in kind, in which event the **Company** must assign to the **Insurer** all the **Company's** rights, title and interest in and to those **Securities**; or

2.    pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(i)    market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

(ii)    the Limit of Liability applicable to the **Securities**.

CVS FL 12006 PV (1/09)

(c)    loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

1.    the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

2.    the amount the **Company** actually spends that is necessary to repair or replace the lost or damaged property; or

3.    the Limit of Liability applicable to the lost or damaged property.

With regard to Conditions 6.(a)(17)(i)(c)(1) through 6.(a)(17)(i)(c)(3), the **Insurer** shall not pay on a replacement cost basis for any loss or damage:

i.    until the lost or damaged property is actually repaired or replaced; and

ii.    unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

(ii)    the **Insurer** will, at the **Company's** option, settle loss or damage to property other than **Money**:

(a)    in the **Money** of the country in which the loss or damage occurred; or

(b)    in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

(iii)    Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

**(b)**    **Conditions Applicable To Insuring Agreement A**

(1)    Termination As To Any Employee

This Insuring Agreement terminates as to any **Employee**:

a.    as soon as the **Company's** Corporate Compliance, Ethics or Responsibility Officer, General Counsel, any **Employee** of the Risk Management Department or Human Resources Department, or, any corporate Vice President or above not in collusion with the **Employee**; or

b.    as soon as any of the **Company's** partners, **Managers**, **Members**, officers, directors, or trustees not in collusion with the **Employee**;

learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after the **Employee** became employed by the **Company**.

c.    on the date specified in a notice mailed to the **Parent Company**. That date will be at least thirty (30) days after the date of mailing.  The **Insurer** will mail or deliver its notice to the **Parent Company's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**(c)**    **Conditions Applicable To Insuring Agreement B**

(1)    Deductible Amount

The Deductible Amount as provided in Item 5.D of the Declarations does not apply to legal expenses paid under Insuring Agreement B.

(2)    Electronic And Mechanical Signatures

Certified Document Number: 85243062 - Page 52 of 84

The **Insurer** will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

(3)   Proof Of Loss

The **Company** must include with its proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**(d)   Conditions Applicable To Insuring Agreements D and E**

(1)   Armored Motor Vehicle Companies

    a.   Under Insuring Agreement E**,** the **Insurer** will only pay for the amount of loss the **Company** cannot recover:

        (i)   under the **Company's** contract with the armored motor vehicle company; and

        (ii)   from any insurance or indemnity carried by, or for the benefit of customers of the armored motor vehicle company.

(2)   Special Limit of Liability For Specified Property

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to:

    a.   precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

    b.   manuscripts**,** drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**(e)   Conditions Applicable To Insuring Agreement F**

(1)   Special Limit of Liability For Specified Property

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

Certified Document Number: 85243062 - Page 53 of 84

CVS FL 12006 PV (1/09)

Endorsement No.:  1
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**OFAC EXCLUSION**
**(all Coverage Sections)**

It is understood and agreed that Clause 3, EXCLUSIONS, of all applicable Coverage Sections is
amended by adding the following exclusion:

This policy shall not cover any **Loss** in connection with any **Claim** in the event that
such coverage would not be in compliance with any United States of America
economic or trade sanctions, laws or regulations, including but not limited to the U.S.
Treasury Department's Office of Foreign Assets Control, or any similar foreign,
federal, state or statutory law or common law.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10005 PPVNP (07/08)

Endorsement No.:  2
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## ADD FULL NUCLEAR EXCLUSION

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability
Coverage Section is amended by adding the following exclusion:

    This policy shall not cover any **Loss** in connection with any **Claim** alleging, arising out
    of, based upon or attributable to nuclear fission, nuclear fusion, radioactive contamination
    or the hazardous properties of any nuclear materials.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10013 PPVNP (03-08)

Endorsement No.:  3
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## TEXAS AMENDATORY ENDORSEMENT

This endorsement modifies insurance coverage provided under the RESOLUTE PORTFOLIO FOR PRIVATE COMPANIES INSURANCE POLICY.

COVERAGE PART:  GENERAL TERMS AND CONDITIONS SECTION

It is understood and agreed:

A. The fifth and sixth paragraphs of Clause **3. LIMITS OF LIABILITY** are deleted and replaced by the following:

If any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this Policy as respects the applicable Coverage Section(s) will be completely fulfilled and the **Insurer** will have no further obligations under this policy of any as respects the applicable Coverage Section(s).

Any payment of **Loss** under any Aggregate Limit of Liability as set forth in Item 4 A. or 4 B. of the Declarations shall reduce and may exhaust the Aggregate Policy Limit of Liability as set forth in Item 4 C. of the Declarations.  If the Aggregate Policy Limit of Liability is exhausted by the payment of such **Loss**, the **Insurer** will have no further obligations of any kind as respects this policy.

B. Clause **6. DEFENSE OF CLAIM AND SETTLEMENT** is amended by the following:

The **Insurer** shall provide written notice to the **Insured** of an initial offer to settle or compromise a **Claim** against the **Insureds**, not less than ten (10) days after the date on which the offer to settle or compromise is made, unless the **Insured** advised the **Insurer** of such initial offer to settle or compromise the **Claim**.  The **Insurer** shall also provide written notice to the **Insured** of the settlement of a **Claim** against an **Insured**, not less than thirty (30) days after the settlement.

C. Clause **8. DISCOVERY CLAUSE** is deleted and replaced by the following:

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall receive, without payment of an additional premium, a Discovery Period of thirty (30) days following the effective date of such non-renewal, termination or **Organizational Change**. This thirty (30) day period is called the "Automatic Discovery Period" in this policy.

With respect to all Coverage Sections, except the Crime and Fidelity Coverage Section, if the **Company** or the **Insurer** refuses to renew one or more Coverage Sections of this policy, or if this policy is terminated by the **Insurer** for any reason (except for non-payment of premium), or if an **Organizational Change** as defined in Clause 13 occurs, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six years following the effective date of the Automatic Discovery Period. In the event of the non-renewal of one or more Coverage Sections of this policy, the **Insured** may purchase a Discovery Period solely as respects the Coverage Section(s) that has been non-renewed.

CVS FL 10409 PV (11/08)

Certified Document Number: 85243062 - Page 56 of 84

The **Insured's** right to purchase a Discovery Period shall lapse unless written notice of election to purchase such Discovery Period and the additional premium for such Discovery Period is received by the **Insurer** or its authorized agent within sixty (60) days after such non-renewal, termination or **Organizational Change**. The additional premium for a Discovery Period of one or two years is set forth in Item 8 of the Declarations and shall be determined by multiplying the applicable percentage set forth in Item 8 of the Declarations by the premium for each applicable Coverage Section(s) as set forth in Item 7 of the Declarations. The additional premium for a Discovery Period of more than two years shall be determined by the **Insurer**.

During such Automatic Discovery Period and such **Discovery Period**, the **Insured** may provide the **Insurer** with written notice, pursuant to Clause 5 of this policy, of **Claims** made against an **Insured** solely with respect to **Wrongful Acts** occurring prior to the effective date of the non-renewal or termination of the policy or the effective date of the **Organizational Change** and otherwise covered by this policy.

The Limit of Liability for the Automatic Discovery Period and, if purchased, the Discovery Period, shall be part of, and not in addition to, the applicable Limits of Liability set forth in Item 4 of the Declarations.

The Discovery Period premium shall be fully earned at the inception of the Discovery Period. The Discovery Period is non-cancellable.

D.  The first paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** is amended by the addition of the following:

The customary short rate return premium shall be calculated by multiplying the pro rata unearned premium by ninety percent (90%).

E.  The second paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** is amended by the addition of the following:

The notice of cancellation shall state the reason for cancellation. The **Insurer** shall not cancel this policy based solely on the fact that the **Insured** is an elected official.

F.  The last paragraph of Clause **12. CANCELLATION AND NON RENEWAL CLAUSE** shall be amended by the addition of the following:

The notice of non-renewal shall state the reason for non-renewal. If notice of non-renewal is delivered or mailed later than the sixtieth (60th) day prior to the expiration of the **Policy Period**, the policy's coverage shall remain in effect until the sixty-first (61st) day after the date on which the notice is delivered or mailed. Earned premium for any period of coverage that extends beyond the expiration of the **Policy Period** shall be computed pro rata based on the policy's current rate. If this policy is so extended, such period of extended coverage shall be part of and not in addition to the **Policy Period**. The **Insurer** shall not refuse to renew this policy based solely on the fact that the **Insured** is an elected official.

G.  The third sentence of Clause **13. ORGANIZATIONAL CHANGES** is deleted and replaced by the following:

This policy shall be non-cancellable upon the effective time of the **Organizational Change**.

CVS FL 10409 PV (11/08)

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

Certified Document Number: 85243062 - Page 58 of 84

CVS FL 10409 PV (11/08)

Endorsement No.:  4
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## TEXAS AMENDATORY ENDORSEMENT

This endorsement modifies insurance coverage provided under the RESOLUTE PORTFOLIO FOR
PRIVATE COMPANIES INSURANCE POLICY.
COVERAGE PART:  DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION

It is understood and agreed:

A. Paragraph (i)(ii) of Clause **3. EXCLUSIONS** is amended by inserting the word "express" before the
word
"approval".

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10550 PV (7/09)

Endorsement No.:  5
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

# IMPORTANT NOTICE

To obtain information or make a complaint:

You may call Starr Indemnity and Liability Company's toll-free telephone number for information (including information regarding claims) or to make a complaint at:

**866-519-2522**

You may also write the Insurer at:

***Starr Indemnity and Liability Company***
***Attn: Financial Lines Department***
***399 Park Avenue***
***8th Floor***
***New York, NY  10022***

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the Texas Department of Insurance:

**P.O. Box 149104**
**Austin, TX 78714-9104**
**Fax: (512) 475-1771**
**Web: http://www.tdi.state.tx.us**
**Email: ConsumerProtection@tdi.state.tx.us**

**PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a Claim you should first contact Starr Indemnity and Liability Company.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY**: This notice is for information only and does not become a part or condition of the attached document.

Certified Document Number: 85243062 - Page 60 of 84

CVS FL 10407 PPVNP (10/08)

Endorsement No.:  6
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**AMEND DECLARATIONS PAGE:**
**CHANGE DISCOVERY PERIOD PREMIUM**

It is understood and agreed that Item 8 of the Declarations, DISCOVERY PERIOD, is deleted in its entirety and replaced with the following:

**ITEM 8:  DISCOVERY PERIOD**

    A.   One Year:  **100% of the applicable premium**

    B.   Two to Six Years:  **premium to be determined**

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10737 PPVNP (3/10)

Endorsement No.:  7
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## RELIANCE ENDORSEMENT
### (other applications)

In granting coverage under this policy, it is understood and agreed that the **Insurer** has relied upon the statements and representations contained in all applications, together with attachments and any other materials submitted for this policy (including all such previous policy applications, and their attachments and materials, for which this policy is a renewal or succeeds in time), as being accurate and complete. It is further understood and agreed that the **Insureds** represent to the **Insurer** that the statements and representations made in such application(s) were accurate on the date such statements and representations were so given. All such statements and representations in such application(s) are the basis of this policy and are to be considered as incorporated into this policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10036 PPVNP (1/09)

Endorsement No.:  8
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## STATE AMENDATORY INCONSISTENCY

It is understood and agreed that the General Terms & Conditions Section is amended by adding the following:

> It is understood and agreed that in the event that there is an inconsistency between a state amendatory attached to this policy and any other term or condition of this policy, then where permitted by law, the **Insurer** shall apply those terms and conditions of either the amendatory or the policy which are more favorable to the **Insured**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10018 PPVNP (07/08)

Endorsement No.:  9
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND CANCELLATION CLAUSE – INSURER RATING DOWNGRADE

It is understood and agreed that Clause 12. CANCELLATION AND NON RENEWAL CLAUSE, of the General Terms and Conditions Coverage Section is amended by adding the following at the end:

> Notwithstanding anything to the contrary herein, this policy may also be cancelled by the **Parent Company** immediately upon written notice to the Insurer by the **Parent Company** if the **Insurer's** financial strength rating for AM Best falls below "A-" and the **Insurer** shall return the customary pro-rata unearned proportion of the premium.

**Authorized Representative**

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

CVS FL 10995 PPV (11/10)

1

Endorsement No.:  10
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## 100% ALLOCATION DEFENSE COSTS

I. It is understood and agreed that Clause 7. ALLOCATION of the General Terms & Conditions
Section is deleted and replaced by the following:

### 7.  ALLOCATION

(a) If both **Loss** covered under this policy and loss not covered under this policy
are incurred by the **Insureds** on account of any **Claim** because such **Claim**
against the **Insureds** includes both covered and non-covered matters and/or
parties, then coverage under this Coverage Section with respect to such **Claim**
shall apply as follows:
(i) **Defense Costs**: One hundred percent (100%) of reasonable and
necessary **Defense Costs** incurred by the **Insured** on account of such
**Claim** will be considered covered **Loss**; and
(ii) **Loss** other than **Defense Costs**: All remaining loss incurred by the
**Insured** on account of such **Claim** shall be allocated by the **Insurer**
between covered **Loss** and non-covered loss based on the relative legal
and financial exposures of the parties to such matters and, in the event of
a settlement in such **Claim**, also based on the relative benefits to the
**Insureds** from such settlement.

(b) If an allocation of **Loss** cannot be agreed to by the **Insurer** and the **Insured**:
(i) the **Insurer** shall pay those amounts which it believes to be fair and equitable
until an amount shall be agreed upon or determined pursuant to the provisions of
this policy; and
(ii) there will be no presumption of allocation of **Loss** in any arbitration, suit or
other proceeding.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10837 PPVNP (4/10)

Endorsement No.: 11
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

## ADD LIBERALIZATION CLAUSE
(General Terms and Conditions Section)

It is understood and agreed that the General Terms and Conditions Section is amended by adding the following at the end:

LIBERALIZATION CLAUSE

In the event that the **Insurer** shall begin selling on an admitted basis in the state indicated in Item 1 of the Declarations, either (1) a new private company primary policy form, or coverage section, sold as a replacement of or alternative to this; or (2) an enhancement of coverage endorsement to this policy form, which is to be made available to all **Insureds** and for which no additional premium is required, then the **Parent Company** shall have the right to such new policy or such new coverage enhancement endorsement subject to all underwriting information or particulars as the **Insurer** may require for such new policy, coverage section or enhanced coverage.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10977 PV (9/10)

Endorsement No.:  12
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**AMEND DEFENSE OF CLAIM AND SETTLEMENT CLAUSE – 80% APPLIES TO DEFENSE
COSTS AND 10% RETENTION REDUCTION FOR CONSENT**

It is understood and agreed that the General Terms & Conditions Section is amended by deleting the sixth
paragraph of Clause 6, DEFENSE OF CLAIM AND SETTLEMENT, in its entirety and replacing with
the following:

> The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's**
> consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the
> **Insurer** deems appropriate.

> In the event the **Insured** refuses to consent to a settlement acceptable to the claimant in
> accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of
> such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled the **Claim**;
> plus (2) eighty percent (80%) of covered **Loss** in excess of the amount for which the **Insurer**
> could have settled the **Claim**. In the event the **Insured** consents to such settlement recommended
> by the **Insurer**, then the **Insured's** applicable Retention Amount stated in Item 5. of the
> DECLARATIONS shall be reduced by ten (10%) percent for such **Claim**. However, in no event
> shall the **Insurer's** liability exceed the applicable Limit of Liability as set forth in Item 4. of the
> Declarations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10771 PV 4/10                                                   1

Endorsement No.: 13
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

### AMEND REPRESENTATIONS AND SEVERABILITY-TOP 3 IMPUTE TO COMPANY
(General Terms and Conditions Section)

It is understood and agreed that Clause 10. REPRESENTATIONS AND SEVERABILITY of the General Terms and Conditions Section is deleted in its entirety and replaced by the following:

### 10. REPRESENTATIONS AND SEVERABILITY

It is agreed that the **Insurer** has relied upon the information contained in the **Application**, as applicable to each Coverage Section, in issuing this policy. In regard to the statements, warranties, representations and information contained in the **Application**, no knowledge of any **Insured** shall be imputed to any other **Insured** for the purpose of determining whether coverage is available under this policy for any **Claim** made against such **Insured**. However, the knowledge possessed by any **Insured Person** who is a past or current chief executive officer, chief financial officer, or chief operating officer of the **Company** shall be imputed to the **Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10878 PVP (5/10)

Endorsement No.:  14
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND SUBROGATION FINAL ADJUDICATION ENDORSEMENT

It is understood and agreed that Clause 19. SUBROGATION of the General Terms & Conditions Section is deleted in its entirety and replaced by the following:

### 19.      SUBROGATION

In addition to any right of subrogation existing at law, in equity or otherwise, in the event of any payment by the **Insurer** under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured(s)'** rights of recovery; provided, however, that the **Insurer** shall not exercise that right until the legal matter underlying the **Claim** upon which such payment is based is subject to a final judgment or adjudication. The **Insured(s)** shall execute all papers required (including those documents necessary for the **Insurer** to bring suit or other form of proceeding in their name) and do everything that may be necessary to pursue and secure such rights.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10834 PPV (4/10)

Endorsement No.: 15
This endorsement, effective: November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to: AHG Properties, LLC
By: Starr Indemnity & Liability Company

### AMEND CONDUCT EXCLUSIONS – ADD NON-APPEALABLE, DELETE IMPROPER & IMPUTATION TO COMPANY CEO & CFO ONLY
(Directors & Officers Liability Coverage Section)

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is amended by deleting Exclusions (a), (b) and (c) and replacing them with the following:

This policy shall not cover any **Loss** in connection with any **Claim**:

(a)  arising out of, based upon or attributable to the gaining of any profit or advantage or illegal remuneration if a final non-appealable judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

(b)  arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an **Insured** if a final non-appealable judgment or adjudication establishes that such act or violation occurred;

(c)  arising out of, based upon or attributable to the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and any amendments thereto or similar provisions of any state statutory law if a final non-appealable judgment or adjudication establishes that a violation of Section 16(b) occurred;

In determining the applicability of Exclusions (a), (b) and (c) the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured** shall not be imputed to any other **Insured** in respect of the coverage afforded under Clause I. Insuring Agreements A. and **B.**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current chief executive officer, or chief financial officer of the **Company** shall be imputed to the **Company** in respect of the coverage afforded under Clause I. Insuring Agreements C.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

Certified Document Number: 85243062 - Page 70 of 84

CVS FL 10871 PV (5-10)

Endorsement No.:  16
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company


### ANTI - TRUST EXCLUSION – APPLIES TO ENTITY ONLY (D&O Coverage Section)

It is understood and agreed that Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is amended by adding the following exclusion:

> This policy shall not cover any **Loss** in connection with any **Claim** alleging, arising out of, based upon or attributable to any violation of any law, whether statutory, regulatory or common, as respects any of the following: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; provided, however, that this exclusion shall apply only to the **Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10093 PV (07/08)

Endorsement No.:  17
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## AMEND CONTRACT EXCLUSION
### (D&O Coverage Section)

It is understood and agreed that Exclusion (e) of Clause 3, EXCLUSIONS, of the Directors & Officers Liability Coverage Section is deleted and replaced by the following exclusion:

(e)  based upon, arising from, or in consequence of any actual or alleged liability of any **Insured** under any express contract or agreement, except to the extent that such **Insured** would have been liable in the absence of such contract or agreement;

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**Authorized Representative**

CVS FL 10087 PV (07/08)

Endorsement No.:  18
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**AMEND DEFINITION OF COMPANY**
**(General Terms & Conditions)**

It is understood and agreed that Definition (c), **"Company"**, of the General Terms & Conditions Section is amended to include the following:

ZG Real Estate Holdings, Ltd.
AHG-C Hardy Residential, LP.
ZG Real Estate Management Group, Inc.
ZG Investment Properties, LTD.
Eastwood Terrace and Oakhill Plaza, LLC.
Gulf Coast Arms GP, LLC.
Gulf Coast Arms, Ltd.

It is further understood and agreed that this endorsement shall apply solely to the following Coverage Section(s):

Directors & Officers Liability

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

Certified Document Number: 85243062 - Page 73 of 84

CVS FL 10187 PPV (07/08)

Endorsement No.:  19
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**AMEND DEFINITION OF COMPANY**
**(General Terms & Conditions)**

It is understood and agreed that Definition (c), **"Company"**, of the General Terms & Conditions Section is amended to include the following:

Zieben Homes GP
Zieben Homes Ltd
Estate of Herbert Zieben

It is further understood and agreed that this endorsement shall apply solely to the following Coverage Section(s):

Directors & Officers Liability
Crime & Fidelity

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.



**AUTHORIZED REPRESENTATIVE**

CVS FL 10187 PPV (07/08)

Endorsement No.:  20
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

## LOSS PAYABLE

### SCHEDULE

| |
|---|
| **Name Of Loss Payee:** <br> Hunt Capital Partners Tax Credit Fund 2011-3, LP ISAOA ATIMA <br> c/o Alden Pacific Asset Management LLC <br><br> **Address Of Loss Payee:** <br> 1225 17th Street Suite 1400 <br> Denver CO 80202 <br> ATTN: Insurance Monitoring |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

It is understood and agreed that:

1.  The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company.**

2.  This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

    Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10923 PV (7/10)

Endorsement No.:  21

This endorsement, effective:  November 3, 2016

(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)

Form a part of Policy No.: 1000057336161

Issued to:  AHG Properties, LLC

By: Starr Indemnity & Liability Company

## LOSS PAYABLE

### SCHEDULE

**Name Of Loss Payee:**

FNBC Leasing Corporation

C/O JPMorgan Capital Corporation, Housing Investments

**Address Of Loss Payee:**

21 S. Clark 12th Floor

Chicago, IL 60603-0502

Attn: Jon Zywiciel

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

It is understood and agreed that:

1.  The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company.**

2.  This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

    Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10923 PV (7/10)

Endorsement No.:  22
This endorsement, effective:  November 3, 2016
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Form a part of Policy No.: 1000057336161
Issued to:  AHG Properties, LLC
By: Starr Indemnity & Liability Company

**LOSS PAYABLE**

**SCHEDULE**

| |
|---|
| **Name Of Loss Payee:**<br>Greystone Funding Corporation<br>Its successors and/or assigns ATIMA<br><br><br>**Address Of Loss Payee:**<br>419 Belle Air Lane<br>Warrenton, VA  20186 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

It is understood and agreed that:

1. The **Parent Company** agrees that any loss payable under this insurance shall be paid to the Loss Payee shown in the Schedule as its interests may appear and any such payment shall constitute payment to the **Parent Company**. The **Insurer** agrees that it will make all such payments to the Loss Payee, and the **Insurer** will not make any payment solely to the **Parent Company** unless the **Insurer** receives a request in writing from the Loss Payee to make such payment to the **Parent Company.**

2. This insurance is for the **Parent Company** benefit only. It provides no rights or benefits to any other person or organization, including the Loss Payee, other than to receive payment for loss as set forth in this endorsement.

   Any claim for loss that is covered under this insurance must be presented by the **Parent Company**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10923 PV (7/10)

Certified Document Number: 85243062 - Page 77 of 84



## Starr Surplus Lines Insurance Company

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

## RESOLUTE PORTFOLIO℠
### For Private Companies
(Inclusive of Directors & Officers Liability, Employment Practices Liability, Fiduciary Liability and Crime & Fidelity)
**INSURANCE RENEWAL APPLICATION-MIDWEST**

**NOTICE: APPLICABLE TO ALL COVERAGE SECTIONS EXCEPT CRIME & FIDELITY, THE INSURANCE POLICY FOR WHICH THIS RENEWAL APPLICATION IS SUBMITTED PROVIDES CLAIMS-MADE AND REPORTED COVERAGE, WHICH GENERALLY APPLIES ONLY TO CLAIMS FIRST MADE, AGAINST THE INSUREDS DURING THE POLICY PERIOD OR ANY DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS THEREIN.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS UNDER THE LIABILITY COVERAGE SECTIONS OF THIS POLICY SHALL BE REDUCED AND MAY BE EXHAUSTED BY DEFENSE COSTS.  THE INSURER IS NOT OBLIGATED TO PAY ANY LOSS, INCLUDING DEFENSE COSTS, AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED BY PAYMENT OF LOSS, INCLUDING DEFENSE COSTS.**

**NOTICE TO MINNESOTA APPLICANTS: APPLICABLE TO ALL COVERAGE SECTIONS EXCEPT CRIME & FIDELITY, THE POLICY FOR WHICH THIS APPLICATION IS SUBMITTED IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS SUBJECT TO ITS TERMS.  THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD, PROVIDED SUCH CLAIM IS REPORTED TO THE INSURER OR THE INSURER'S AGENT OR BROKER IN ACCORDANCE WITH THE TERMS OF THE POLICY.  THIS MEANS THAT ONLY CLAIMS ACTUALLY MADE DURING THE POLICY PERIOD ARE COVERED UNLESS COVERAGE FOR A DISCOVERY PERIOD IS PURCHASED.  IF A DISCOVERY PERIOD IS NOT MADE AVAILABLE TO THE INSURED, THE INSURED RISKS HAVING GAPS IN COVERAGE WHEN SWITCHING FROM ONE COMPANY TO ANOTHER.  MOREOVER, EVEN IF SUCH REPORTING PERIOD IS MADE AVAILABLE TO THE INSURED, THE INSURED MAY STILL BE PERSONALLY LIABLE FOR CLAIMS REPORTED AFTER THE PERIOD EXPIRES.  CLAIMS-MADE POLICIES MAY NOT PROVIDE COVERAGE FOR WRONGFUL ACTS COMMITTED BEFORE A FIXED RETROACTIVE DATE.  RATES FOR CLAIM-MADE POLICIES ARE DISCOUNTED IN THE EARLY YEARS OF A POLICY, BUT INCREASE STEADILY OVER TIME.  AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY. PLEASE READ THIS POLICY CAREFULLY.**

**NOTICE:  APPLICABLE TO ALL COVERAGE SECTIONS AND JURISDICTIONS:  PLEASE READ THE ENTIRE RENEWAL APPLICATION CAREFULLY, BEFORE SIGNING.**

Certified Document Number: 85243062 - Page 78 of 84

**Starr Surplus Lines Insurance Company**

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

## I.  GENERAL INFORMATION

1.  Name of Company: _____
2.  Address: _____
    City: _____ State: _____ Zip Code: _____
3.  Nature of Business: _____

4.  Indicate below the Resolute Portfolio$^{SM}$ coverages for which the company seeks renewal.

    ☐ Directors & Officers Liability     ☐ Fiduciary Liability
    ☐ Employment Practices Liability    ☐ Crime and Fidelity

5.  Number of Employees (including Subsidaries):

    Total: _____  Total US: _____  Full Time: _____  Part Time: _____

6.  Company's total revenues as of the most recent fiscal year end:   $ ████████████
7.  Company's total assets as of the most recent fiscal year end:   $ ████████████
8.  Cash flow from operations as of the most recent fiscal year end:   $ ███████████

9.  Is the Company in compliance with all debt and /or loan covenants?   ☐ Yes ☐ No
    If the answer is no, please attach a full explanation.

10. In the next 12 months is the Company contemplating (or has the Company completed within the last year) any actual or proposed merger, acquisition, or divestment, any registration for a public offering or a private placement of securities, any location, facility or office closings, consolidations or layoffs or any reorganization or arrangement with creditors under federal or state law? ☐ Yes ☐ No  If the answer is yes, please attach a full explanation.

## II.  DIRECTORS & OFFICERS LIABILITY COVERAGE SECTION

1.  Over the past 12 months, has there been any change to the board of directors, executive officers or senior management of the Company?   ☐ Yes ☐ No

2.  Has there been any change in the Company's ownership structure within the last twelve months? ☐ Yes ☐ No
    If the answer is yes, please attach a full description of ownership structure.

3.  Please list all non-director and non-officer shareholders who directly or beneficially hold common stock and the percentage owned by each (if none, so indicate)

    Non director or non officer shareholders:     % of voting shares owned:
    _____    _____ %
    _____    _____ %

## III.  EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION

1.  Within the last year has the Company updated its employment practices handbook, or human resources policies and procedures or department?   ☐ Yes ☐ No
    If the answer is yes, please attach a copy of updated materials and a description of changes.

2.  Number of Employees who have left the Company over the past 12 months:

    Voluntary: _____  Involuntary: _____

Certified Document Number: 85243062 - Page 79 of 84

CVS FL 12009 PV (3-10)        2

**Starr Surplus Lines Insurance Company**

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

## IV.  FIDUCIARY LIABILITY COVERAGE SECTION

1.  Please complete the following information regarding the Company's employee pension benefits plan

| Pension Benefit Plan Name | Plan assets (current year) | Defined Contribution (DC) Or Defined Benefit (DB) | DB Only -Amount underfunded (only if more than 25%) | Number of Participants |
|---|---|---|---|---|
| | | | | |
| | | | | |

2.  In the next 12 months is the Company contemplating (or has the Company completed within the last year) merging or terminating any plan(s)?   ☐ Yes  ☐ No
    If yes, please attach an explanation.

## V.  CRIME

1.  Does the Company:

    a.  Allow the employees who reconcile the monthly bank statement to also sign checks, handle deposits and have access to check signing machines or signature plates?   ☐ Yes  ☐ No
    b.  Have procedures in place to verify the existence and ownership of all new vendors prior to adding them to the authorized master vendor list?   ☐ Yes  ☐ No
    c.  Verify invoices against a corresponding purchase order, receiving report and the authorized master vendor list prior to issuing payment?   ☐ Yes  ☐ No

2.  How often does the Company perform a physical inventory check of stock and equipment?   $_____

3.  What is the limit above which the Company requires countersignature for their checks?   $_____

## VI. NOTICES TO COMPANY

The undersigned authorized representative of the Company declares that the statements set forth herein are true, and reasonable effort has been made to obtain sufficient information from all persons proposed for this insurance to facilitate the accurate completion of the Renewal Application. The undersigned authorized representative agrees that if the information supplied on this Renewal Application changes between the date of this Renewal Application and the effective date of the insurance, he/she will in order for the information to be accurate on the effective date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations or agreement to bind insurance

The submission of this Renewal Application by the Company to the Insurer or signing of this Renewal Application by the Company does not obligate the Insurer to issue the insurance. It is agreed that this Renewal Application shall be the basis of the contract if a policy is issued and shall be deemed to be attached to, incorporated into and become part of, the policy. However, this paragraph does not apply in the state of Wisconsin.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS RENEWAL APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS RENEWAL APPLICATION AND MADE A PART HEREOF.  NOTHING CONTAINED HEREIN OR INCORPORATED HEREIN BY REFERENCE SHALL CONSTITUTE NOTICE OF A CLAIM OR

Certified Document Number: 85243062 - Page 80 of 84

**Starr Surplus Lines Insurance Company**

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

POTENTIAL CLAIM SO AS TO TRIGGER COVERAGE UNDER ANY CONTRACT OF INSURANCE. PROVIDED, HOWEVER, THIS PARAGRAPH DOES NOT APPLY IN THE STATE OF WISCONSIN.

NOTICE TO WISCONSIN RESIDENTS: THE SUBMISSION OF THIS RENEWAL APPLICATION BY THE COMPANY TO THE INSURER OR SIGNING OF THIS APPLICATION BY THE COMPANY DOES NOT OBLIGATE THE INSURER TO ISSUE THE INSURANCE. NOTHING CONTAINED HEREIN SHALL CONSTITUTE NOTICE OF A CLAIM OR POTENTIAL CLAIM SO AS TO TRIGGER COVERAGE UNDER ANY CONTRACT OF INSURANCE.  ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS RENEWAL APPLICATION ARE MADE A PART HEREOF PROVIDED THIS RENEWAL APPLICATION AND SUCH MATERIALS ARE ATTACHED TO THE POLICY AT THE TIME OF ITS DELIVERY.

### WARNING

ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT S(HE) IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT MAY BE GUILTY OF INSURANCE FRAUD.

**NOTICE TO ARKANSAS APPLICANTS:**  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

**NOTICE TO LOUISIANA APPLICANTS:**  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO OHIO APPLICANTS**: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**NOTICE TO OKLAHOMA APPLICANTS**: "WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY".

**NOTICE TO TENNESSEE APPLICANTS:**  "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

CVS FL 12009 PV (3-10)                          4

**✦ Starr Surplus Lines Insurance Company**

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

**NOTICE TO TEXAS APPLICANTS:** "ANY PERSON WHO KNOWLINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN STATE PRISON."

**VI. DECLARATION AND SIGNATURE**
THE UNDERSIGNED AUTHORIZED REPRESENTATIVE IS MAKING THE REPRESENTATIONS IN THIS APPLICATION ON BEHALF OF THE COMPANY AND ALL ENTITIES OR PERSONS PROPOSED FOR COVERAGE UNDER THE POLICY.

| DATE | SIGNATURE | TITLE |
|---|---|---|
| 10/26/16 | | Managing Member |
| | | (President, CFO, CEO) |

NOTE:   This Renewal Application must be signed by the President, CFO and/or CEO of the applicant Company acting as the authorized agent of the persons and entity(ies) proposed for this insurance.

If this Renewal Application is completed in Florida, please provide the Insurance Agent's name and license number as designated. If this Renewal Application is completed in Iowa, please provide the Insurance Agent's name only.

**VII. PLEASE ATTACH THE FOLLOWING REQUIRED INFORMATION:**
☐  Most recent CPA prepared financial statements
☐  Most recent CPA Letter to Management and management's response (If this Letter is not issued, so indicate)
☐  Most recent EEO-1 Report (Applicable to Employment Practices Liability coverage only)

| PRODUCER (Insurance Agent or Broker) | INSURANCE AGENCY OR BROKERAGE |
|---|---|
| INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. | AGENT OR BROKER LICENSE NO. |
| ADDRESS OF AGENT OR BROKER (Include Street, City and Zip Code) | |
| E-MAIL ADDRESS OF AGENT OR BROKER | |
| SUBMITTED BY (Insurance Agency) | INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. |
| ADDRESS OF AGENT OR BROKER (Include Street, City and Zip Code) | |

*If this Application is completed in Wisconsin, the following notices apply:*

CVS FL 12009 PV (3-10)                    5

Certified Document Number: 85243062 - Page 82 of 84



**Starr Surplus Lines Insurance Company**

399 Park Ave, New York, NY* Tel (646) 227-6377* Fax (631) 685-6738

- *If any Aggregate Limit of Liability as set forth in Item 4A. or 4B. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this policy as respects the applicable Coverage Section(s) will be completely fulfilled and the **Insurer** will have no further obligations under this policy of any kind as respects the applicable Coverage Section(s) and the premium as respects the applicable Coverage Section(s) as set forth in Item 7 of the Declarations will be fully earned.*

- *If the Aggregate Policy Limit of Liability as set forth in Item 4C. of the Declarations is exhausted by the payment of **Loss**, the **Insurer** will have no further obligations of any kind as respects this policy and the applicable premium set forth in Item 7 of the Declarations will be fully earned.*

- *The Discovery Period premium shall be fully earned at the inception of the Discovery Period.*

- *In the event the policy is canceled by the **Parent Company**, the **Insurer** shall retain the customary short rate proportion of the premium.*

- *This policy shall be non-cancellable and the entire premium shall be deemed fully earned upon the effective time of the **Organizational Change**.*

---

**RESOLUTE PORTFOLIO** SM is a registered service mark owned by C. V. Starr & Co., Inc.

CVS FL 12009 PV (3-10)                                        6

Endorsement No.:        22
This endorsement, effective:        November 3, 2017
(at 12:01 a.m. Standard Time at the address stated in Item 1 of the Declarations)
Forms a part of Policy No.:        1000057336161
Issued to: AHG Properties, LLC
By:        Starr Indemnity & Liability Company

## AMEND POLICY PERIOD

It is understood and agreed that Item 2 of the Declarations, POLICY PERIOD, is deleted in its entirety and replaced with the following:

**ITEM 2:**        **POLICY PERIOD:**        From:   November 3, 2016   To:   November 30, 2017
                                                                    (12:01 a.m. Standard Time at the address stated in Item 1)

All **Claims** made during the **Policy Period** and during the amended or extended **Policy Period** set forth in this endorsement shall be subject to the Limits of Liability set forth in Item 4 of the Declarations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Authorized Representative**

CVS FL 10025 PPVNP (07/08)



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 14, 2019

Certified Document Number:        85243062 Total Pages:  84

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**